**Appeal No. 2022-1514**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

UPL NA INC.,

*Appellant*,

v.

TIDE INTERNATIONAL (USA), INC.,

*Appellee*.

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2020-01113**

# OPENING BRIEF OF APPELLANT UPL NA INC.

Parmanand K. Sharma
Rajeev Gupta
Joshua L. Goldberg
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Maximilienne Giannelli
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
(571) 203-2700

July 18, 2022

*Attorneys for Appellant UPL NA Inc.*

## INDEPENDENT CLAIMS OF U.S. PATENT 6,743,685

1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w of an insecticidally active compound of the following formula . . . wherein said insecticidally active compound is Acephate;

(ii) 0.1-5.0% w/w a dispersing agent;

(iii) 0.1-3% w/w a wetting agent;

(iv) 0.01-0.08% w/w an antifoaming agent;

(v) 0.01-1% w/w a stabilizer and

(vi) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

7. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w [acephate];

(ii) 0.1-5.0% w/w a dispersing agent;

(iii) 0.1-3% w/w a wetting agent;

(iv) 0.1-3% w/w a binding agent;

(v) 0.01-0.08% w/w an antifoaming agent;

(vi) 0.01-10% w/w a disintegrating agent;

(vii) 0.01-1% w/w a stabilizer and

(viii) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1514

**Short Case Caption** UPL NA Inc. v. Tide International (USA), Inc.

**Filing Party/Entity** UPL NA Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/18/2022

Signature: /s/ Maximilienne Giannelli

Name: Maximilienne Giannelli

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| UPL NA Inc. | | UPL Europe Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| UPL NA Inc. v. Tide International (USA), Inc. et al., Case No. 8:19-cv-1201-RSWL-KS (C.D. Cal. 2019) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Statement of Related Cases....v

Jurisdictional Statement....1

I. Statement of the Issues....2

II. Preliminary Statement....2

III. Statement of the Case....7

A. The Parties....7

1. UPL NA, Inc.....7

2. Tide International (USA), Inc.....8

B. Technology Background....8

1. The Art Reported Difficulties with Preparing Granules Containing High Levels of Acephate....8

2. Binding Agents in Granules....10

C. The ’685 Patent Claims Inventive Formulations and Overcame the Difficulties with Granulating Acephate....12

D. The Proceedings Below....16

1. The Challenged Claims and Claim Constructions....16

2. The Asserted Grounds and Prior Art....18

3. Tide’s Arguments....24

4. UPL NA’s Arguments....30

5. The Board’s Final Written Decision....31

IV. Summary of the Argument....33

V. Argument....35

A. Standard of Review ....................................................................35

B. The Board's Construction of "Fillers" to Include "a Binding Agent" Conflicts with Black-Letter Patent Law ..............................36

C. The Board's Determination that a POSITA Would Have Been Motivated to Prepare an Acephate Granule Without a Binding Agent Is Flawed.......................................................................40

1. The Board's Determination that a POSITA Would Have Combined Cited Art to Arrive at the Granule of Claim 1, Which Excludes a Binding Agent, Conflicts with the Standard for Obviousness ......................................................40

2. The Board's Determination that a POSITA Would Have Combined Cited Art to Arrive at the Granule of Claim 1, Which Excludes a Binding Agent, Conflicts with the Art of Record ..........................................................................43

VI. Conclusion ..........................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ....................46

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017). ....................35

*Auris Health, Inc. v. Intuitive Surgical Operations, Inc.*,
32 F.4th 1154 (Fed. Cir. 2022) ....................41

*CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000); .................... 36, 40

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012) .................... 36, 40

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................42

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998) ....................42

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021). ....................35

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 ....................41

*Nanosys, Inc. v. Bd. of Trs. of the Univ. of Ark.*,
IPR2020-00503, Paper 27 (Pat. Tr. & App. Bd. Aug. 16, 2021) ....................42

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018) ....................42

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ....................35

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc). ....................35

*Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*,
24 F.4th 1406 (Fed. Cir. 2022). ....................35

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................41

*Winner Int'l Royalty Corp. v. Wang*,
202 F.3d 1340 (Fed. Cir. 2000) ....................42

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 103 ....................19

35 U.S.C. § 141(c) ....................1

35 U.S.C. § 318(a). ....................1

35 U.S.C. § 319 ....................1

35 U.S.C. § 6 ....................1

## STATEMENT OF RELATED CASES

There have been no other appeals from the present Patent Trial and Appeal Board ("Board") action in this or any other appellate court. The patent at issue (U.S. Patent No. 7,473,685, the "'685 patent") is being asserted in *UPL NA, Inc. v. Tide International (USA), Inc., Zhejiang Tide CropScience Co., Ltd., and Ningbo Tide Imp. & Exp. Co., Ltd.*, Case No. 8:19-cv-01201 (C.D. Cal.), which may be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This appeal arises from a Final Written Decision Board in *Inter Partes* Review ("IPR") No. IPR2020-01113. The Board had jurisdiction under 35 U.S.C. §§ 6 and 318(a). Appellant UPL NA Inc. filed its notice of appeal on March 7, 2022. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## I. Statement of the Issues

1. Did the Board err in construing "fillers" to include well-known binding agents, where the specification repeatedly identifies and claims "fillers" separate from "binding agent[s]" and distinguishes functional excipients such as "binding agent[s]" from non-functional (inert) "fillers"?

2. Did the Board err in finding a motivation to combine the prior art to arrive at the granules of claims 1-4 (which exclude a binding agent), where the cited prior art consistently includes common binding agents in acephate granules, taught that binding agents were important to granular strength and worker safety, and neither the Board nor Tide articulated any motivation to replace the binding agents in the art of record with fillers?

## II. Preliminary Statement

The '685 patent describes and claims two distinct formulations. Both inventive formulations require a high level of a specific insecticide (acephate) in granular form. Preparing such granules was no small task, as acephate was known to be a difficult molecule to granulate at high concentrations. Indeed, prior to the '685 patent, available granular products typically contained about 15% acephate rather than the claimed 85-98% acephate.

Both inventive formulations of the '685 patent further require specific ranges of functional excipients including a (1) dispersing agent, (2) a wetting agent, (3) an

antifoaming agent, and (4) a stabilizer plus non-functional "fillers to make 100%." For independent claim 1, the claimed 85-98% acephate granule may not contain any other ingredients—it is a granule "consisting of" these agents and nothing more.

By contrast, independent claim 7, which is also a closed "consisting of" formulation, recites the same ingredients as claim 1 and further requires (5) a binding agent and (6) a disintegrating agent, and these functional excipients are again combined with "fillers to make 100%." In short, the '685 patent provides not one but two distinct granules containing 85-98% acephate, an inventive embodiment ***without a binding agent*** (claim 1) and one ***with a binding agent*** (claim 7).

The Board upheld the validity of claim 7 and its challenged dependent claims, finding that a skilled artisan would not have been motivated to include a disintegrating agent in combination with all other excipients required by claim 7. Petitioner Tide International (USA), Inc. ("Tide") did not appeal this determination. This appeal focuses on the invention of claim 1.

In short, the '685 patent provides not one but two distinct granules containing 85-98% acephate, an inventive embodiment ***without a binding agent*** (claim 1) and one ***with a binding agent*** (claim 7).

That the granule of claim 1 contains 85-98% acephate without a binding agent represents a significant departure from the prior art. Indeed, the prior art fails to provide any working examples of granules containing such high levels of acephate

without a binding agent. In fact, of the universe of patents and publications describing formulations for acephate (which was first registered in the 1970s), Tide was able to locate a single prior art publication disclosing granules containing 85-98% acephate, a Japanese patent publication that, notably, combines acephate with common binding agents such as dextrin and/or lactose.

That this lone publication disclosing granules containing 85-98% acephate combined acephate with one or more binding agents is unsurprising. Binding agents were known to play a key role in granular formulations, providing strength and reducing dustiness, and thereby enhancing worker safety. This is precisely why skilled artisans sought to prepare granules in the first place. Granules represented a significant improvement over powder products because they were non-dusty and thus posed a reduced risk of dust inhalation.

Notwithstanding the reported importance of binding agents in preparing non-dusty granules, and the lack of any granules in the prior art containing acephate without a binding agent, the Board concluded that claim 1—which excludes a binding agent—was shown to be unpatentable. The Board's determination cannot be squared with the alleged motivation of a skilled artisan to prepare non-dusty acephate granules—a benefit that the prior art associated specifically with binding agents.

The Board relied on two alternate and equally flawed determinations to support its decision.

*First*, the Board applied an erroneous construction of the claim term "fillers," concluding that "fillers to make 100%" could include well-known, common binding agents (i.e., agents that assist in binding particles together such as lactose). This construction conflicts with the patent specification, which repeatedly identifies and claims "fillers" separately from "binding agents," and which distinguishes functional excipients (e.g., binding agents, wetting agents, etc.) from non-functional "fillers." Indeed, Tide admitted that the "fillers" of the '685 patent are ***inert***, and that the same ingredient cannot serve as both a filler and a binding agent.

A comparison of the recited limitations of claim 1 versus claim 7 underscores the problem with the Board's construction.

| Independent Claim 1 | Independent Claim 7 |
|---|---|
| 1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) 0.01-0.08% w/w an antifoaming agent;<br><br>(v) 0.01-1% w/w a stabilizer and<br><br>***(vi) fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. | 7. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) ***0.1-3% w/w a binding agent;***<br><br>(v) 0.01-0.08% w/w an antifoaming agent;<br><br>(vi) 0.01-10% w/w a disintegrating agent;<br><br>(vii) 0.01-1% w/w a stabilizer and<br><br>(viii) ***fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. |

As shown above, claim 1 recites a granule "consisting of" specific ingredients including "fillers to make 100%" with no binding agent, while claim 7 recites a granule "consisting of" specific ingredients including "fillers to make 100%" and a binding agent. Including binding agents as fillers in claim 1 makes no sense. The claim recites "***fillers*** to make 100%," not "binding agents to make 100%."

*Second*, the Board erroneously determined that even if binding agents were not properly considered fillers in the context of the ’685 patent (which they are not), a person of ordinary skill in the art (“POSITA”) would have been motivated to prepare granules containing what the Board called “non-binding” fillers, with no binding agent. Here, the Board applied the wrong legal standard, searching the art for disclosures of what a POSITA *could have* prepared, instead of analyzing what a POSITA *would have* been motivated to prepare. Indeed, neither Tide nor the Board articulated any motivation to prepare a granule without a binding agent, much less identified any purported benefits that would have prompted a POSITA to replace the well-known binding agents of the prior art with fillers. When the prior art is evaluated as a whole—as it must be—it is evident that the Board’s decision fails to comport with this Court’s standard for obviousness and is not supported by substantial evidence.

This Court should reverse the Board’s finding that independent claim 1 and dependent claims 2-4 of the ’685 patent were shown to be unpatentable, as both prongs of the Board’s analysis are fundamentally flawed.

## III. Statement of the Case

### A. The Parties

#### 1. UPL NA, Inc.

UPL NA provides crop protection products and technologies designed for agricultural, professional, and aquatics markets in the United States. Appx1116.

Holding over 200 active Environmental Protection Agency ("EPA") registrations, UPL NA's products encompass insecticides, herbicides, bactericides, fungicides, fumigants, aquatic products, and a plant growth regulator. UPL NA markets a variety of acephate products, including Acephate 97UP, a granular formulation containing 97% acephate. *See* UPL (USA), Find Your Product, https://www.upl-ltd.com/us/crop-product-portfolio (last visited July 14, 2022). UPL NA is based in King of Prussia, Pennsylvania. *Id.* UPL NA's arguments are supported by a declaration of David Rockstraw, Ph.D., P.E. *See* Appx1697-1699.

#### 2. Tide International (USA), Inc.

Tide competes with UPL NA in the North American market for acephate. UPL NA filed suit against Tide in 2019, alleging that products such as Tide Acephate 90 WDG infringe one or more claims of the '685 patent. Tide retained Mr. William Geigle as its expert in this matter.

### B. Technology Background

#### 1. The Art Reported Difficulties with Preparing Granules Containing High Levels of Acephate

The technology at issue concerns granules containing a high level (85-98% by weight) acephate. Acephate is a broad-spectrum insecticide that as of 2001 was approved for controlling pests on field crops such as cotton, agricultural crops, ornamental plants, residential areas, and golf courses, among other applications. Appx899-901 (EPA Reregistration Eligibility Decision for Acephate).

EPA has approved various formulations of acephate, including powders, liquids, implantable cartridges, granules, and pellets. Appx1713-1714; Appx1789-1834. Notably, as of December 2001, formulations comprising more than 50% acephate were generally sold as powders or pellets, not granules.[1] *E.g.*, Appx1789 (listing Acephate 75 SP, a soluble powder); Appx1797-1798 (listing Orthene 97 Pellets). By contrast, registered granular products typically contained about 15% acephate.[2] *E.g.*, Appx1795 (Orthene 15 Granular); Appx1799 (Payload 15 Granular and Pinpoint 15 Granular).

The paucity of registrations for granules containing a high level of acephate is not surprising in view of the reported difficulties of formulating such granules. *See generally* Appx1702-1715 (Rockstraw Decl., ¶¶ 29-71). For example, Chan explained that the concentration of acephate in granules was "limited by the ability of binding agents to form agglomerates, i.e. a minimum amount of any particular

---

[1] Granules are particle agglomerates. For example, the granules of the '685 patent are on the order of 1 to 3 mm in size. Appx49 ('685 patent, 3:64-66). Compared to granules, pellets "were generally larger, more highly compacted, and required longer times to dissolve or disperse in water." Appx1714 (Rockstraw Decl. ¶ 68).

[2] Among the numerous registrations for acephate as of December 2001, one—and only one—appears to have been a granular formulation comprising a high level of acephate. Appx1713 (Rockstraw Decl. ¶ 67); Appx1790 (Acephate 97 EG); Appx1789-1834 (complete list of registrations, annotated). Notably, however, the formulation for that lone product was not publicly disclosed. Appx1713-1714 (Rockstraw Decl. ¶ 67).

binding agent is required in order to meet physical properties of attrition resistance, crush strength and bulk density." Appx1684 (Chan, 2:17-22); *see also id.* (2:61-64) (noting that around 1990, when Chan was filed, "currently available granular ORTHENE® [acephate], as mentioned above, contains relatively small amounts of ORTHENE® [acephate], typically no more than 5% active ingredient").

Additionally, it was reported that acephate had a "lower stability in a pesticidal formulation" compared to other molecules in the same class. Appx1604 (Yamada, 1:15-17) ("On the contrary to other organic phosphoric compounds having an insecticidal activity, acephate has a lower stability in a pesticidal formulation."). As such, "acephate in the formulation is vigorously decomposed depending on the storage condition and the activity of acephate could not be often exhibited efficiently." *Id.* (1:17-20).

### 2. Binding Agents in Granules

As recognized by Chan (Appx1684), binding agents provide important properties to granular formulations, as detailed in the textbook cited by Tide titled *Chemistry and Technology of Agrochemical Formulations* ("Knowles"), which teaches that binders are "major contributors" to the physical properties of granules. Appx1281.

Indeed, Knowles appears to expect that all granules contain binders, reporting that "[t]he quantities and types of ***binders present in granule formulations*** are also

major contributors to the measured physical properties." *Id.* (emphasis added); *see also* Appx1292 (water dispersible granules ("WG") "disperse according to the dissolution rate of ***the binder used to hold them together***" (emphasis added)); Appx1281 ("A ***minimum quantity of binder***/dispersant, however, ***is required to prevent ageing***, and to allow for complete dispersion, and there is therefore a balance between this and the need to reduce the level in order to obtain fast dispersion." (emphases added)); *see also* Appx1281 ("Where a combination of dispersants and binders are used, it is clear there is synergy between the components (see later)."); Appx1287-1288 (discussing dispersants).

As Knowles explains, "granules become stronger as greater amounts of binding materials are added." Appx1281. JP '902 echoes this well-known benefit of binding agents, reporting that "[i]ncluding a water-soluble binder improves the granule strength of pesticide granules of the present invention without undermining disintegration and dispersibility in water." Appx855 (JP '902, [0011]).

Critically, Knowles teaches that binding agents reduce granule dustiness, thereby improving worker safety. Appx1286-1287. In fact, Knowles reports that adding "large quantities" of binding agents to "tie down" small amounts of dust is "very important for safety reasons":

> The quantity of dust which is being measured in this type of experiment is usually very small, say 0.1 % w/w of the overall formulation. ***Adding large quantities of binder in order to tie***

> ***down this small fraction of particles seems excessive but it is, of course, very important for safety reasons***.

*Id.* (emphasis added); *see also* Appx1226 (explaining that granules should be "non-dusty"); Appx1238 (explaining that water dispersible granules were "becoming more popular" in part because they were "non-dusty").

### C. The '685 Patent Claims Inventive Formulations and Overcame the Difficulties with Granulating Acephate

The '685 patent describes dust-free, soluble granules containing acephate. *E.g.*, Appx49 ('685 patent, 2:62-63). As the specification explains, acephate is an important commercial insecticide effective against a wide range of pests, including aphids, leaf-miners, larvae, sawflies, and thrips, while being non-toxic to many crops. *Id.* (1:54-60).

The specification explains that difficulties had been encountered with preparing pellets and/or granules containing acephate. *Id.* (1:61-67). For example, the inventors disclosed that "[c]onsiderable experimentation in the area of producing the preferred high-strength acephate granules has been conducted and confirms the manufacturing difficulties which earlier formulators have experienced." *Id.* (2:1-4); *see also* Appx1703-1707 (Rockstraw Decl. ¶¶ 31-53) (summarizing the difficulties with forming granules and/or pellets of acephate, as reported in the prior art cited during the prosecution of the '685 patent). The inventors further note that the acephate pellets proposed in the prior art "leave considerable room for

improvement" and failed to solve the problems encountered. Appx49 ('685 patent, 2:4-12).

The specification explains that an available formulation of acephate comprised a soluble powder with 75% by weight (w/w) acephate, 1-2% (w/w) surfactant, and an inert filler (precipitated silica) to make 100% (w/w). *Id.* (2:13-16). This specification further notes that this powder formulation poses problems with dust and handling, among other detriments. *Id.* (2:16-20).

The specification thus explains that in view of "the problems associated with producing granular forms of phosphoramidothioates, such as the preferred acephate," there remained a need for chemically stable, dust-free, soluble acephate granules, "which are useful from a practical stand point, as well as for a low cost, practical manufacturing technique which can be practiced on a commercial scale without requiring expensive additives or solvents." *Id.* (2:21-29).

Overcoming the problems associated with granulating acephate, the specification discloses dust-free granules containing, e.g., 85%, 90%, 97%, and even 98% acephate in combination with functionally active excipients and a filler. Appx50-51 ('685 patent, Examples 1-6). The specification explains that these granules were chemically stable, e.g., "characterized by aging stability for a minimum of two years." Appx49 (2:62-67).

The specification discloses preferred excipients to prepare these non-dusty, stable granules. Appx50 (3:44-54). Of note for this appeal, the specification discloses "sucrose and starch derivatives or a blend thereof" as the preferred binding agents, and "precipitated silica and kaolin and the like" as preferred fillers. *Id.* (3:44-45, 3:53-54).

Notably, apart from fillers, each of the excipients described in the '685 patent performs a specific function, such as dispersing, wetting, preventing or reducing foam, stabilizing, binding, or disintegrating. Appx9-10. The fillers of the '685 patent, by contrast, are added to "make 100%." *E.g.*, Appx50 ('685 patent, 3:23).

The specification states that the functional excipients—"adjuvants"—should "have a maximum of 1% water insoluble matter." Appx49 ('685 patent, 2:48-51). By contrast, the preferred fillers, precipitated silica and kaolin, are "essentially insoluble in water." Appx50 (3:53-54); Appx867 (Mayer, 7:31-38) (describing fillers such as kaolin, quartz (silica), silicates, etc., as "essentially insoluble in water"). The specification characterizes these fillers as "inert ingredients," contrasting them with the "specified adjuvants." Appx46 ('685 patent, Abstract); Appx49 ('685 patent, 2:15-16 (identifying a preferred filler, precipitated silica, as an "inert filler")).

The '685 patent narrowly claims these innovative formulations as granules having specific dimensions and "consisting of" 85-98% acephate in combination

with a precise set of either four or six functionally active excipients plus "fillers to make 100%." Appx52.

| Independent Claim 1 | Independent Claim 7 |
|---|---|
| 1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) 0.01-0.08% w/w an antifoaming agent;<br><br>(v) 0.01-1% w/w a stabilizer and<br><br>(vi) ***fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. | 7. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) ***0.1-3% w/w a binding agent;***<br><br>(v) 0.01-0.08% w/w an antifoaming agent;<br><br>(vi) 0.01-10% w/w a disintegrating agent;<br><br>(vii) 0.01-1% w/w a stabilizer and<br><br>(viii) ***fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. |

As shown above, the independent claims of the '685 patent recite two distinct formulations, both "consisting of" 85-98% acephate combined with specified adjuvants and "fillers to make 100%." The key distinction between these claims is that independent claim 7 recites a "binding agent" and a "disintegrating agent,"

while claim 1 specifically excludes those adjuvants. As detailed below, the invention of claim 1—reciting a granule with 85-98% acephate ***with no binding agent***—represents a significant departure from all prior art formulations of acephate.

### D. The Proceedings Below

#### 1. The Challenged Claims and Claim Constructions

Tide challenged claims 1-4 and 7-12 of the '685 patent. As noted above, claim 1 recites a granule "consisting of" 85-98% acephate combined with a dispersing agent, a wetting agent, an antifoaming agent, a stabilizer, and fillers to make 100%. Claim 7 recites the same set of ingredients and additionally requires a binding agent and a disintegrating agent.

In a related proceeding, the district court rejected Tide's arguments that the preamble phrase "low compact" and the claim term "stabilizer" rendered the claims indefinite and adopted UPL NA's proposed constructions of the disputed claim terms, as listed below. Appx1115-1116; *see generally* Appx1115-1133.

| Claim Term | District Court's Construction |
|---|---|
| claim preamble | claim preamble is not limiting and thus the disputed term "low compact" need not be construed |
| "dispersing agent" | an agent that assists with dispersion |
| "antifoaming agent" | an agent that reduces or prevents the formation of foam |
| "stabilizer" | an agent that promotes physical or chemical stability |

UPL NA's proposed claim constructions, as adopted by the district court, were proposed by Tide in its Petition, and ultimately also adopted by the Board. Appx9-11. The Board additionally construed the terms below in accordance with their plain and ordinary meaning in the context of the '685 patent, as proposed in the Petition and agreed to by UPL NA. Appx9-11.

| Claim Term | Board's Construction |
|---|---|
| "consisting of" | the challenged claims are "limited to granule compositions containing only those ingredients recited in the claims" |
| "wetting agent" | an agent that when added to a liquid, reduces the interfacial tension between the liquid and the surface on which it is spreading |
| "binding agent" | an agent that assists in the binding of particles together in a formulation |
| "disintegrating agent" | an agent that enables a liquid to penetrate the pores of a granule to allow for the dissolution of that particle |

UPL NA applied these constructions throughout its analysis, including the construction of a "binding agent" as "an agent that assists in the binding of particles together in a formulation." Tide, however, led the Board astray, erroneously identifying agents that assist in binding as fillers, as detailed below.

Notably, the Board determined that there were "no other terms that need to be construed to resolve the issues presented in this proceeding," and thus did not

provide a construction for the claim term "fillers to make 100%" or otherwise address the meaning of that term in the context of its claim construction analysis. Appx8-11. Yet the Board did ultimately provide a construction of this term when announcing that adding binding agents "to make 100%" "would seem to meet the plain meaning of 'fillers to make 100%,' as recited in claim 1.". Appx29; *infra* Section III.D.5.

### 2. The Asserted Grounds and Prior Art

Tide relied on the same prior art publications when attempting to invalidate both independent claim 1 (excluding a binding agent) and claim 7 (requiring a binding agent):

- U.S. Patent No. 6,387,388 ("Misselbrook");[3]
- Chinese Patent Application No. 1127588A ("CN '588");[4]
- Japanese Patent Application No. JP1997315902A ("JP '902"); and
- U.S. Patent No. 6,030,924 ("Mayer").

Tide combined these publications in the exact same manner when attempting to invalidate independent claim 1 (excluding a binding agent) and claim 7 (requiring a binding agent), as summarized below. Appx64 (Petition).

---

[3] Misselbrook is a divisional of U.S. Patent Publication No. 2002/0114821 ("Lescota"), which was cited during prosecution. *See* Appx161.

[4] CN '588 is a foreign counterpart of U.S. Patent No. 5,448,043 ("Yamada," which was also cited during prosecution, *see* Appx161).

| Ground | ’685 Patent Claims | Basis for Rejection |
|---|---|---|
| **Ground 1** | 1-4, 7-12 | 35 U.S.C. § 103 over Misselbrook and CN ’588 in view of JP ’902 |
| **Ground 2** | 1-4, 7-12 | 35 U.S.C. § 103 over Misselbrook and Mayer in view of CN ’588 |
| **Ground 3** | 1-4, 7-12 | 35 U.S.C. § 103 over Misselbrook and JP ’902 in view of Mayer |

As a result, Tide argued on one hand that the prior art combinations would have motivated a POSITA to prepare acephate granules containing a binding agent, while also arguing that the exact same references could be cobbled together to prepare an acephate granule without a binding agent. *E.g.*, Appx76-99. Yet even when purporting to combine the prior art to arrive at the invention of claim 1, Tide pointed specifically to agents that function as binding agents in acephate granules, including a preferred binding agent of the ’685 patent (sucrose) and other common binding agents such as lactose. Appx91-92; *see also* Appx765-766 (Geigle Decl. ¶ 95).

**a. Misselbrook (Appx814-823)**

Tide’s primary reference, Misselbrook, does not disclose any specific granular formulation comprising 85-98% acephate. *See generally* Appx814-823. At most, Misselbrook includes “acephate” among a list of twelve water-soluble pesticides, while emphasizing its preference for a different pesticide, emamectin benzoate. Appx817 (Misselbrook, 5:28-41). That Misselbrook fails to describe any working

embodiment containing acephate is not surprising, as Misselbrook's method for granulating its preferred pesticide (emamectin benzoate) would not work for acephate—it would result in a "sticky, agglomerated mess (as opposed to granules)." Appx1737 (Rockstraw Decl. ¶ 136).

Misselbrook discloses that the composition is preferably a water-soluble granule but may also be a wettable powder, aggregate, matrix, or a monolith such as a brick, pellet, tablet, stick, film, sheet, and the like. Appx816 (Misselbrook, 3:22-27). Misselbrook discloses that these various pesticidal compositions comprise "0.1 to 90% by weight of the water-soluble pesticide" (*id.* (3:58-60)), including formulations comprising "0.1 to 90% by weight of a water-soluble pesticide, preferably emamectin benzoate; and 30 to 99.9% by weight of a water-soluble filler, preferably lactose (not to the exclusion of other ingredients)" (*id.* (3:34-38)).

Notably, while Misselbrook generally refers to "compositions" having up to 90% pesticide (somehow present in combination with 30% lactose), it does not describe any specific ***granule*** containing more than 60% by weight of any pesticide—much less acephate. For example, Misselbrook's "preferred" embodiments contain "0.1 to 60% by weight of a water-soluble pesticide, preferably emamectin benzoate" (*id.* (3:45-46)), or "0.1 to 60% emamectin benzoate" (*id.* (3:61-62)); and "[m]ore preferred" embodiments contain "1 to 50% by weight of emamectin benzoate" (*id.* (4:1-3)), "[e]ven more preferred" embodiments contain "1

to 20% by weight of emamectin benzoate" (*id.* (4:10-12)), and "[e]specially preferred" embodiments contain "about 5.3% by weight of emamectin benzoate" (*id.* (4:25-28)). Similarly, Misselbrook's working examples of granules contain between about 5% to 50% emamectin benzoate. Appx819-820 (Misselbrook, Examples 1-5).

Misselbrook discloses that in addition to a water-soluble pesticide, the disclosed formulations contain "a water-soluble filler." Appx814 (Misselbrook, Abstract). But Misselbrook's preferred water-soluble fillers are in fact binding agents, specifically "lactose, sucrose, glucose, and the like." Appx815-816 (Misselbrook, 2:67-3:2). This point is undisputed: lactose, sucrose, and glucose are binding agents. *E.g.*, Appx96 ("A POSITA would know in 2001 that ***common binding agents include sugars***, starches, starch blends, and their derivatives because they hold particles together using their viscosity." (emphasis added)); Appx122 ("Misselbrook, JP '902, and Mayer—detailed above—teach using ***agents that are traditionally binding agents***, or 'viscosity controlling agents' and 'agglomeration auxiliaries,' such as sugars (e.g., ***sucrose*** and ***lactose***), starches, and starch derivatives (e.g., dextrin)." (emphases added)); Appx95 ("JP '902 teaches adding a 'water-soluble ***binder***,' such as dextrin, ***glucose*** and ***sucrose*** . . . ." (emphases added)). Indeed, the '685 patent identifies sucrose as a preferred binding agent.

Appx50 ('685 patent, 3:44-45). These binding agents are included in all preferred and exemplary granular formulations in Misselbrook. Appx819-820.

In short, Misselbrook does not disclose preparing any acephate granule, much less a granule consisting of 85-98% acephate ***without a binding agent***, which is the invention of claim 1 of the '685 patent.

**b. CN '588 (Appx838-842)**

CN '588 is similarly devoid of any working example of a granule containing 85-98% acephate without a binding agent. Appx838-842. In fact, CN '588 does not provide any working examples of ***granules*** at all, much less a granule containing a high level of acephate. Instead, the working embodiments of CN '588 are all ***wettable powders***—not granules—containing only ***25% acephate***. Appx840.

CN '588 purports to disclose stabilizers for acephate, specifically "condensed sodium phosphate and/or synthetic silicic acid with alkylsilylated silanol groups." Appx838. But while the wettable powders of CN '588 contain 20% to 30% of these stabilizers, the acephate still decomposed during an accelerated aging study. Appx840-842 (CN '588); Appx1731-1733 (Rockstraw Decl. ¶¶ 119-121, Fig. 5).

**c. JP '902 (Appx849-862)**

JP '902 discloses pesticide granules comprising one or two pesticides, including acephate, nitenpyram, cartap hydrochloride, and validamycin. Appx857-859.

JP ’902 explains that the “development of pesticide granules that do not experience dusting, that are easy to measure and handle, and that are easy to store is desired.” Appx853 (JP ’902, [0003]). In that regard, the granules of JP ’902 contain well-known binding agents, including dextrin (a starch derivative) and lactose. Appx857-859.

JP ’902 provides two examples of granules containing 95% acephate, both of which contain water-soluble binders among other excipients. Appx858-859 (JP ’902, [0018], [0024]).

- Reference Example 4 contains 95% acephate in combination with 1% dextrin and 3.4% lactose, i.e., 4.4% by weight binding agents (Appx858);
- Example 6 contains 95% acephate in combination with 4.2% lactose, a binding agent (Appx859).

As JP ’902 explains, “[i]ncluding a water-soluble binder improves the granule strength of pesticide granules of the present invention without undermining disintegration and dispersibility in water.” Appx855 ([0011]). As such, ***all*** the granules in JP ’902 contain one or more water-soluble binding agents, e.g., dextrin and/or lactose. Appx857-859. Thus, while JP ’902 discloses granules containing 85-98% acephate, it does not disclose preparing such granules in the absence of a binding agent, as recited in claim 1. Instead, JP ’902 reinforces the teachings of the prior art that binding agents were desirable, if not required, in granular formulations containing acephate.

**d. Mayer (Appx863-871)**

Like Misselbrook and CN ’588, Mayer fails to provide any working example of a granule containing 85-98% acephate in the absence of a binding agent. Appx863-871. In fact, Mayer fails to mention acephate at all, despite providing extensive lists of pesticides that may be used in the formulations described therein. Appx864-865 (Mayer, 2:21-3:59); Appx65-66 (Rockstraw Decl. ¶¶ 191-197, Fig. 7). As the Board did not rely on Mayer in its analysis, it is not further summarized herein.

**3. Tide’s Arguments**

As noted above, Tide relied on the same art and arguments for claim 1 (which excludes binding agents) and claim 7 (which requires a binding agent). *E.g.*, Appx76-99. The arguments presented by Tide that are pertinent to this appeal are briefly summarized below.

First, Tide repeatedly argued that a POSITA would be motivated to prepare granular acephate formulations because granules are less dusty than powders. *E.g.*, Appx76; Appx83. For example, Tide argued that “[a] POSITA would seek to formulate soluble ***granule formulations that avoided the dustiness of powdered pesticides*** and the hazardous storage and disposal of liquid pesticides.” Appx83 (emphasis added); *see also* Appx76 (identifying the advantages of granules reported in Misselbrook, including “lower dust exposure”); Appx79 (noting that JP ’902

discloses "[p]esticide granules containing a water-soluble pesticide ingredient that solves [*sic*] the problem of dusting in water-soluble powders"); Appx103 ("Both Misselbrook and Mayer share common goals of formulating less dusty, soluble granule pesticides."); Appx116 ("In addition to a POSITA's knowledge of acephate as an effective and popular insecticide, ***motivation to create less dusty formulations***, and motivation to focus on higher acephate concentrations, a POSITA in 2001 would look to JP '902 and Mayer to improve the soluble granule described in Misselbrook because they share the same ***goal of making less dusty granule formulations*** and use similar ingredients." (emphases added)).

Next, Tide acknowledged that binding agents contribute to the advantageously non-dusty nature of granules—an advantage relied on by Tide in its motivations to combine. Appx96-97 (noting that binding agents "affect the dust content" of granular formulations, and that a POSITA would optimize the "workable range" of a binding agent in a granule by testing, *inter alia*, "dust content"). Notably, Tide did not identify any other adjuvant as purportedly contributing to the non-dusty nature of granules.

Tide further conceded that sugars such as sucrose, lactose, and glucose are binding agents. *E.g.*, Appx95-96; Appx1518. For example, Tide characterized sucrose and lactose as "agents that are traditionally binding agents":

> Misselbrook, JP '902, and Mayer—detailed above—teach using ***agents that are traditionally binding agents***, or "viscosity

> controlling agents" and "agglomeration auxiliaries," such as sugars (e.g., ***sucrose*** and ***lactose***), starches, and starch derivatives (e.g., dextrin).

Appx122 (emphases added).

Tide also repeatedly admitted that sugars (e.g., sucrose, lactose, and glucose) are "common binding agents":

> A POSITA would know in 2001 that ***common binding agents include sugars,*** starches, starch blends, and their derivatives because ***they hold particles together using their viscosity***.

Appx96 (emphases added); Appx100 ("A POSITA by 2001 would know that sugars, starch, and starch derivatives are commonly used binding agents."); Appx115 (same); Appx126 (same); Appx111 (referring to a POSITA's "knowledge of sugars and starches as binding agents"); *see also* Appx95 ("JP '902 teaches adding a 'water-soluble ***binder***,' such as dextrin, ***glucose*** and ***sucrose*** . . . ." (emphases added)).

Notably, at the hearing, Tide's counsel doubled down on its position that lactose, sucrose, and glucose are binding agents—not fillers—despite the Board's apparent invitation for Tide to reverse course. Appx435-436. Indeed, Tide's counsel specifically argued that the same ingredient cannot function as both a "binding agent" and a "filler," as "a filler in this case is just an inert ingredient":

> JUDGE VALEK: Sure. So I'm looking at your slide 14 which has an excerpt from Misselbrook and there's a list of what it calls water soluble fillers which include lactose, glucose, some other kind of simple sugars. ***Misselbrook teaches that those sugars are fillers; correct***?

> MS. BENEDICT: ***Misselbrook labels those sugars as fillers***. It's ***undisputed in this case that a person of ordinary skill in the art would recognize that those sugars were commonly used as binding agents***. That's consistent with testimony from Mr. Geigle and Dr. Rockstraw.
>
> JUDGE VALEK: Counsel, ***can a single ingredient function as both a filler and a binding agent***?
>
> MS. BENEDICT: According to, let me check this. I believe that there is some testimony from Dr. Rockstraw in his deposition that it cannot. ***A single ingredient cannot function as both***.
>
> JUDGE VALEK: Counsel, what is Petitioner's position? Can these things be both a filler and a binding agent?
>
> MS. BENEDICT: ***Petitioner's position I believe is that they cannot be both a filler and a binding agent*** but that the use of fillers which -- the construction of ***a filler in this case is just an <u>inert</u> ingredient that makes it up to 100 percent*** is a concept that was so well known in the art and I don't believe that that's been disputed by UPL either, that the use of fillers is really well known in the art and so if, well I'll leave it at that.

*Id.* (Oral Hr'g Tr. 15:14-16:12) (emphases added); *see also* Appx1518 (Tide's demonstrative slide 14, which is captioned "Misselbrook Teaches Claim 7 Binding Agent" and highlights Misselbrook's disclosure of "lactose, glucose, fructose, mannose, mannitol, sucrose, such as confectioner's sugar, black sugar, brown sugar, soft brown sugar, other sugars or saccharides" (quoting Appx817 (Misselbrook, 6:1-13)).

The Board questioned Tide's counsel again on this point, again appearing to wish that she would agree that sucrose, lactose, and glucose should be considered "fillers," as labelled in Misselbrook. Appx436. After this second round of

questioning, Tide's counsel injected a new argument that the common use of sugars as binding agents does not "necessarily" mean that they are always binding agents:

> JUDGE VALEK: So just one more question on this point. Petitioner's position is that when Misselbrook says that certain of these things in the list here, lactose and fructose, are fillers that that's not correct. ***You're saying that one of skill in the art[,] notwithstanding the specific teaching in Misselbrook that these are fillers[,] would understand them to be just a binding agent***?
>
> MS. BENEDICT: Not necessarily, Your Honor. It depends on the function for which they were included in the composition and so ***a person of ordinary skill in the art would know that these sugars, starches and starch blends are commonly used as binding agents*** and that doesn't -- that they're commonly used as binding agents, yes. ***That does not necessarily mean that every time they are used[,] they are used as binding agents. It depends on the formulation at issue***.

Appx436-437 (Oral Hr'g Tr. 16:23-17:10) (emphases added).

The flaw in this untimely new argument is that it is devoid of support in the evidentiary record. There is simply no evidence that sucrose, lactose, and glucose somehow fail to function as binding agents in Tide's proposed combinations. Quite the opposite. As Tide's own expert explained, a POSITA would be motivated to add sugars to acephate granules precisely because they function as binding agents ***in acephate granules***:

> A POSITA would know by 2001 that ***sugars***, starches, and starch blends and derivatives are commonly used as binding agents because of their ability to ***hold particles together using their viscosity***. For all of these reasons***, a POSITA would therefore be motivated to use these types of ingredients in an acephate granule formulation***.

Appx773 (Geigle Decl. ¶ 109) (emphases added). UPL NA's expert agreed with this analysis, explaining that sugars such as lactose, glucose, and sucrose have hydroxyl groups that allow them to hydrogen bond to each other and/or water-soluble pesticides, "resulting in particle adhesion and reduced dustiness." Appx1725-1726 (Rockstraw Decl. ¶¶ 97-98, Fig. 3).

Disregarding the undisputed binding function of sugars ***in acephate granules***, Tide specifically pointed to sugars as purported "fillers" when attempting to map the prior art onto claim 1 of the '685 patent. *E.g.*, Appx92 (identifying lactose and sucrose as "fillers"). But, again, sugars are binding agents in acephate granules—binding agents that, notably, are present in every granular formulation of Misselbrook and JP '902. Appx819-820 (Misselbrook); Appx857-860 (JP '902). Of course, these agents are not present in working examples of CN '588, but that is expected, as CN '588 discloses preparing wettable powders, not granules. Appx840-841 (CN '588).

Finally, Tide argued that "a POSITA would be motivated to ***add*** a binding agent to acephate granule formulations." Appx111 (emphasis added). UPL NA submits that the POSITA would not have needed to "add" a binding agent, as a binding agent would have already been present based on the prior art combinations asserted by Tide.

### 4. UPL NA's Arguments

During the IPR, UPL NA explained that the proposed combinations would not have rendered obvious any challenged claim. Appx268-322; Appx366-393. In chief, UPL NA argued that the prior art emphasized the importance of binding agents—which are excluded from claims 1-4—and that the art would have discouraged a POSITA from seeking to prepare a granule without a binding agent. *E.g.*, Appx269-274; Appx. 378-382.

For example, UPL NA noted that a textbook proffered by Tide, Knowles, teaches that adding "large quantities of binder" to tie down a "small fraction of particles seems excessive but it is, of course, very important for safety reasons." Appx269 (quoting Appx1286-1287). UPL NA further explained that a POSITA would have recognized the importance of binding agents in the cited prior art combinations. Appx269-272. For example, UPL NA explained that a POSITA would have recognized the preferred so-called fillers of Misselbrook (lactose, sucrose, and glucose) as binding agents in the context of the '685 patent—a point that Tide itself conceded. Appx270-271; *see supra* pp. 25-28. UPL NA explained that a POSITA would have understood that lactose, sucrose, and glucose were key components of Misselbrook's non-dusty granules, as they were included in all preferred and working embodiments. Appx272. UPL NA also explained that JP '902 would have reinforced Misselbrook's requirement for water-soluble binders in

granular formulations, and that no publication of record provided any rationale for removing or replacing the binding agents of Misselbrook. Appx273-274; Appx294.

UPL NA further noted the inconsistency in Tide's arguments. Appx269-270. For example, Tide relied on the reduced dustiness of granules as purported motivation to combine, while simultaneously purporting to arrive at a granule lacking the very ingredient understood to contribute to the non-dusty nature of granules. *Id.*

UPL NA also explained that the prior art did not provide any motivation to include a mere 0.01-1% stabilizer in an acephate granule (*e.g.*, Appx274-277) and that Tide's arguments were all improperly based on hindsight (*e.g.*, Appx278-282). For example, UPL NA explained that the selection of Misselbrook as the starting point for the analysis reflects Tide's hindsight-driven analysis, as a POSITA would not have considered Misselbrook's method of granulation suitable for acephate. Appx279. Indeed, a POSITA following the guidance of Misselbrook to prepare acephate granules would have expected "the result would be a sticky, agglomerated mess (as opposed to granules)." *Id.* (quoting Appx1737 (Rockstraw Decl. ¶ 136)).

#### 5. The Board's Final Written Decision

The Board found that claims 1-4 would have been obvious over Misselbrook, CN '588, and JP '902 (Ground 1 of the Petition). Appx18-34. The Board did not separately address the patentability of claims 1-4 in view of Grounds 2 and 3, noting

that Grounds 2 and 3 were "similar" to Ground 1 and need not be addressed in view of its determination based on Ground 1. Appx39.

Pertinent to the present appeal, the Board made two alternate determinations to support its conclusion that claim 1 of the '685 patent (which excludes a binding agent) would have been obvious. Appx28-30.

First, notwithstanding the importance of binding agents in the prior art, the Board found that a POSITA would have been motivated to prepare granules containing "'*any* water soluble or water dispersible' diluent" as fillers, instead of Misselbrook's preferred so-called fillers such as sucrose, lactose, and glucose, which would all be considered binding agents in the context of the '685 patent. Appx28-29 (quoting Appx817 (Misselbrook, 6:1-3)). The Board found that a POSITA would not have recognized "fillers with binding properties like lactose, sucrose, and glucose" to be a key feature of Misselbrook's granules, despite Misselbrook's inclusion of such agents in every preferred and working embodiment, and despite the teachings of the prior art that binding agents were important components of granules. Appx29.

Second, the Board determined that binding agents could serve as the "fillers" claimed in the '685 patent, provided that the binding agents "are used 'to normalize the concentration of the active ingredient' by 'adding an amount . . . to make 100%.'" *Id.* (quoting Appx766 (Geigle Decl. ¶ 95)). Then, notwithstanding Tide's admission

at the hearing that the fillers of the ’685 patent are “inert,” the Board stated that including binding agents as fillers “would seem to meet the plain meaning of ‘fillers to make 100%.’” Appx29; Appx436 (Oral Hr’g Tr. 16:8-9). Finally, contrary to Tide’s argument that the same ingredient could not be both a filler and a binding agent, the Board concluded that the claim language “consisting of” does not exclude binding agents as fillers “because a POSITA would understand that the same ingredient may also serve a different purpose.” Appx29-30; Appx436 (Oral Hr’g Tr. 16:6-7) (“Petitioner’s position I believe is that they cannot be both a filler and a binding agent . . . .”).

Finally, the Board concluded that claims 7-12 had not been shown to be unpatentable by a preponderance of the evidence under any of the grounds in the Petition. Appx34-39. In particular, the Board found that Tide failed to show that a POSITA would have been motivated to combine the claimed “disintegrating agent” with the other ingredients of claim 7. *Id.* The Board thus avoided addressing the express motivation to include a binding agent in an acephate granule, as argued in Tide’s Petition when attempting to invalidate claim 7 of the ’685 patent. *Id.*

## IV. Summary of the Argument

The Board made two critical errors in its analysis of claims 1-4 of the ’685 patent. First, the Board incorrectly concluded that the term “fillers” could encompass “binding agents.” Appx29-30. Under the Board’s flawed analysis, claim 1—which

recites a granule narrowly "consisting of" only recited ingredients—could include non-recited, excluded excipients such as binding agents, as long as such excipients were added "to make 100%." But the claims require "fillers to make 100%," not "excipients to make 100%" or "binding agents to make 100%." And in the context of the '685 patent, the claimed "fillers" would not have been understood to comprise any of the functionally active components specifically recited in the claims, e.g., "a binding agent." Rather, a POSITA would have understood that the claimed "binding agent" is distinct from the claimed "fillers" based on the specification, which repeatedly identifies and claims "fillers" separately from "binding agents." Moreover, as Tide argued, a POSITA would have understood that the claimed "fillers" are "inert," in contrast to the claimed excipients that serve specific purposes such as dispersing, wetting, preventing or reducing foam, stabilizing, binding, or disintegrating.

Next, the Board erred when it determined that even if "fillers" did not include "binding agents," claims 1-4 would be obvious over the prior art. *Id.* Here, the Board's analysis fails, as the record is devoid of any motivation to prepare granules lacking the binding agents of Misselbrook (sucrose, glucose, and lactose) and JP '902 (dextrin and/or lactose). Indeed, binding agents were understood to be key to providing non-dusty granules, a benefit Tide repeatedly relied on when arguing that a POSITA "would seek" to prepare granules in the first place. Appx83.

# V. Argument

## A. Standard of Review

Claim construction is a matter of law reviewed de novo. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021). Determinations by the Board based on the intrinsic record in connection with claim construction are also reviewed de novo, while findings based on extrinsic evidence are reviewed for substantial evidence. *Id.* As the petition for IPR of the '685 patent was filed after November 13, 2018, the Board applies the claim construction standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1414 n.5 (Fed. Cir. 2022).

Obviousness is a question of law (reviewed de novo) based on underlying factual findings (reviewed for substantial evidence). *Id.* at 1414. "The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381-82 (Fed. Cir. 2019) (citation omitted).

"Determining whether a claimed combination would have been obvious to a skilled artisan requires consideration of all the facts . . . ." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017). As

such, "[e]vidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine." *Id.* at 1363.

### B. The Board's Construction of "Fillers" to Include "a Binding Agent" Conflicts with Black-Letter Patent Law

The Board's conclusion that well-known, common binding agents of the prior art could be mapped onto the claimed "fillers" in the '685 patent conflicts with basic tenets of claim construction and constitutes reversible legal error.

First, contrary to the Board, a POSITA would have understood that in the '685 patent, the claimed "fillers" (recited in claims 1 and 7) are distinct from the claimed "binding agent" (recited in claim 7). As this Court explained, "[i]n the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings." *CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *see also Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) ("The general presumption that different terms have different meanings remains." (citing *CAE Screenplates*, 224 F.3d at 1317)).

That fillers are distinct from binding agents is evident from the structure of the claims. Claim 7 specifically recites a granule "consisting of" 85-98% acephate combined with adjuvants including "a binding agent" plus "fillers to make 100%," while claim 1 recites a granule "consisting of" 85-98% acephate combined with adjuvants excluding a binding agent plus "fillers to make 100%." Appx52.

| Independent Claim 1 | Independent Claim 7 |
|---|---|
| 1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) 0.01-0.08% w/w an antifoaming agent;<br><br>(v) 0.01-1% w/w a stabilizer and<br><br>***(vi) fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. | 7. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule ***consisting of***<br><br>(i) 85-98% w/w [acephate];<br><br>(ii) 0.1-5.0% w/w a dispersing agent;<br><br>(iii) 0.1-3% w/w a wetting agent;<br><br>(iv) ***0.1-3% w/w a binding agent;***<br><br>(v) 0.01-0.08% w/w an antifoaming agent;<br><br>(vi) 0.01-10% w/w a disintegrating agent;<br><br>(vii) 0.01-1% w/w a stabilizer and<br><br>***(viii) fillers to make 100%,***<br><br>wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm. |

As reflected in the plain language of the claims, claim 1 excludes a binding agent, while claim 7 specifically requires one. *Id.* Yet under the Board's analysis, a granule containing binding agents such as lactose, sucrose, and/or glucose could be covered by claim 1, provided that the binding agents were purportedly added in amounts to "normalize" the concentration of acephate. Appx28-29. But the claims recite "***fillers*** to make 100%," not "binding agents to make 100%." Appx52 (emphasis added). This distinction between "fillers" and adjuvants such as the

claimed "binding agent" is further evident from the written description, which repeatedly identifies "fillers" separately from the functionally active excipients, including the claimed "binding agent." Appx50-52 ('685 patent, 3:15-22, 3:43-44, 3:52-53, 4:38-45, 5:10-17, 5:33-39, 5:65-63, 6:10-17, 6:32-39, 6:55-62, 7:9-16).

Moreover, the operative understanding of the parties in this IPR was that the "fillers" of the '685 patent are "inert," e.g., they do not serve as binding agents. Appx436 (Oral Hr'g Tr. 16:8-9) ("[T]he construction of ***a filler in this case is just an inert ingredient*** that makes it up to 100 percent . . . ." (emphasis added)). And as Tide's counsel admitted, "[a] single ingredient cannot function as both" "a filler and a binding agent." *Id.* (Oral Hr'g Tr. 16:4-12).

The parties' understanding that fillers are "inert" is firmly grounded in the '685 patent. *See, e.g.*, Appx49-50 ('685 patent, 2:15-16, 3:53-54). For example, the '685 patent discloses that preferred fillers include "precipitated silica and kaoline and the like." Appx50 (3:53-54). Such agents were understood to be "inert" in agrochemical formulations, serving to dilute or "normalize" the concentration of the active ingredient, i.e., "to make 100%." Appx49 (2:15-16) (identifying precipitated silica as an "inert filler"); Appx864 (Mayer, 1:12 (referring to "inert fillers, such as chalk or kaolin"); Appx766 (Geigle Decl. ¶ 95) ("A POSITA would have known to use fillers to normalize the concentration of the active ingredient in the formulation, thus adding an amount of fillers to make 100%.").

In contrast to the claimed "fillers," the adjuvants claimed in the '685 patent serve a specific purpose and are not present simply to dilute the pesticide. For example, the parties and the Board agree that:

- A "dispersing agent" "assists with dispersion";
- An "antifoaming agent" "reduces or prevents the formation of foam";
- A "stabilizer" "promotes physical [or] chemical stability";[5]
- A "wetting agent," "when added to a liquid, reduces the interfacial tension between the liquid and the surface on which it is spreading";
- A "binding agent" "assists in the binding of particles together in a formulation";
- A "disintegrating agent" "enables a liquid to penetrate the pores of a granule to allow for the dissolution of that particle."

Appx9-10. The '685 patent distinguishes these functional excipients, i.e., adjuvants, from "inert ingredients," i.e., the claimed fillers. Appx46 ('685 patent, Abstract, describing a process involving pre-mixing "technical grade phosphoramidothioate [e.g., acephate] with ***specified adjuvants*** and other ***inert ingredients***" (emphases added)). This reference to "inert ingredients" necessarily refers to the claimed fillers, as the specification teaches that "[t]he specified adjuvants have a maximum of 1%

[5] The Final Written Decision states that a "stabilizer" "promotes physical ***and*** chemical stability." Appx9 (emphasis added). The construction proposed by Tide, which was based on the district court's adoption of UPL NA's proposed construction, defines a "stabilizer" as "an agent that promotes physical ***or*** chemical stability"). Appx66 (emphasis added).

water insoluble matter" (Appx49 ('685 patent, 2:50-51)), while the preferred fillers precipitated silica and kaolin are "essentially insoluble in water" (Appx50 ('685 patent, 3:53-54, identifying preferred fillers); Appx867 (Mayer, 7:31-38, describing fillers such as kaolin, quartz (silica), silicates, etc., as "essentially insoluble in water")).

At bottom, the Board's construction of "fillers" to encompass common binding agents conflicts with this Court's presumption that different claim terms—here, "fillers" and "a binding agent"—have different meanings and cannot be squared with the disclosures of the '685 patent. *See CAE Screenplates*, 224 F.3d at 1317; *Chi. Bd. Options*, 677 F.3d at 1369.

If this Court agrees that "fillers" do not encompass "binding agents," that is fatal to the Board's analysis, as the prior art would have discouraged a POSITA from seeking to prepare granules without a binding agent, as discussed further in Section V.C.

### C. The Board's Determination that a POSITA Would Have Been Motivated to Prepare an Acephate Granule Without a Binding Agent Is Flawed

#### 1. The Board's Determination that a POSITA Would Have Combined Cited Art to Arrive at the Granule of Claim 1, Which Excludes a Binding Agent, Conflicts with the Standard for Obviousness

The Board's alternate conclusion that the prior art would not have led a POSITA to include a binding agent because the prior art disclosed "non-binding"

fillers (i.e., fillers in the context of the ’685 patent) is based on an incorrect legal standard and conflicts with the teachings of the prior art. Appx29.

The first flaw in the Board’s analysis is that it failed to provide any rationale for substituting Misselbrook’s preferred so-called “fillers,” sucrose, glucose, and lactose—which are all well-known binding agents—with the fillers as claimed in the ’685 patent (which are not binding agents). Appx28-29. For example, the Board noted that Misselbrook’s teachings “are not limited to the types of water-soluble fillers that Patent Owner says are binding agents,” then conclusorily asserted that “the combination of references in Petitioner’s ground would not, as Patent Owner contends, have led a POSITA to include a binding agent.” Appx29.

As reflected in the Board’s conclusory analysis, it failed to apply the correct legal standard. As this Court recently reiterated, a determination of obviousness “cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.” *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) (quoting *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). As such, “[t]he motivation-to-combine inquiry asks whether a skilled artisan ‘not only could have made but would have been motivated to make the combinations . . . of prior art to arrive at the claimed invention.’” *Auris Health, Inc. v. Intuitive Surgical Operations, Inc.*, 32 F.4th 1154, 1158 (Fed. Cir. 2022) (citation omitted).

Here, by simply pointing to the prior art's disclosures of ingredients satisfying the meaning of "fillers" in the '685 patent (ingredients without binding properties), the Board effectively concluded that the claimed granule "could have [been] made," while failing to provide any reason why the skilled artisan "would have been motivated" to make such a granule. *See id.* As the Board failed to provide any rationale for combining the art to arrive at the granule of claim 1, its analysis does not support a determination of obviousness. *See, e.g.*, *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1272-73 (Fed. Cir. 2018) ("The mere fact that the prior art could be so modified would not have made the modification obvious unless the prior art suggested the desirability of the modification." (quoting *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984))); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000) ("Trade-offs often concern what is feasible, not what is, on balance, desirable. Motivation to combine requires the latter."); *In re Rouffet*, 149 F.3d 1350, 1356 (Fed. Cir. 1998) (noting that there must be "something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination" (citation omitted)); *Nanosys, Inc. v. Bd. of Trs. of the Univ. of Ark.*, IPR2020-00503, Paper 27 at 23 (Pat. Tr. & App. Bd. Aug. 16, 2021) ("For purposes of an obviousness challenge, demonstrating a reason to combine teachings in the prior art requires showing that a modification would have been desirable, not merely feasible.").

### 2. The Board's Determination that a POSITA Would Have Combined Cited Art to Arrive at the Granule of Claim 1, Which Excludes a Binding Agent, Conflicts with the Art of Record

The Board's conclusion that the art would not have motivated a POSITA to include a binding agent contradicts the record and is not supported by substantial evidence. Contrary to the Board, it was not merely UPL NA that contended that the prior art combinations would have led a POSITA to include a binding agent in an acephate granule. Appx29 ("[T]he combination of references in Petitioner's ground would not, ***as Patent Owner contends***, have led a POSITA to include a binding agent." (emphasis added)). Rather, Tide also specifically contended that its prior art combinations would have motivated a POSITA to include a binding agent in an acephate granule.[6] Appx95-97; Appx111; Appx122; Appx435-437; *see also* Appx773 (Geigle Decl. ¶ 109).

Indeed, the notion that a POSITA would have prepared an acephate granule lacking a binding agent conflicts with Tide's purported motivation to prepare granules in the first place. For example, it is undisputed that the beneficial non-dusty

---

[6] Similarly, the Board's reference to "water-soluble fillers that ***Patent Owner says are binding agents***" (Appx29 (emphasis added)) fails to acknowledge that Tide conceded that Misselbrook's so-called water-soluble fillers sucrose, glucose, and lactose are "commonly used binding agents" and "traditionally binding agents"—binding agents Tide argued a POSITA would have been motivated to specifically include in an acephate granule.[6] *E.g.*, Appx100; Appx115; Appx122; Appx125-126.

nature of granules was attributed to the quantities and types of binding agents "present in granule formulations." Appx1281; *see also* Appx1286-1287 ("Adding large quantities of binder in order to tie down this small fraction [e.g., 0.1% w/w of the formulation] of particles seems excessive but it is, of course, very important for safety reasons."); *see also* Appx96 ("A POSITA would know that binding agents affect the dust content, dispersion rate, and strength of granules—thereby affecting product performance."); Appx773 (Geigle Decl. ¶ 109) ("A POSITA would know that a binding agent affects the dust content, rate of dispersion, and strength of a granule which, in turn, affects the performance of a water dispersible (or soluble) granule."). And Tide relied on the beneficial reduced dustiness attributed to binding agents when combining the prior art to prepare acephate granules (as opposed to, e.g., wettable powders):

- "A POSITA would seek to formulate soluble ***granule formulations that avoided the dustiness of powdered pesticides*** and the hazardous storage and disposal of liquid pesticides." Appx83 (emphasis added);
- "Both Misselbrook and Mayer share ***common goals of formulating less dusty, soluble granule pesticides.***" Appx103 (emphasis added);
- "In addition to a POSITA's knowledge of acephate as an effective and popular insecticide, ***motivation to create less dusty formulations***, and motivation to focus on higher acephate concentrations, a POSITA in 2001 would look to JP '902 and Mayer to improve the soluble granule described in Misselbrook because they share the same ***goal of making less dusty granule formulations*** and use similar ingredients." Appx116 (emphases added);

- "[A] POSITA knew acephate to be an effective and versatile pesticide, would be ***motivated to create less dusty formulations***, and would be motivated to attain the highest concentration of acephate in order to reduce costs." Appx780 (Geigle Decl. ¶ 124) (emphasis added).

Moreover, the only publication of record that actually prepared granules containing 85-98% acephate (JP '902) consistently included well-known binding agents such as dextrin and/or lactose when doing so. Appx858-859 (JP '902, [0018], [0024]). And while none of Misselbrook's working embodiments contain acephate, they all contain common binding agents such as lactose, sucrose, and glucose. Appx819-820. In fact, certain of Misselbrook's embodiments included "Direct Tableting Grade" lactose, i.e., lactose "commonly used to bind tablet ingredients together."[7] Appx1725 (Rockstraw Decl. ¶ 96); Appx819 (Misselbrook, 9:50, 9:56, 10:63).

In sum, the art cited by Tide, including Knowles, Misselbrook, and JP '902, would have discouraged a POSITA from preparing a granule without a binding agent, thereby leading a POSITA "in a direction divergent from the path that was

[7] For comparison, the exemplary formulations of CN '588 do not include binding agents, because the examples in CN '588 provide ***wettable powders***, not granules. Appx840-841.

taken by the applicant."[8] *Allergan*, 796 F.3d at 1305 ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." (citation omitted)).

Indeed, while the art of record would have provided a POSITA with a strong motivation to include a binding agent, neither the Board nor Tide identified any rationale for omitting a binding agent, e.g., replacing Misselbrook's preferred

[8] While the Board cited UPL NA's argument that the art teaches away from preparing a granule that does not contain a binding agent, the Board misinterpreted that argument as relying solely on Misselbrook. *Compare* Appx27-28 ("Patent Owner argues that the cited references 'teach[] away from preparing a granule without a binder' because 'Misselbrook discloses granules containing water-soluble binders, preferably "lactose, sucrose, glucose, and the like."'" (alteration in original) (citation omitted)), *with* Appx270 ("In fact, the art cited by Tide teaches away from preparing granule without a binder, as discussed below. *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) ('A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.')."; Appx294 ("A [POSITA] would have understood that binding agents such as those included in Misselbrook reduce granule dustiness, thereby enhancing worker safety. As a result, a [POSITA] would have been discouraged from removing the binding agent from Misselbrook's 'non-dusty granules.'" (citing Appx1281-1287; Appx1754 (Rockstraw Decl. ¶ 174)); Appx269 ("[T]he art would have discouraged a [POSITA] from seeking to prepare a granule *without* a binding agent. . . . For example, Knowles explains that adding 'large quantities of binder in order to tie down [a] small fraction of particles seems excessive but it is, of course, very important for safety reasons.'" (third alteration in original) (quoting Appx1286-1287)).

lactose, glucose, and sucrose with a filler, to arrive at the granule of claim 1. As a result, under the proper application of the term "fillers," which excludes binding agents, the art fails to render claims 1-4 of the '685 patent obvious.

## VI. Conclusion

UPL NA respectfully requests that the Court reverse the Board's conclusion that claims 1-4 of the '685 patent were shown to be unpatentable.

Respectfully submitted,

*<u>/s/ Maximilienne Giannelli</u>*
Maximilienne Giannelli
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

Parmanand K. Sharma
Rajeev Gupta
Joshua L. Goldberg
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Ave., NW
Washington, DC 20001-4413
(202) 408-4000

*Attorneys for Appellant UPL NA, Inc.*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper No. 30
Date: January 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TIDE INTERNATIONAL (USA), INC.,
Petitioner,

v.

UPL NA INC.,
Patent Owner.

---

IPR2020-01113
Patent 7,473,685 B2

---

Before SUSAN L. C. MITCHELL, ZHENYU YANG, and MICHAEL A. VALEK, *Administrative Patent Judges*.

VALEK, *Administrative Patent Judge*.

# JUDGMENT
## Final Written Decision
## Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Tide International (USA), Inc., ("Petitioner") filed a Petition (Paper 2, "Pet."), seeking *inter partes* review of claims 1–4 and 7–12 of U.S. Patent No. 7,473,685 B2 (Ex. 1001, "the '685 patent"). We instituted trial on all of the grounds in the Petition. Paper 12 ("Institution Dec.").

Following institution, UPL NA, Inc., ("Patent Owner") filed a Response (Paper 14, "Resp."), Petitioner filed a Reply (Paper 21, "Reply"), and Patent Owner filed a Sur-Reply (Paper 23, "Sur-Reply"). We held a hearing on October 27, 2021, and a transcript is of record. Paper 29 ("Tr.").

We have jurisdiction pursuant to 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Petitioner bears the burden of proving unpatentability of the challenged claims by a preponderance of the evidence. *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d) (2019).

Upon consideration of the full record, and for the reasons explained below, we find Petitioner has shown by a preponderance of the evidence that claims 1–4 are unpatentable, but has not shown by a preponderance of the evidence that claims 7–12 are unpatentable on the grounds in the Petition.

# II. BACKGROUND

## *A. Real Parties in Interest*

Petitioner identifies itself, "Tide International (USA), Inc.," as well as "Zhejiang Tide Cropscience Co. Ltd., Ningbo Tide Imp. & Exp. Co., Ltd., and Tide International Company Limited" as the real parties-in-interest. Pet. 73. Petitioner explains that Tide International Company Limited is its parent corporation and that "the remaining parties are defendants in

co-pending litigation." *Id.* Patent Owner identifies itself, "UPL NA Inc.," as the real party-in-interest. Paper 3, 1.

### *B. Related Matter*

Petitioner and Patent Owner identify the following related matter involving the '685 patent: *UPL NA Inc. v. Tide International (USA), Inc.*, No: 8:19-cv-1201-RSWL-KS (C.D. Cal. 2019) ("the related litigation").

### *C. The '685 Patent*

The '685 patent was issued on January 6, 2009, and claims priority to a utility application filed on April 22, 2002, and a provisional application filed December 18, 2001. Ex. 1001, codes (45), (63), (60).

The '685 patent relates to "[d]ry flow, low compact, dust free, soluble granules" containing the pesticide "acephate" in combination with other ingredients, and processes for making such. Ex. 1001, Abstr. According to the Specification, "[t]he formulation of acephate presently in use . . . poses the problems of dust, low pourability, high transportation costs, high capital manufacturing investment, measurement difficulties, difficulties in packing material disposal, handling problems, high risk of caking and others." *Id.* at 2:13–20.

The Specification purports to overcome these problems by describing a method that constitutes "an improvement over prior manufacturing processes" that produces granules that are "more advantageous than prior granular products and exhibit[] certain very desirable characteristics." Ex. 1001, 2:33–43.

The claims of the ’685 patent recite particular formulations of granule compositions “consisting of” acephate and certain recited ingredients in amounts falling within specified ranges. Ex. 1001, 7:44–8:65.

*D. Challenged Claims*

The Petition challenges claims 1–4 and 7–12. Of these, claims 1 and 7 are independent. Claim 1 reads as follows:

> 1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of
>
> (i) 85-98% w/w an insecticidally active compound of the following formula:
>
> 
>
> wherein R and $R^1$ individually are alkyl, alkynyl or alkenyl group containing up to 6 carbon atoms, $R^2$ is hydrogen, an alkyl group containing 1 to 18 carbon atoms, a cycloalkyl group containing 3 to 8 carbon atoms, an alkenyl group containing 2 to 18 carbon atoms or an alkynyl group containing 3 to 18 carbon atoms, $R^3$ is hydrogen or an alkyl group containing 1 to 6 carbon atoms, and Y is oxygen or sulfur, wherein said insecticidal active compound is Acephate:
>
> (ii) 0.1-5.0% w/w a dispersing agent;
> (iii) 0.1-3% w/w a wetting agent;
> (iv) 0.01-0.08% w/w an antifoaming agent;
> (v) 0.01-1% w/w a stabilizer and
> (vi) fillers to make 100%,
>
> wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

Ex. 1001, 7:44–8:4. Claim 7 is directed to a granule with the same dimensions, ingredients, and ranges as claim 1 and that additionally consists

of a "binding agent" and a "disintegrating agent" within specified ranges. *See id.* at 8:19–48.

### *E. Instituted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–4, 7–12 | 103(a)[1] | Misselbrook,[2] CN '588,[3] JP '902,[4] |
| 1–4, 7–12 | 103(a) | Misselbrook, Mayer,[5] CN '588 |
| 1–4, 7–12 | 103(a) | Misselbrook, JP '902, Mayer |

Petitioner relies on the declaration of William Geigle (Ex. 1003) in support of these grounds. Patent Owner relies on the declaration of David A. Rockstraw, Ph.D., P.E. (Ex. 2007), which was submitted with its Response.

## III. ANALYSIS OF ASSERTED GROUNDS

### *A. Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. §§ 102 and 103 that became effective after the filing of the application that led to the '685 Patent. Therefore, we apply the pre-AIA versions of 35 U.S.C. §§ 102 and 103.
[2] U.S. Patent No. 6,387,388 B1, issued May 14, 2002 (Ex. 1005) ("Misselbrook").
[3] CN 1127588A, published July 31, 1996 (Ex. 1006). Petitioner has provided a certified translation (Ex. 1007), which we refer to and cite herein as "CN '588."
[4] JP 9-315902, published Dec. 9, 1997 (Ex. 1008). Petitioner has provided a certified translation (Ex. 1009), which we refer to and cite herein as "JP '902."
[5] U.S. Patent No. 6,030,924, issued Feb. 29, 2000 (Ex. 1010) ("Mayer").

unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). This burden of persuasion never shifts to patent owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, if any.[6] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Subsumed within the *Graham* factors is the requirement that the skilled artisan would have had a reasonable expectation of success in combining the prior art references to achieve the claimed invention. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007). "Obviousness does not require absolute predictability of success . . . all that is required is a reasonable expectation of success." *In re O'Farrell*, 853 F.2d 894, 903–4 (Fed. Cir. 1988). Moreover, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. "If a person of

---

[6] In this case, Patent Owner does not direct us to any objective indicia of nonobviousness.

ordinary skill can implement a predictable variation, § 103 likely bars its patentability." *Id.* at 417.

On the other hand, a patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418 (for an obviousness analysis, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). A petitioner's assertion of obviousness "cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) (citing *KSR*, 550 U.S. at 418).

### *B. Level of Ordinary Skill in the Art*

We begin by assessing the level of skill in the art. Considerations relevant to determining the level of ordinary skill in the art include the type of problems encountered in the art and prior art solutions to those problems. *See Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983). The prior art itself may also reflect an appropriate level of skill. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

According to Petitioner's declarant, Mr. Geigle, "a person of ordinary skill in the art for the '685 patent has a bachelor's degree or Ph.D. in chemistry or chemical engineering, with at least two to four years of experience or education specifically in the formulation and development of [solid pesticides subjected to granulation processes]." Ex. 1003 ¶ 18. Mr. Geigle additionally opines "a person who does not satisfy the identified educational level may still qualify as a person of ordinary skill if they [have] had more relevant work experience." *Id.*

Patent Owner's declarant, Dr. Rockstraw, offers a similar description of a person of ordinary skill in the art ("POSITA"), but states the POSITA's experience more generally as "experience with agrochemicals and related formulations." Ex. 2007 ¶ 77. According to Dr. Rockstraw,

> requiring at least two to four years of experience or education "specifically in the formulation and development" of "solid pesticides subjected to granulation processes" is overly limiting. Ex. 1003, ¶ 18. There are other areas of practice in which an understanding of particles, granules, dispersion, wetting, foaming, and/or stability are important, and these fields overlap considerably.

*Id.* ¶ 79.

We adopt Patent Owner's description of a POSITA because it reflects the experience of one familiar with the types of problems and solutions described in the '685 patent and the cited prior art, which include granule as well as other kinds of agrochemical formulations. That said, we do not discern a meaningful difference between the parties' proposals. Our findings and conclusions would be the same under Petitioner's description of a POSITA.

### *C. Claim Construction*

In an *inter partes* review, claim terms are "construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b).

Here, the district court in the related litigation construed certain terms that appear in the challenged claims. Ex. 1015. The district court's constructions are noted in the table below.

| Claim term | District court's construction |
|---|---|
| "dispersing agent" | an agent that assists with dispersion |
| "antifoaming agent" | an agent that reduces or prevents the formation of foam |
| "stabilizer" | an agent that promotes physical and chemical stability |

*Id.* at 19. At Patent Owner's urging, the district court also determined that the preamble of claim 1 was not limiting. *Id.* at 10. Petitioner adopts these constructions, and further contends that the identical preamble in claim 7 is not limiting, for purposes of this proceeding. Pet. 3.

In addition to the terms construed by the district court, Petitioner contends the following terms should be given their "plain and ordinary meaning" as set forth in the table below and evidenced by the testimony of Petitioner's expert.

| Claim term | Petitioner's proposed construction |
|---|---|
| "wetting agent" | an agent that when added to a liquid, reduces the interfacial tension between the liquid and the surface on which it is spreading |

| | |
|---|---|
| "binding agent" | an agent that assists in the binding of particles together in a formulation |
| "disintegrating agent" | an agent that enables a liquid to penetrate the pores of a granule to allow for the dissolution of that particle |

Pet. 4–5 (citing Ex. 1003 ¶¶ 53–55).

Patent Owner "agrees with the constructions adopted by the district court" and applies the additional constructions proposed by Petitioner for "wetting agent," "binding agent," and "disintegrating agent" as set forth above. Resp. 12. Patent Owner also agrees that the preamble of the challenged claims is not limiting. *See* Resp. 12; Tr. 50:17–20, 51:3–5 (Patent Owner's counsel stating "[w]e agree that the preamble is not limiting. . . ."). Patent Owner does not propose any additional terms for construction.

The parties have not identified any disputes regarding the construction of any term in the challenged claims. As noted in the Institution Decision, the constructions proposed in the Petition "appear to be consistent with the cited portions of the intrinsic record of the '685 patent as well as the usage of similar terms in the asserted prior art." Dec. 29. Neither party disputes this, nor suggests that any of these terms have a different meaning in the art. Accordingly, we adopt the claim constructions noted above for our analysis.

We also adopt the parties' position that the preamble of claims 1 and 7 is not limiting beyond the term "granule." Claims 1 and 7 each recite "[a] chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of" the set of ingredients recited in body of those claims. Ex. 1001, 7:44–45, 8:19–20. While the wherein clause describing the dimensions of "said granule" relies on "granule" in the

preamble for antecedent basis, none of the other preamble language appears to be necessary to breathe life and meaning into the claim, and the claim body recites a structurally complete invention. *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (explaining that a preamble is limiting if it is "necessary to give live, meaning, and vitality to the claim," but "is not limiting where a patentee defines a structurally complete invention in the claim body") (internal quotations omitted). Thus, we agree with the parties, and the district court in the related litigation, that the preamble language other than "granule" is not limiting.

Moreover, we agree that the transitional phrase "consisting of" in claims 1 and 7 creates a "very strong presumption that the claim element is 'closed' and therefore exclude[s] any elements, steps, or ingredients not specified in the claim." Pet. 5; Resp. 12 (both quoting *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016)). Neither party seeks to overcome that presumption, nor do we see any basis for doing so based on the record before us. Accordingly, we construe the challenged claims to be limited to granule compositions containing only those ingredients recited in the claims.

There are no other terms that need to be construed to resolve the issues presented in this proceeding. Therefore, we do not construe any additional terms. *See, e.g.*, *Nidec Motor Corp. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*D. References Relied Upon*

*i. Misselbrook*

Misselbrook is a patent issued on May 14, 2002, from a series of applications dating back to November 6, 1996. Ex. 1005, 1. Petitioner asserts that Misselbrook qualifies as prior art under 35 U.S.C. § 102(e). Pet. 2. Patent Owner does not dispute, and we agree, that Misselbrook is prior art to the ’685 patent.

Misselbrook describes “soluble granule (SG) pesticidal formulation[s] comprising a water-soluble pesticide and a water-soluble filler.” Ex. 1005, Abstr. According to Misselbrook, these granule formulations provide “efficacy equal to the corresponding liquid formulation, yet with improved handler safety, such as lower eye irritation.” *Id.*; *see also id.* at 2:4–21 (describing “numerous advantages” its soluble granule formulation provides over liquid formulations).

While the examples in Misselbrook are directed to a different pesticide active ingredient (*see* Ex. 1005, 9:20–17:13), Misselbrook teaches that acephate is one of the “[e]xemplary water-soluble pesticides” for use in its granule compositions. *Id.* at 5:28–41. Misselbrook teaches “[t]he pesticidal compositions of the present invention comprise 0.1 to 90% by weight of a water-soluble pesticide . . . and 30 to 99.9% by weight of a water-soluble filler, preferably lactose (not to the exclusion of other ingredients).” *Id.* at 3:34–39; *see also id.* at 3:58–60 (“In one embodiment of the present invention the formulation contains about 0.1 to 90% by weight of the water-soluble pesticide.”).

Misselbrook also discloses “a more preferred embodiment” comprising:

> 0.1 to 60% by weight of a water-soluble pesticide . . . 40 to 99.9% by weight of a water-soluble filler; 0 to 50% by weight of a wetting surfactant; 0 to 50% by weight of a dispersing surfactant; 0 to 5% by weight of a defoaming agent (not to the exclusion of other ingredients).

Ex. 1005, 3:44–51. Misselbrook teaches that "[i]n addition to the pesticide, the water-soluble filler, the wetting surfactant, the dispersing surfactant and the defoaming agent, the instant pesticidal compositions may also appropriately contain stabilizers, synergists, coloring agents, etc." *Id.* at 6:53–57.

Moreover, Misselbrook explains that "[t]he term 'water-soluble filler' as used herein includes any water soluble or water dispersible agent which may be employed to dilute the pesticide." Ex. 1005, 6:1–3. Thus, in addition to sugars (e.g., "lactose, glucose, fructose, mannose") Misselbrook teaches that other "[a]ppropriate water-soluble fillers" include "cellulose, calcium phosphates(s), inorganic water-soluble salts, and the like, and mixtures thereof." *Id.* at 6:4–10.

*ii. CN '588*

CN '588 is a Chinese patent publication published on July 31, 1996. Ex. 1006, code (43). Petitioner asserts that CN '588 is prior art under 35 U.S.C. § 102(b). Pet. 2. Patent Owner does not dispute, and we agree, that CN '588 is prior art to the '685 patent.

CN '588 teaches that acephate "is less stable in pesticide preparations" than other "organophosphorous compounds" and "may be decomposed violently with the change of storage conditions, thereby unable

to effectively show activity all the time." CN '588, 4.[7] According to CN '588, "condensed sodium phosphate and/or synthetic silicic acid with alkylsilylated silanol groups on the surface can improve the stability of acephate in dry preparations." *Id.*

To this end, CN '588 describes a "dry pesticide preparation" wherein the "content of acephate" is

> generally 0.5 to 99 (wt) %, preferably 5 to 95 (wt) %. The content of condensed sodium phosphate in the dry pesticide preparation is an amount that can stabilize acephate, generally 0.01 to 50 (wt) %, preferably 1 to 20 (wt) %, more preferably 1 to 10 (wt) %. The content of synthetic silicic acid with alkylsilylated silanol groups on the surface is an amount that can stabilize acephate, generally 1 to 99 (wt) %.

CN '588, 5. In addition to these ingredients, CN '588 teaches that its compositions may contain a wide variety of "solid carriers" as well as "adjuvants" such as "surface active agents, coating agents, fragrance and known stabilizers" in varying amounts. *Id.* CN '588 further teaches that its dry pesticide preparation may be in the form of a "water soluble granule." *Id.* at 6.

*iii. JP '902*

JP '902 is a Japanese patent publication published on December 9, 1997. Ex. 1008, code (43). Petitioner asserts that JP '902 is prior art under 35 U.S.C. § 102(b). Pet. 2. Patent Owner does not dispute, and we agree, that JP '902 is prior art to the '685 patent.

---

[7] As does the Petition, we cite to the page numbers of the translation in Exhibit 1007.

JP ’902 describes “pesticide granules” that are “easy-to-use” because they “prevent caking during long-term storage and cause very little dusting during use.” JP ’902, Abstr. JP ’902 teaches that a number of pesticides, preferably acephate, can be formulated in such granules and that the “amount of pesticide active ingredient is about from 10 to 95% by weight relative to the entire formulation” (*Id.* ¶¶ 5–7) and “even more preferably about 50 to 95% by weight” (*Id.* ¶ 12).

In addition, JP ’902 teaches that such granules may include other ingredients such as silica, surfactants, binders, colorants, stabilizers, and bulking agents. *Id.* ¶¶ 11–12. JP ’902 discloses concentration ranges for some of these types of ingredients. *Id.* ¶ 12. For instance, JP ’902 teaches the amount of surfactant “is usually about 10% by weight or less and preferably about 5% by weight or less,” the amount of binder “is usually about 20% by weight or less and preferably about 10% by weight or less,” and the amount of stabilizers “is about 10% by weight or less.” *Id.*

JP ’902 provides a number of exemplary granule formulations containing acephate and other ingredients such as surfactants, binders, stabilizers, and bulking agents. *See, e.g.*, JP ’902 ¶¶ 9, 11, 18, 24. The Petition cites two of those examples in particular, i.e., Reference Example 4 and Example 6, which are described as containing “95% Acephate.” Pet. 17–18 (citing Ex. 1008 ¶¶ 18, 24). Specifically, JP ’902 describes these examples as follows:

> [Reference Example 4]
>
> Preparation of Granules D Containing 95% Acephate
>
> After thoroughly mixing together 95 parts acephate, 0.5 parts Newpol PE-64 surfactant, 1.0 part dextrin, 0.1 part Cyanine

> Green G, and 3.4 parts lactose, 8 parts water was added per 100 parts by weight formulation in terms of solid content, and the resulting mixture was prepared in the same manner as Reference Example 1 to obtain Granules D containing 95% acephate.
>
> [Example 6]
>
> Preparation of Granules J Containing 95% Acephate
>
> After thoroughly mixing together 95 parts acephate, 0.2 parts Dixsol WK surfactant, 0.1 part Cyanine Green G, 0.5 part Aerosil 200, and 4.2 parts lactose, 4 parts water was added per 100 parts by weight formulation in terms of solid content, and the resulting mixture was prepared in the same manner as Reference Example 1 to obtain Granules J containing 95% acephate.

JP ’902 ¶¶ 18, 24.

JP ’902 describes disintegration tests conducted on these and other example granules and discloses the results of those tests in Table 1. JP ’902 ¶¶ 28–32. JP ’902 reports that “[i]t is clear from Table 1 that the granular water-soluble powders of the present invention have excellent disintegration in water, dispersibility in water, and caking properties.” *Id.* ¶ 31. In addition, JP ’902 explains these “pesticide granules . . . prevented caking during long-term storage,” “had fewer harmful chemical effects,” and “readily disintegrated and dispersed in water to create easy-to-use formulations that can be used in place of conventional powdery water-soluble formulations and liquid formulations.” *Id.* ¶ 32.

*iv. Mayer*

Mayer is a patent issued on February 29, 2000. Ex. 1010, code (45). Petitioner asserts that Mayer qualifies as prior art under 35 U.S.C. § 102(b).

Pet. 2. Patent Owner does not dispute, and we agree, that Mayer is prior art to the ’685 patent.

Mayer teaches that “[m]any solid crop protection agents are currently supplied in the form of wettable powders” containing an “insecticidal active ingredient[] . . . together with inert fillers, such as chalk or kaolin, in particular surface active substances, in the preparation of such formulations so that the formulations are well wetted and dispersed in water.” Ex. 1010, 1:9–15. According to Mayer, such formulations “tend to foam” and “develop dust when added to water in the spray tank.” *Id.* at 1:15–30. Thus, Mayer proposes to teach “solid formulations for crop protection with reduced tendency of foaming and dustiness.” *Id.* at 1:31–34, 14:49–61 (claim 1 reciting “[a] low dustiness water-dispersible granule formulation”).

Mayer teaches that the amount of “active ingredient” in its granule formulations “is, as a rule, 30 to 90% by weight, preferably 50 to 87% by weight, and, in particular, 70 to 85% by weight of total composition.” Ex. 1010, 4:4–6. In addition, Mayer teaches that its formulations contain a “defoaming agent and/or foam breaking agent” in an amount of “0.05 to 10% by weight.” *Id.* at 4:26–29. Mayer further teaches these formulations also include “formulation auxiliaries selected from the group consisting of dispersants, agglomeration auxiliaries, stabilizers, wetting agents, disintegrants and fillers” in varying amounts. *See id.* at 4:43–58.

Mayer also describes the preparation of “cylindrical granules.” *See* Ex. 1010, 5:65–6:23; 9:28–49 (Ex. 1). Mayer describes extruding the mixed ingredients “through a die or screen” with “die holes rang[ing] in diameter from 0.25 to 7 mm, and preferably, from 0.4 mm to 2 mm” and, after drying, sieving the product “on 0.4 and 2.0 mm sieves” to obtain granules. *Id.*

*E. Ground 1: Obviousness over Misselbrook, CN '588, and JP '902*

Petitioner contends that claims 1–4 and 7–12 are unpatentable as obvious over Misselbrook, CN '588, and JP '902. *See* Pet. 14–39. Patent Owner disputes this. *See* Resp. 13–37. As explained below, Petitioner has shown by a preponderance of the evidence that claims 1–4 are unpatentable, but has not shown by a preponderance of the evidence that claims 7–12 would have been obvious over these references.

*i. Claim 1*

Claim 1 recites a granule "consisting of" acephate and five other ingredients—a dispersing agent, a wetting agent, an antifoaming agent, a stabilizer, and fillers. Ex. 1001, 7:44–8:4. Petitioner must show that a granule containing only those ingredients, in the recited amounts, and in the recited dimensions would have been obvious.

To do so, Petitioner relies primarily on Misselbrook's teaching of a granule containing a pesticide such as acephate and four other ingredients: a wetting surfactant, a dispersing surfactant, a defoaming agent, and a water-soluble filler. *See* Pet. 19–33. Petitioner contends, supported by the testimony of Mr. Geigle, that these ingredients respectively correspond to the "wetting agent," "dispersing agent," "defoaming agent" and "fillers" recited in claim 1. *Id.* at 22–27, 29–30; Ex. 1003 ¶¶ 83, 86, 89, 95. Petitioner also points out that Misselbrook teaches ranges for the amount of pesticide and these other ingredients that overlap with the corresponding weight percentage ranges in claim 1. *See* Pet. 23, 25, 26. Petitioner contends that the overlapping ranges in Misselbrook and the other references present a prima facie case of obviousness for the corresponding ranges in

claim 1. *See id.* at 13 (citing *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003); *In re Wertheim*, 541 F.2d 257, 267 (CCPA 1976)).

For the "stabilizer" limitation, Petitioner directs us to Misselbrook's teaching that, in addition to a granule containing the ingredients noted above, the "instant pesticidal compositions may also appropriately contain stabilizers, synergists, coloring agents, etc." Pet. 27–28 (quoting 1005, 6:53–57). Petitioner further relies on teachings in CN '588 and JP '902 regarding the use of stabilizers in acephate compositions. *Id.* (citing CN '588, 5; JP '902 ¶¶ 11, 12, 20). In particular, Petitioner cites CN '588's teaching that "acephate is less stable in pesticide compositions" and "may decompose violently" to show that a POSITA would have been motivated to include a stabilizer in Misselbrook's granule. *Id.* at 16 (quoting CN '588, 4–5). According to Petitioner, a POSITA would have been motivated to include a stabilizer because they "would know that acephate may decomposed under changed storage conditions as compared to other organophosphorus compounds, and that adding a stabilizer could avoid such decomposition." *Id.* at 28–29 (citing CN '588, 4; Ex. 1003 ¶ 94).

For the "85-98% w/w . . . Acephate" limitation (Ex. 1001, 7:46–64), Petitioner argues that all three of the cited references disclose pesticide ranges that overlap with the recited acephate range, creating a presumption that range would have been obvious. *See* Pet. 14, 19–21 (citing Ex. 1005, 3:34–39; CN '588, 5; JP '902 ¶¶ 7, 12, 24). Petitioner also relies on working examples in JP '902 that describe granules containing 95% acephate and some of the ingredients recited in claim 1. *Id.* at 20 (citing JP '902 ¶¶ 18, 24). Petitioner contends that "[t]o allay the costs of granulation, a POSITA would aim for higher acephate concentrations to reduce manufacturing

costs" and therefore would have been motivated to formulate Misselbrook's granule with an amount of acephate in the claimed range. *Id.* at 21 (citing Ex. 1005, 2:14–18; Ex. 1003 ¶ 74). According to Petitioner,

> [a] POSITA would be motivated to use routine experimentation to determine a formulation allowing for high weight percentages of acephate to achieve cost savings. A POSITA would also possess a reasonable expectation of success in achieving higher acephate concentrations and would not view the concentration as unexpected or producing unexpected results based on at least JP '902's 95% acephate granules.

*Id.* at 21–22 (citing Ex. 1003 ¶¶ 80–82).

Regarding the concentration ranges for the other ingredients, Petitioner again relies on overlapping ranges disclosed in the cited references. *See* Pet. 23–30. Moreover, Petitioner alleges it would have been obvious to optimize the amounts of these ingredients to the recited ranges in order to accommodate a higher percentage of acephate. For example, regarding the amount of dispersing agent, Petitioner contends:

> a POSITA would be motivated to achieve higher acephate concentrations, thereby decreasing other ingredients' concentrations. A POSITA would know dispersing agents affect the performance of soluble granules when mixed in water for application. Because of the similarities among Misselbrook, CN '588, and JP '902 . . . a POSITA would use their disclosed ranges as a starting point for running routine tests and experiments to optimize the workable range of dispersing agent—including suspensibility tests (to determine the extent particles remain suspended when a granule is in solution) and wet sieving tests (to determine the amount of non-dispersible material in the granule). A POSITA would use these results to optimize a range for the dispersing agent, would possess a reasonable expectation of success in doing so, and would not view achieving the claimed range as unexpected or producing

> unexpected results, since soluble granules generally used 1-6% by weight dispersing agent at that time.

*Id.* at 23–24 (citing Ex. 1003 ¶ 85, Ex. 1026, Ex. 1023, Ex. 1024, 28). Petitioner offers similar arguments and evidence for the weight percentage ranges for the wetting agent (Ex. 1003 ¶ 88), antifoaming agent (*id.* ¶ 90), and stabilizer (*id.* ¶ 94), and fillers (*id.* ¶ 95).

Finally, Petitioner offers evidence that granules having the dimensions recited in claim 1, i.e., "a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm," would have been obvious over these references. Mr. Geigle, testifies that a POSITA would have understood that granules produced by the processes described in Misselbrook and JP '902 would have had a "0.8 mm diameter . . . with lengths between 0.5 to 5.0 mm." Ex. 1003 ¶¶ 96–97, 99. Mr. Geigle further testifies that the recited dimensions "are not unexpected" and represent "typical diameter lengths used by manufacturers of water dispersible or soluble granules at the time." *Id.* ¶ 100.[8]

Having considered the entire record, we find Petitioner's contentions above to be credible and sufficiently supported by the evidence. As an initial matter, we agree that the combined references teach or suggest an acephate granule containing only the ingredients in claim 1. Misselbrook discloses a granule containing acephate and four of the five ingredients (i.e., a dispersing agent, a wetting agent, an antifoaming agent, and fillers) recited

[8] Patent Owner does not dispute Mr. Geigle's testimony that a POSITA would understand that the granulation processes described in Misselbrook and JP '902 would produce granules having the recited dimensions and that such dimensions were typical for pesticide granules in the prior art. *See generally* Resp. We find Mr. Geigle's testimony on this point credible and sufficient to meet Petitioner's burden for this limitation.

in claim 1 and identifies the fifth ingredient, a stabilizer, as a type of ingredient its granules "may also appropriately contain." Ex. 1005, 3:44–51, 6:53–57. Petitioner persuasively shows that a POSITA would have been motivated to add a stabilizer because acephate was known to have stability issues and both CN '588 and JP '902 teach the use of a stabilizer in acephate compositions, including granules. CN '588, 4–5; JP '902 ¶ 12. This combination results in a granule consisting of acephate and only the five other ingredients recited in claim 1.

Petitioner also demonstrates that the combined references teach or suggest the concentration ranges in claim 1. Beginning with the acephate range, Misselbrook teaches compositions containing between "0.1 to 90% by weight" pesticide. Ex. 1003, 3:34–39, 3:58–60. CN '588 and JP '902 disclose similar acephate ranges. *See* CN '588, 2 (acephate preferably 5 to 95% wt); JP '902 ¶ 12 (acephate preferably 50 to 95% wt). The upper end of the prior art ranges overlap with the 85–98% range in claim 1, creating a presumption that the claimed range would have been obvious. *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (explaining that "a prima facie case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art" and "such overlap creates a presumption of obviousness") (quotations omitted). Patent Owner notes that a preferred embodiment in Misselbrook on which some of Petitioner's contentions rely discloses a lower pesticide range that does not overlap with the claimed range. *See* Resp. 7–8. But Misselbrook's teachings are not limited to that preferred embodiment. And "the fact that a specific embodiment is taught to be preferred is not controlling, since all disclosures of the prior art, including

unpreferred embodiments, must be considered." *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (quoting *In re Lamberti,* 545 F.2d 747, 750 (CCPA 1976)). Thus, Patent Owner's focus on Misselbrook's preferred embodiment does not negate the presumption arising from the broader, overlapping range taught elsewhere in Misselbrook and in the other cited references.

In addition to the presumption, Petitioner persuasively shows that it would have been obvious to increase the acephate concentration in Misselbrook's granules to the recited range. Mr. Geigle notes the higher costs associated with preparing granule versus liquid and powder formulations and explains that a POSITA would have sought to offset those costs by increasing the acephate concentration in the granules so as to achieve the benefits of a granule formulation at a lower cost. Ex. 1003 ¶¶ 25, 27–28, 59–60. He further explains that this would have motivated a POSITA to maximize the acephate concentration in Misselbrook's granules and that there would have been a reasonable expectation of successfully achieving a high acephate content within the claimed range given that JP '902 disclosed working examples of 95% acephate granules. *Id.* ¶¶ 74, 80–82. We find this evidence credible and sufficient to support Petitioner's contentions regarding the "85-98% w/w" acephate limitation.

Petitioner also meets its burden for the other ranges recited in claim 1. It is well-established that "where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). Here, Petitioner identifies where the cited art discloses overlapping ranges for each of other ingredients in claim 1, thereby

demonstrating that the "general conditions" regarding the use of these ingredients in such compositions was known. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (noting that any overlap between the claimed and disclosed ranges serves to disclose the "general conditions" of the claim). "Such overlap itself provides sufficient motivation to optimize the ranges." *Id.* Moreover, we credit Mr. Geigle's testimony that a POSITA would have understood because the concentration of acephate was increased the concentration of the other ingredients would necessarily decrease and that a POSITA would have been able optimize these amounts using standard techniques and testing. Ex. 1003 ¶¶ 85–113. Thus, Petitioner has demonstrated that these ingredient concentrations are result-effective variables that would have been obvious to optimize through routine experimentation.

Patent Owner does not seek to rebut Petitioner's showing with evidence of unexpected results or other evidence of criticality relating to the ranges in claim 1. *See* Reply 8 ("[Patent Owner] does not, and has never, alleged that its invention claims an unexpected result."); Sur-Reply 4 (responding by challenging Petitioner's "*prima facie* case" and agreeing "there is no need for the Board to look to unexpected results or other indicia of nonobviousness"). Rather, Patent Owner attacks the sufficiency of Petitioner's showing in several respects. We address Patent Owner's arguments below to explain why they are unavailing.

Patent Owner argues that the prior art evidences "difficulties with preparing granules containing 85-98% acephate." *See* Resp. 3–7 (citing Ex. 2003, Ex. 2005 and Ex. 2006). According to Patent Owner, the Petition cites only "a *single* prior art reference describing granules containing 85-

95% acephate, JP ’902.” *Id.* at 7. Patent Owner argues that Petitioner’s other references “do not provide any working examples of a granule containing acephate much less 85-98% acephate” and do not “propose any process, method, or formulation to overcome the difficulties” with formulating acephate granules. *Id.*

Regarding the two working examples of 95% acephate granules in JP ’902, Patent Owner argues that one does “not provide a workable option for granules containing 85-98% acephate” because “most of the product remained caked at the bottom of the container.” Resp. 8 (citing JP ’902 ¶¶ 15, 24). Patent Owner acknowledges that the other example (Example 6) is reported to have “acceptable disintegration properties,” but argues that because JP ’902 “fails to provide any information regarding its chemical stability” it is “unclear whether JP ’902 provides a workable solution.” *Id.* at 9. Patent Owner further contends that Petitioner “does not rely on Example 6 as the starting point in its arguments, and . . . does not attempt to show any path (much less a scientifically valid path) for modifying Example 6 to arrive at the granules claimed in the ’685 patent.” *Id.* at 9. From this Patent Owner concludes “the prior art highlights the unpredictability and difficulties with preparing granules containing 85-98% acephate and establishes that selecting and optimizing ingredients and amounts to prepare such granules was not a simple matter of routine experimentation.” *Id.*

Patent Owner’s arguments are unpersuasive for several reasons. First, as Patent Owner acknowledges, JP ’902 discloses actual working examples of acephate granules, including Example 6 that contains 95% acephate in combination with some of the other ingredients taught in Misselbrook and

recited in claim 1. JP ’902 ¶¶ 18, 24; Ex. 1003 ¶¶ 83, 86, 95 (explaining these granules also contain a dispersing agent, wetting agent, and fillers). Nothing in JP ’902 suggests these exemplary granules were difficult to prepare or otherwise unsuccessful. To the contrary, JP ’902 reports that the granule in Example 6 had “excellent disintegration in water, dispersibility in water, and caking properties” and provides an “easy-to-use formulation[] that can be used in place of conventional powdery water-soluble formulations and liquid formulations.” JP ’902 ¶¶ 31–32. Patent Owner’s argument that Petitioner does not use Example 6 as the “starting point” for its analysis misses the point. *See* Resp. 9. Petitioner relies on the 95% acephate granule in Example 6 to demonstrate both a motivation to increase the acephate content in Misselbrook’s granule and to show that a POSITA would have had a reasonable expectation of successfully achieving a high acephate concentration within the claimed range. *See* Pet. 21–22. We agree with Petitioner on both counts.

Second, Patent Owner’s focus on what it characterizes as a lack of relevant working examples in Misselbrook and CN ’588 ignores the other teachings in these references. Both references teach acephate compositions in the form of granules. Ex. 1005, 2:55–59; 5:35–41; CN ’588, 4–5. And both references teach that the amount of acephate in those granules may be as much as 90% by weight. Ex. 1005, 3:34–35, 58–60; CN ’588, 4. The fact that, unlike JP ’902, Misselbrook and CN ’588 do not further exemplify these teachings in a working example does not negate the relevance of their teachings in an obviousness analysis. *See, e.g.*, *Merck*, 874 F.2d at 807 (“all disclosures of the prior art . . . must be considered”).

Third, we credit Mr. Geigle's testimony that pesticide granules and the general principles for making them were known in the prior art. *See* Ex. 1003 ¶¶ 24–29. This testimony is supported by the background teachings in Misselbrook and JP '902. *See, e.g.*, Ex. 1005, 1:40–50 (referring to "methods for preparing water-soluble granules of pesticides [that] are known in the art"); JP '902 ¶¶ 13–14 (describing methods "commonly used to prepare pesticide granules").

Moreover, Petitioner presents evidence that there were already a number of EPA registrations for high acephate content pesticide compositions prior to 2001, including at least one that Patent Owner acknowledges is for a "granular product containing 85-98% acephate." Ex. 1003 ¶ 23 (citing Exs. 1012–1014); Sur-Reply 5 (citing Ex. 2007 ¶¶ 66–71, Attachments A and B). These registrations are not themselves references for any of the grounds in the Petition, but their existence corroborates Mr. Geigle's testimony that the general conditions of formulating acephate compositions were already known in the art. Such evidence also undermines Patent Owner's argument that there were intractable difficulties to the formulation of acephate granules containing 85-98% acephate. For all these reasons, we credit Petitioner's showing over Patent Owner's evidence of the alleged difficulties in formulating such granules.

Patent Owner next argues that Petitioner's combination of references would have led a POSITA to include a binding agent, which is not one of the ingredients recited in claim 1. Resp. 13–19. According to Patent Owner, "[b]inding agents were understood to reduce granule dustiness, which was and is an important safety consideration." *Id.* at 14 (citing Ex. 2007 ¶¶ 83–88; Ex. 1024, 62, 64, 66–67). Patent Owner argues that the cited references

"teach[] away from preparing a granule without a binder" because "Misselbrook discloses granules containing water-soluble binders, preferably 'lactose, sucrose, glucose, and the like.'" *Id.* at 15 (quoting Ex. 1005, 3:2). Patent Owner acknowledges that Misselbrook refers to these agents as 'water-soluble fillers,'" but urges that a POS[IT]A "would have known that these agents assist in holding the particles together, i.e., they are binding agents." *Id.* (citing Ex. 2007 ¶ 92). According to Patent Owner, "water-soluble binders are a key feature of the granules" taught in Misselbrook and "neither CN '588 nor JP '902 provide any scientific reason to *remove* Misselbrook's water-soluble binding agent." *Id.* at 17–18.

Petitioner does not dispute that lactose, sucrose, and glucose were known to be binding agents, but argues that Misselbrook also teaches the use of other water-soluble fillers that do not have binding properties. Reply 10–12. Specifically, Petitioner contends that "Misselbrook's formulations teach using a 'water soluble filler' which 'includes ***any*** water soluble or water dispersible agent which may be employed to dilute the pesticide.'" *Id.* at 10 (quoting Ex. 1005, 6:1–3 (emphasis added by Petitioner)). According to Petitioner,

> A filler is a common, well-understood concept to a POSITA, and specific examples of non-binding-agent-fillers are not needed in order to disclose the concept of a filler. A POSITA would know fillers normalize the concentration of the active ingredient in a formulation, would reasonably expect success in doing so, and would not view this as unexpected or producing unexpected results.

*Id.* at 11 (citing Ex. 1003 ¶ 95). Petitioner further points to the disclosure of fillers "which are not also binding agents," such as "inorganic salts" in CN '588 and JP '902. *Id.* (citing CN '588, 2; JP '902 ¶¶ 5, 11).

We agree with Petitioner that Misselbrook's teachings are not limited to the types of water-soluble fillers that Patent Owner says are binding agents. In addition to lactose and other sugars, Misselbrook teaches that "microcrystalline cellulose, powdered cellulose, calcium phosphate(s), [and] inorganic water-soluble salts" are also "[a]ppropriate water-soluble fillers" for its granules. Ex. 1003, 6:4–10. Nothing in the record suggests that such fillers are binding agents. Moreover, Misselbrook's express teaching that "*any* water soluble or water dispersible" diluent can be used as fillers (Ex. 1003, 6:1–3 (emphasis added)) rebuts Patent Owner's argument that a POSITA would understand fillers with binding properties like lactose, sucrose, and glucose to be a "key feature" of those granules. Resp. 18. Thus, the combination of references in Petitioner's ground would not, as Patent Owner contends, have led a POSITA to include a binding agent.

Furthermore, we are not convinced that the premise for Patent Owner's argument—that the "consisting of" language in claim 1 excludes Misselbrook's use of lactose as a filler—is correct. "Consisting of" excludes unrecited ingredients. But "fillers to make 100%" are one of the ingredients recited in claim 1. Ex. 1001, 8:2. Mr. Geigle persuasively explains that the fillers taught in Misselbrook, including lactose, are used "to normalize the concentration of the active ingredient" by "adding an amount . . . to make 100%." Ex. 1003 ¶ 95. This would seem to meet the plain meaning of "fillers to make 100%," as recited in claim 1.[9] Thus, we do not understand "consisting of" to exclude such fillers from the granule of claim 1 simply

[9] Petitioner does not propose a specific construction for this claim term, but states it should be given its plain meaning. Pet. 3. Patent Owner does not respond to this contention, nor propose its own construction.

because a POSITA would understand that the same ingredient may also serve a different purpose. That said, because Misselbrook's teachings are not limited to lactose, and Petitioner has sufficiently shown that it would have been obvious to use both non-binding and binding fillers in the asserted combination, Patent Owner's argument would remain unavailing even if claim 1 were construed as Patent Owner suggests.

Patent Owner further argues that there is "no basis to expect that a POS[IT]A would 'optimize' the level of stabilizer to 0.01-1%" because the cited art either "does not suggest any amount" of stabilizer to use or it suggests the use of a higher concentration. *See* Resp. at 19–22. According to Patent Owner:

> CN '588 reports that acephate decomposed, even when combined with stabilizers at 20-30%, well above the claimed range of 0.01-1%. Thus, while CN '588 generally states that stabilizers could be used at "0.01 to 10 parts" by weight relative to acephate, CN '588 provides no motivation for selecting a stabilizer at or near the low end of this range. Thus, CN '588 undermines [Petitioner's] notion that a POS[IT]A would somehow "optimize" the level of stabilizer to 0.01-1% based on accelerated aging tests.

*Id.* at 20 (citing Ex. 2007 ¶¶ 119–22).

We disagree. As explained above, both CN '588 and JP '902 teach stabilizer ranges that encompass or overlap the recited range at their lower end. *See, e.g.*, CN '588, 5 (a stabilizer in "an amount that can stabilize acephate, generally 0.01 to 50 (wt) %"); JP '902 ¶ 12 ("The amount of other additive such as stabilizers and preservatives relative to the overall formulation is about 10% by weight or less."). CN '588 teaches that an amount of stabilizer in this range "can stabilize acephate" in a dry pesticide preparation such as a granule. CN '588, 5. Moreover, we credit Mr.

Geigle's testimony that a POSITA would understand that as the concentration of acephate was increased, the amount of the other ingredients, including the stabilizer, would have to decrease. *See, e.g.*, Ex. 1003 ¶ 94. Such evidence demonstrates a motivation to optimize the concentration of stabilizer toward the lower end of the ranges taught in these references.

The results of CN '588's accelerated aging tests, which Patent Owner refers to in its Response, do not overcome Petitioner's showing. As an initial matter, the data Patent Owner relies upon shows that the compositions containing a stabilizer had a lower decomposition rate than the control samples. CN '588, 7–8; Ex. 2007 ¶ 120 (highlighting data). Thus, the data do not undermine CN '588's teaching of effective stabilizer ranges, but rather support the reference's thesis that adding such stabilizers "can improve the stability of acephate in dry preparations." CN '588, 4. Moreover, as Petitioner points out, claim 1 does "not claim a ***stable*** acephate granule" that undergoes no decomposition whatsoever in accelerated aging tests, but rather a "granule that ***includes a stabilizer***."[10] Reply 19. And Petitioner has sufficiently shown that a POSITA would have been motivated to add a stabilizer, been able to optimize the amount using routine techniques, and had a reasonable expectation of achieving some improvement by doing so even at the lower end of the prior art ranges.

Finally, Patent Owner' arguments that Petitioner's ground is based on

---

[10] While the claim preamble refers to a "stable" granule, Patent Owner agrees this language is not limiting. Tr. 50:17–20, 51:3–5. Thus, Patent Owner has waived any argument that the challenged claims can be distinguished from the cited prior art based on language in the preamble.

improper hindsight are also unavailing. *See* Resp. 23–27. Patent Owner contends that a POSITA would not have looked to Misselbrook as the "starting point" for developing acephate granules because "Misselbrook's disclosure focuses on emamectin benzoate, which is Misselbrook's preferred, more preferred, even more preferred, and especially preferred pesticide." *Id.* at 23. But while the Misselbrook inventors may have preferred emamectin benzoate, they also identify "acephate" as an "[e]xemplary water-soluble pesticides which may be employed in the present invention." Ex. 1005, 5:35–41. It is well settled that "the fact that a specific embodiment is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered." *Merck*, 874 F.2d at 807 (Fed. Cir. 1989) (quotations omitted). Likewise, even if a reference's "principal focus" lies elsewhere, it does not "negate" additional teachings that other embodiments are also effective. *See In re Inland Steel Co.*, 265 F.3d 1354, 1361 (Fed. Cir. 2001). This maxim that all teachings in a reference must be considered is all the more true here because Misselbrook identifies acephate as one of a handful of exemplary pesticides for its granule formulations—not an unpreferred option. Thus, contrary to Patent Owner's argument, Petitioner has shown that Misselbrook is a valid starting point for its obviousness analysis.

Patent Owner further contends the ground is hindsight-driven because the references "do not teach any granule containing the five excipients—and only the five excipients—recited in claim 1 of the '685 patent." Resp. 25. To this end, Patent Owner identifies "numerous specific choices" it contends are not taught in the references and that a POSITA would have to make to arrive at the granule of claim 1. *Id.* at 25–27.

We do not agree with Patent Owner. As explained above, Petitioner demonstrates that Misselbrook teaches an acephate granule containing four of the excipients in claim 1 and sets forth sufficient reasoning with rational underpinning to include the fifth as taught by both CN ’588 and JP ’902. Petitioner also persuasively shows that it would have been obvious to optimize the concentrations within the recited ranges. The flaw in Patent Owner’s argument is that, to the extent they are relevant, the choices it contends one would have had to make to arrive at the claimed granule are all taught or suggested by the combination of references, and in most instances by Misselbrook itself. Moreover, Petitioner has shown that any leaps a POSITA would have to make are not nearly as great as Patent Owner suggests and well within the knowledge of one of ordinary skill using routine experimentation. To the extent there are any disagreements between the parties’ experts on this point, we credit the testimony of Mr. Geigle and the evidence and rationale offered in the Petition.

In sum, Petitioner addresses every element of claim 1 and persuasively demonstrates that a POSITA would have been motivated to combine the cited teachings with a reasonable expectation of success. After considering the full trial record, we determine Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable as obvious over Misselbrook, CN ’588, and JP ’902.

*ii. Claims 2–4*

Claims 2–4 depend from claim 1. These claims further limit the “dispersing agent” (claim 2), “wetting agent” (claim 3), and “antifoaming

agent" (claim 4) in claim 1 to a more particular category of such ingredients. *See* Ex. 1001, 8:5-14.

Petitioner identifies where examples of ingredients within each of the categories recited in claims 2–4 are taught in Misselbrook and, in some instances, the other cited references as well. *See* Pet. 37 (citing Ex. 1025, 2–3 (sodium lauryl sulfate); Ex. 1005, 6:36–37; Ex. CN '588, 5, JP '902 ¶ 10 for claim 2); 37–38 (citing Ex. 1005, 4:1–9 (sodium alkyl naphthalene sulfonate); CN '588, 5; Ex. 1009 ¶ 10 for claim 3); 38 (citing Ex. 1005, 3:13–15 (methylated silicones)). Petitioner also offers testimony from Mr. Geigle supporting these arguments. Ex. 1003 ¶¶ 102–103 (claim 2); 104–105 (claim 3); 106–107 (claim 4). Patent Owner does not dispute Petitioner's contentions regarding the additional limitations recited in claims 2–4. *See generally* Resp.

Petitioner's contentions are sufficiently supported by the record and persuasive. Thus, we find that the additional limitations recited in claims 2–4 are taught in the cited references, and it would be obvious to use such ingredients in the asserted combination. To the extent Patent Owner asserts the same arguments for claims 2–4 that it does for claim 1, those arguments are unavailing for the reasons noted above. Accordingly, Petitioner has shown by a preponderance of the evidence that claims 2–4 are unpatentable as obvious over Misselbrook, CN '588, and JP '902.

*iii. Claim 7*

We reach a different conclusion on independent claim 7. Like claim 1, claim 7 is a "consisting of" claim. Claim 7 recites all of the ingredients and ranges in claim 1 and further recites a specified amounts of a

"binding agent" and a "disintegrating agent." Ex. 1001, 8:41–43. For the ingredients recited in both claims, Petitioner relies on the same evidence and arguments discussed above for claim 1. *See* Pet. 14–37. Petitioner presents additional arguments regarding the binding agent and disintegrating agent limitations. *Id.*

We have considered these arguments and determine that Petitioner does not sufficiently show that a POSITA would have been motivated to combine a disintegrating agent with the other ingredients in claim 7. Because this issue is dispositive of Petitioner's challenge to claim 7, we focus on the parties' arguments regarding the disintegrating agent limitation in our analysis below.

Petitioner acknowledges that neither Misselbrook, nor JP '902, teaches a disintegrating agent as an ingredient in their acephate compositions. Pet. 35–36; Tr. 25:12–26:1 (Petitioner's counsel agreeing that Misselbrook does not identify disintegrating agents). According to Petitioner, "CN '588 teaches adding 'bentonite' as a 'solid carrier' to dry acephate formulations" and a POSITA would know bentonite "can be used as a disintegrating agent." Pet. 35–36. Petitioner argues that a POSITA would have been motivated to add a disintegrating agent, such as bentonite, to Misselbrook's granule because he or she "would know the need for disintegrating agents varies based on a granules compactness and ingredients, and that adding a binding agent may require adding a disintegrating agent to assist in granule dissolution." *Id.* at 36 (citing Ex. 1003 ¶ 112). Petitioner further contends "a POSITA would be motivated to run routine tests and experiments to optimize the workable range of the disintegrating agent—including testing the rate of dispersion" as

in the disintegration tests described in JP ’902. *Id.* (citing Ex. 1003 ¶ 113; JP ’902 ¶ 28).

Patent Owner disagrees, urging that “[t]he art provides no scientific rationale for adding a disintegrating agent to Misselbrook’s granules.” Resp. 32. According to Patent Owner, both Misselbrook and JP ’902 teach acephate granules without a disintegrating agent and, “[w]hile CN ’588 mentions disintegrating agents among a laundry list of solid carriers,” it “does not disclose any benefit associated with adding a disintegrating agent to a granule of the type disclosed in Misselbrook.” *Id.* at 32–33.

Moreover, Patent Owner contends that a POSITA “would have understood that the granules in Misselbrook did not require a disintegrating agent based on at least JP ’902.” *Id.* at 33 (citing Ex. 2007 ¶ 156). Patent Owner’s expert, Dr. Rockstraw, explains that the disintegration tests in JP ’902 show that “granules containing water-soluble pesticides, water-soluble binders, and *no* disintegrating agent,” like those disclosed in JP ’902 and Misselbrook, “had acceptable disintegrating properties when mixed with water, i.e., no disintegrating agent was required.” Ex. 2007 ¶ 155. As such Patent Owner argues that “[c]onsistent with [Petitioner’s] theme of efficiency and reducing costs, a POSA would not seek to add an extra ingredient such as a disintegrating agent when it was not required.” Resp. 33.

In its Reply, Petitioner responds largely by repeating its arguments from the Petition. *See* Reply 22–24. Petitioner does not directly respond to Patent Owner’s argument and Dr. Rockstraw’s testimony that the results of JP ’902’s disintegration tests suggest that a disintegrating agent is not

required even when those granules contain an ingredient with binding properties such as lactose. *Id.*

Having considered the record as a whole, we conclude that Petitioner has not met its burden for this element. The record shows that disintegrating agents such as bentonite were known in the art. But obviousness requires more than showing that a claim element was known in the prior art, Petitioner must also demonstrate that a motivation for combining that element with the others recited in the claim. *KSR*, 550 U.S. at 418.

Here, Petitioner relies on the following testimony of Mr. Geigle to try to show the required motivation:

> A POSITA in 2001 would know that the need for a disintegrating agent varies based on the compactness of a granule, and the other ingredients used in the formulation. A POSITA would know that adding a binding agent may require adding a disintegrating agent to assist in the dissolution of a granule in solution.

Ex. 1003 ¶ 112.

This testimony and the arguments Petitioner premises on it are not persuasive. As an initial matter, the testimony is equivocal. Mr. Geigle states only that a POSITA would know that a disintegrating agent "may" be required. Ex. 1003 ¶ 112. More importantly, Petitioner's argument that a POSITA would have known that a disintegrating agent may be required does not account for disintegration tests reported in JP '902. Those tests show that acephate granules containing several of the same ingredients recited in the challenged claims had "excellent disintegration in water, dispersibility in water, and caking properties" without the need for any disintegrating agent. JP '902 ¶ 31; *see also id.* ¶ 32 ("[T]he pesticide granules readily disintegrated and dispersed in water"). This is true even though at least

some of those granules, including the 95% acephate granule in Example 6, also contain lactose—an ingredient both parties agree can act as a binding agent. *Id.* Petitioner does not explain why a POSITA would have understood that a disintegrating agent may be required in the presence of such a binding agent when there is data in the record suggesting that no disintegrating agent is required. For these reasons, we credit Dr. Rockstraw's testimony that "a POS[IT]A would have expected that a disintegrating agent would not be required to achieve acceptable dissolution" and that "factors such as cost and efficiency would have discouraged adding extra, unnecessary ingredients." Ex. 2007. ¶¶ 156, 248.

Moreover, Petitioner's argument that it would have been obvious to add a disintegrating agent absent sufficient evidence of a need to do so is in tension with its other arguments. As Patent Owner points out, Petitioner advances a "theme of efficiency and reducing costs" both to show a motivation to increase the concentration of acephate and to optimize the concentrations of the other ingredients. *See* Resp. 33 (citing arguments in the Petition). That theme is at odds with Petitioner's argument for adding a disintegrating agent because JP '902 suggests such an agent is not necessary to produce a granule that readily dissolves. Petitioner has not sufficiently reconciled this tension, which further undermines its argument for adding a disintegrating agent to Misselbrook's granule.

For these reasons, we find that Petitioner's alleged motivation for including a disintegrating agent in its combination of references is not supported by a preponderance of the evidence. Accordingly, Petitioner has not shown sufficiently that claim 7 would have been obvious over Misselbrook, CN '588, and JP '902.

*iv. Claims 8–12*

Claims 8–12 depend from claim 7 and therefore also require a "disintegrating agent." For the same reasons Petitioner has not carried its burden for claim 7, Petitioner has not shown that claims 8–12 are unpatentable over the cited references.

*F. Petitioner's Other Grounds*

Petitioner's other grounds are similar to its first ground and challenge the same claims, but add Mayer to the combination of Misselbrook and CN '588 (ground 2) and Misselbrook and JP '902 (ground 3). *See* Pet. 39–61. Having determined that Petitioner establishes by a preponderance of the evidence that the subject matter of claims 1–4 would have been obvious over Misselbrook, CN '588, and JP '902 we need not address Petitioner's additional grounds challenging these claims. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding that a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address [alternative grounds] that are not necessary to the resolution of the proceeding.").

As for claims 7–12, we again find that Petitioner's alleged motivation for including a disintegrating agent is lacking. This is true for both ground two and ground three because Petitioner advances essentially the same arguments for this limitation in both grounds. *Compare* Pet. 50–51, *with id.* at 61–62. Our discussion and findings below apply to both grounds.

*i. Claim 7*

According to Petitioner,

> Mayer teaches "[c]onventionally used disintegrants may be used in the solid formulation according to the present invention," and that "[t]he solid formulation according to the present invention preferably comprises 1 to 10% by weight, in particular, 1 to 7.5% by weight of at least one distintegrant"—falling within the claimed range. Mayer describes examples of 75-85% and 70-85% active ingredient granules containing "1 to 5%" disintegrant and "1 to 7.5%" disintegrant, respectively.

Pet. 50; *see also id.* at 61 (referring to these teachings). Based on this "knowledge of distintegrating agents, the effect binders have on disintegration, the focus on higher acephate concentrations, and motivation to look to Mayer . . . to improve upon Misselbrook," Petitioner argues that a POSITA would have been motivated to run routine tests to optimize the workable range of disintegrating agent starting at the range in Mayer. *Id.* at 50–51. Petitioner alleges the same motivation for adding a disintegrating agent to the combination in ground three, additionally pointing out that "JP '902 describes testing 95% acephate granules for disintegration, consistent with routine tests a POSITA would know to conduct in 2001." *Id.* at 61.

As it did in the first ground, Patent Owner responds that none of the cited references "provide[] any scientific rationale for adding a disintegrating agent to Misselbrook's granules" and "[t]he mere fact" that the references "mention the possibility of adding a disintegrating agent to pesticide formulations does not establish that a POS[IT]A would have been motivated to add one to *Misselbrook's* granules." Resp. 49–50; 62–63. Patent Owner repeats its argument that "based on Misselbrook and JP '902, a POS[IT]A would have understood that granules comprised largely of

water-soluble pesticides and water-soluble binding agents do not require disintegrating agents." *Id.* at 50 (citing Ex. 2007 ¶¶ 154–56, 212). According to Patent Owner, a POSITA "would have understood that Misselbrook's granules did not require a disintegrating agent" and concerns regarding cost and efficiency would have discouraged the addition of an unnecessary ingredient. *Id.*; *see also id.* at 62–63 (same response for ground three).

Having considered the record as a whole, including the additional teachings cited in Mayer, we again determine that Petitioner has not carried its burden. It is true that Mayer teaches that a disintegrating agent is one of many types of ingredients that may be included in a pesticide granule. But, as Patent Owner points out, that teaching does not itself evidence a motivation to add a disintegrating agent to Misselbrook's granule. *See* Resp. 49–50; 62–63.

The motivation Petitioner alleges for combining Mayer's disintegrating agent in grounds two and three is the same one it offers for the first ground, i.e., that a POSITA would have known that a disintegrating agent may be required when a binding agent is used. As explained above, that argument is unpersuasive in view of the disintegration tests reported in JP '902 and Dr. Rockstraw's testimony that based on those tests a POSITA would expect acephate granules with excipients like those taught in Misselbrook and JP '902 to dissolve acceptably without the need for a disintegrating agent. JP '902 ¶¶ 31–32; Ex. 2007 ¶¶ 155–158, 209–212, 247. While Mayer describes pesticide granules and disintegrating agents generally, it does not mention acephate at all. *See* Pet. 41 (acknowledging that "Mayer does not explicitly name acephate"). Thus, Mayer does not

suggest a need for a disintegrating agent in an acephate granule, much less one with the excipients similar to those taught in Misselbrook and JP ’902. Accordingly, we agree with Patent Owner that Mayer’s teachings do not provide a persuasive rationale for adding a disintegrating agent to Misselbrook’s granules and credit Dr. Rockstraw’s testimony that “factors such as cost and efficiency would have discouraged adding extra, unnecessary ingredients” such as a disintegrating agent. Ex. 2007 ¶ 248.

For these reasons, as well as those explained in our analysis of claim 7 in the first ground, we find that the preponderance of the evidence does not support Petitioner’s alleged motivation for combining a disintegrating agent with the other ingredients in its combination of references to show that claim 7 would have been obvious. Accordingly, Petitioner does not sufficiently show that claim 7 would have been obvious over either Misselbrook, Mayer, and CN ’588 (ground two) or Misselbrook, JP ’902, and Mayer (ground three).

#### *ii. Claims 8–12*

For the same reasons Petitioner has not carried its burden for claim 7, Petitioner has not shown by a preponderance of the evidence that claims 8–12 are unpatentable over the references in grounds two and three.

## IV. CONCLUSION[11]

Petitioner demonstrates, by a preponderance of the evidence, that claims 1–4 of the ’685 patent are unpatentable, but does not establish the same for claims 7–12.

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–4, 7–12 | 103(a) | Misselbrook, CN ’588, JP ’902 | 1–4 | 7–12 |
| 1–4,[12] 7–12 | 103(a) | Misselbrook, Mayer, CN ’588 | | 7–12 |
| 1–4,[13] 7–12 | 103(a) | Misselbrook, JP ’902, Mayer | | 7–12 |
| **Overall Outcome** | | | 1–4 | 7–12 |

## V. ORDER

Accordingly, it is:

ORDERED that Petitioner has shown that claims 1–4 of U.S. Patent 7,473,685 B2 are unpatentable;

FURTHER ORDERED that Petitioner has not shown that claims 7–12 of U.S. Patent 7,473,685 B2 are unpatentable; and

---

Decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.* *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), 42.8(b)(2).

[12] As explained above, we do not reach this ground for claims 1–4.

[13] As explained above, we do not reach this ground for claims 1–4.

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Dorothy Whelan
Thad Kodish
Jacqueline Tio
FISH & RICHARDSON P.C.
whelan@fr.com
tkodish@fr.com
tio@fr.com

For PATENT OWNER:

Maximilienne Giannelli
Anand Sharma
Rajeev Gupta
Joshua Goldberg
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP
Maximilienne.Giannelli@finnegan.com
Anand.sharma@finnegan.com
Raj.Gupta@finnegan.com
Joshua.Goldberg@finnegan.com

US007473685B2

(12) **United States Patent**
**Jadhav et al.**

(10) **Patent No.: US 7,473,685 B2**
(45) **Date of Patent: Jan. 6, 2009**

(54) **PROCESS FOR PREPARATION OF CHEMICALLY STABLE, DRY-FLOW, LOW COMPACT, DUST FREE, SOLUBLE GRANULES OF PHOSPHOROAMIDOTHIOATES**

(75) Inventors: **Prakash Mahadeo Jadhav**, Mumbai (IN); **Rajju Devidas Shroff**, Mumbai (IN)

(73) Assignee: **United Phosphorus, Ltd.**, Mumbai (IN)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/060,283**

(22) Filed: **Feb. 18, 2005**

(65) **Prior Publication Data**

US 2005/0143351 A1 Jun. 30, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/126,965, filed on Apr. 22, 2002, now Pat. No. 6,875,381.

(60) Provisional application No. 60/340,272, filed on Dec. 18, 2001.

(51) **Int. Cl.**
*A01N 57/02* (2006.01)

(52) **U.S. Cl.** ....................... **514/120**; 424/408; 424/409; 424/417; 424/421

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,716,600 A 2/1973 Magee
3,845,172 A 10/1974 Magee
3,914,417 A 10/1975 Magee
4,218,444 A 8/1980 Koundakjian
4,544,553 A 10/1985 Smolanoff
4,892,866 A * 1/1990 Itzel et al. .................. 514/119
5,075,058 A 12/1991 Chan
5,100,667 A 3/1992 Chan
5,298,501 A 3/1994 Cummings
5,352,674 A 10/1994 Cummings
5,369,100 A 11/1994 Cummings
5,443,764 A 8/1995 Lloyd

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0304492 B1 12/1994

(Continued)

OTHER PUBLICATIONS

International Specialty Products, "Granules & Tablets," A grimer Polymers & Copolymers, International Specialty Products, 1996.

(Continued)

*Primary Examiner*—Neil Levy
(74) *Attorney, Agent, or Firm*—Jones, Tullar & Cooper, P.C.

(57) **ABSTRACT**

Dry flow, low compact, dust free, soluble granules of phosphoroamidothioates, preferably acephate, are produced by the process of 1) pre-mixing technical grade phosphoroamidothioate with specified adjuvants and other inert ingredients; 2) grinding to produce a ground product having a preferred particle size of 5 microns to 10 microns; 3) post-mixing; 4) granulating; 5) drying; 6) sizing to required length, preferably 1.5 to 3.0 mm; 7) and sieving to remove the fines to get the desired dust free soluble granule.

**12 Claims, 1 Drawing Sheet**



U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,464,623 | A | 11/1995 | Chan |
| 5,488,043 | A | 1/1996 | Yamada |
| 5,622,658 | A | 4/1997 | Lloyd |
| 5,650,163 | A | 7/1997 | Cannelongo |
| 5,698,540 | A | 12/1997 | Katayama |
| 6,013,272 | A | 1/2000 | Cummings |
| 6,337,323 | B2 | 1/2002 | Cummings |
| 6,387,388 | B1 | 5/2002 | Misselbrook |
| 2001/0018063 | A1 | 8/2001 | Cummings |
| 2002/0091106 | A1 | 7/2002 | Cummings |
| 2002/0114821 | A1 | 8/2002 | Lescota |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 58067603 | | 4/1983 |
| JP | 61126006 | * | 6/1986 |
| JP | 6-92803 | | 4/1994 |
| JP | 9-124406 | | 5/1997 |
| WO | WO 98/26656 | | 6/1998 |

OTHER PUBLICATIONS

Fuji Paudal Co., Ltd., “Powder & Granulation Process Technology,” Fuji Paudal Co., Ltd., 1954.

* cited by examiner


2
Insecticidally Active compound
4
Dispersing Agent
6
Wetting Agent
8
Binding Agent
10
Antifoaming Agent
Disintegrating Agent
12
Stabiliser
14
Filler
16
PREMIXING
18
20
GRINDING
22
24
POST MIXING
26
28
CHARGING
30
GRANULATION
34
36
DRYING
38
40
SIZING
42
44
54
DUST FREE SOLUBLE GRANULES
SIEVING
46
FINES
50

FIG. 1

# PROCESS FOR PREPARATION OF CHEMICALLY STABLE, DRY-FLOW, LOW COMPACT, DUST FREE, SOLUBLE GRANULES OF PHOSPHOROAMIDOTHIOATES

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit, under 35 U.S.C. 119 (e), of U.S. Provisional Application No. 60/340,272 filed Dec. 18, 2001, the contents of which are incorporated herein by reference.

This application is a continuation application of U.S. Ser. No. 10/126,965 filed Apr. 22, 2002 now U.S. Pat. No. 6,875, 381, the contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a process for preparing insecticidally active soluble granules of phosphoroamidothioate, referred to herein as acephate.

2. Background Information

In recent years, agricultural chemicals have been most preferably formulated in the form of dusts, wettable powders, soluble powders, emulsifiable concentrates, soluble liquid/concentrates, granules, coated granules, water dispersible granules, suspension concentrates, and solutions. Occasionally, when dusts are produced by absorbing or mixing active ingredients with a finely divided inert carrier material, for example China Clay or the like, drift problems occur. With wettable powders and soluble powders the problems faced at the time of dilution are not only drift, but the final disposal of containers, for dust particles tend to stick to sides of the containers. The left over materials within the containers pose great problems to the environment, operators and users.

Although dusts are undesirable because of airborne contamination and handling difficulties, liquid spray formulations have not provided an acceptable alternative, for they involve solvents and packaging expenses, along with container disposal requirements that detract from their commercial desirability.

Water dispersible granules produced by fluidized bed spray dryers overcome the problems associated with wettable powders and soluble powders, but have high processing costs and require high value capital investment, as well as requiring highly skilled staff. These problems impose a significant barrier in widening the market acceptance of these compounds.

Certain phosphoroamidothioates and phosphoroamidodithioates, collectively referred to as Phosphoroamidothioates, are known to have excellent insecticidal activity against a variety of insects and in a variety of environments. Acephate, one of the important commercial insecticides within this class of compounds, is a systemic and contact insecticide of moderate persistence with residual activity lasting about 10-15 days. It is effective against a wide range of aphids, leaf-miners, lepidopterous, larvae, sawflies and thrips and it is also a non-phytotoxic on many crop plants.

Phosphoroamidothioate containing pellets have been proposed in the past, but difficulties have been encountered in pelletizing acephate technical, the preferred insecticide within the class of phosphoroamidothioates. Attempts to manufacture acephate technical pellets from acephate technical powders have been proposed and have been unsuccessful.



Considerable experimentation in the area of producing the preferred high-strength acephate granules has been conducted and confirms the manufacturing difficulties which earlier formulators have experienced. Furthermore, the pellets and methods proposed for making pellets suggested in the prior art leave considerable room for improvement. Prior extrusion processes have proposed the addition of costly surfactants, the combination of phosphoroamidothioate with a second active ingredient, or the creation of a mixture of the active ingredient with a solvent in an amount of from 3-25% by weight before extrusion, but these processes have not solved the problems encountered.

The formulation of acephate presently in use is acephate 75% soluble powder having acephate active ingredient 75% (w/w), surfactant 1 to 2% (w/w), inert filler (precipitated silica) to make 100% (w/w). Acephate 75% soluble powder poses the problems of dust, low pourability, high transportation costs, high capital manufacturing investment, measurement difficulties, difficulties in packing material disposal, handling problems, high risk of caking and others.

Because of the problems associated with producing granular forms of phosphoroamidothioates, such as the preferred acephate, there is a need in the art for a process for preparing chemically stable, dry flow, low compact, dust free, insecticidally active soluble granules of phosphoroamidothioate which are useful from a practical stand point, as well as for a low cost, practical manufacturing technique which can be practiced on a commercial scale without requiring expensive additives or solvents.

## SUMMARY OF THE INVENTION

By the present invention the above-identified major limitations have been overcome. The method for producing dry flow, low-compact, dust free, soluble phosphoroamidothioate granules, such as the preferred compound acephate, is an improvement over prior manufacturing processes. Further, the dust free soluble granules produced by this invention, which has a concentration of the insecticidally active ingredient in this formulation may vary from 40-98% of phosphoroamidothioate active ingredient, is more advantageous than prior granular products and exhibits certain very desirable characteristics as noted hereinafter.

Briefly, and in accordance with a preferred embodiment of the invention, dry flow, low compact, dust free, soluble granules of insecticially active phosphoroamidothioate are prepared by forming a pre-mix containing the required quantity of phosphoroamidothioate, a dispersing agent, a wetting agent, a binding agent, an antifoaming agent, a disintegrating agent, a stabilizer and filler. The specified adjuvants have a maximum of 1% water insoluble matter. This pre-mix is then ground to produce a ground product having preferred particle sizes between 5.0 microns to 10.0 microns. The ground product is fed to a post-mixer to form a mixture. The mixture is then fed through a hopper into a granulator where granules are formed. The granules are then dried, and the dried granules are sized and sieved to separate dry granules from fines, producing dry flow, low compact, dust free, soluble granules of phosphoro-amidothioate as noted above, the preferred phosphoroamidothioate is acephate. The fines may be recycled back to the post mixer.

This invention produces essentially dry flow, low compact, dust free soluble phosphoroamidothioate granules having a preferred granule size of 1.5 to 3.0 mm in length and 0.5 to 1.0 mm in diameter. These granules of phosphoroamidothioates are characterized by aging stability for a minimum of two years.

BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will become apparent from the following detailed description of preferred embodiments thereof, taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a flow chart of the preferred embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The process of the present invention is best described by referring to the flow chart in FIG. **1**. An essentially dry pre-mix comprising about 95% to 99% of solids and 1% to 5% moisture and/or solvent is formed from the following ingredients: 40% to 98% of the insecticidally active compound **2**, 0.1% to 5.0% dispersing agent **4**, 0.1% to 3.0% wetting agent **6**, 0.1% to 3.0% binding agent **8**, 0.01% to 0.08% antifoaming agent **10**, 0.01% to 10.0% disintegrating agent **12**, 0.01% to 1.0% stabilizer **14**, and fillers **16** to make 100% (w/w). The insecticidally active compounds of the present invention have the following formula:



wherein R and $R^1$ individually are an alkyl, alkenyl or alkynyl group containing up to 6 carbon atoms, $R^2$ is hydrogen, an alkyl group containing 1 to 18 carbon atoms, a cycloalkyl group containing 3 to 8 carbon atoms, an alkenyl group containins 2 to 18 carbon atoms or an alkynyl group containing 3 to 18 carbon atoms, $R^3$ is hydrogen or an alkyl group containing 1 to 6 carbon atoms, and Y is oxygen or sulfur. All of the inert ingredients are preferably solids and in a powder form. In one preferred embodiment, the binding agent **8** is selected from sucrose and starch derivatives or a blend thereof, the wetting agent **6** is selected from calcium or sodium salt of alkyl aryl sulphonate, the dispersing agent **4** is selected from the derivative of sulfonated fatty alcohols, the disintegrating agent **12** is selected from swelling type clays such as Bentonite and zeolite, the antifoaming agent **10** is selected from silicon oil derivatives, the stabiliser **14** is selected from salts of higher fatty acids, and the filler **16** is selected from precipitated silica and kaoline and the like. Grinding **22** of the pre-mix **20** is then conducted, preferably in a microniser, to obtain a ground product **24** having a preferred particle size of 5 microns to 10 microns.

The ground product **24** is subjected to post-mixing **26** to form a mixture **28** which is then made into granules **36** by preferably charging **30**, by way of a rotary feeder, a feeding hopper which supplies the mixture to a granulator for granulation **34**. The granulator that performs the granulation **34** has a preferred inlet temperature between 30 to 35° C. and a preferred outlet temperature of between 40° C. to 45° C. The resulting granules **36** are subjected to a drying **38** process, preferably by passing the granules **36** through an air chamber, producing dry granules **40**.

Sizing **42** the dry granules **40** is then accomplished to produce sized granules **44** of a desired length and diameter. Sizing the granules is preferably conducted by passing the dry granules **40** through an oscillating cutter to obtain granules which are preferably between about 1.5 mm and 3.0 mm in length and 0.5 mm to 1.0 mm in diameter. After sizing, the sized granules **44** are subjected to sieving **46** to separate fines **50** generated during the sizing process from desired dust free soluble granules **51**.

The fines **50** from the sieving **46** process may be collected and recycled at the charging **30** stage of the process to obtain a minimum yield of 99.0% dry flowable, low compact, dust free, soluble granules **54** of phosphoroamidothioates, preferably acephate.

The dust free soluble granules **54** were tested for required quality specifications and packed in desired packing. This technique gives 99% of conversion yield. The dust free soluble granules **54** enjoy all the formulation advantages described above, producing dust free soluble granules **54** which are beneficial from an economic aspect and a handling aspect and which show a very good performance during use.

The following examples are presented to illustrate but not to restrict the present invention. Parts and percentage are by weight unless otherwise specified.

EXAMPLE 1

Acephate 97% Granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredients | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 98.48 |
| Dispersing agent | 0.50 |
| Wetting agent | 0.10 |
| Binding agent | 0.10 |
| Antifoaming agent | 0.03 |
| Disintegrating agent | 0.50 |
| Stabilizer | 0.05 |
| Filler | 0.24 |
| Total | 100.00 |

EXAMPLE 1

Process

The constituents of the above composition are mixed in a pre-mixer, then ground in a microniser to the required size of 5 micron to 10 micron. The ground product **24** is again mixed in a post-mixer to get a uniform homogeneous mixture **28**. This homogeneous mixture **28** is then fed through a rotary feeder into a low compaction granulator, while maintaining an inlet temperature of 32 to 35° C. and an outlet temperature of 40 to 45° C. The Acephate granules **36** formed in the granulator are further dried through an air chamber, sized to 1.5 mm to 3 mm length, and are collected. The fines **50** generated during the process are recharged to get a conversion yield of 99 percent.

EXAMPLE 2

Acephate 98% granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 99.50 |
| Dispersing agent | 0.25 |
| Wetting agent | 0.03 |
| Binding agent | 0.05 |
| Antifoaming agent | 0.02 |
| Disintegrating agent | 0.05 |
| Stabilizer | 0.05 |
| Filler | 0.05 |
| Total | 100.00 |

Acephate 98% granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 3

Acephate 97.5% granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 98.99 |
| Dispersing agent | 0.40 |
| Wetting agent | 0.10 |
| Binding agent | 0.10 |
| Antifoaming agent | 0.03 |
| Disintegrating agent | 0.20 |
| Stabilizer | 0.05 |
| Filler | 0.13 |
| Total | 100.00 |

Acephate 97.5% granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 4

Acephate 90% Granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity(% w/w) |
| Acephate Technical 98.5% purity | 91.38 |
| Dispersing agent | 00.75 |
| Wetting agent | 00.10 |
| Binding agent | 00.20 |
| Antifoaming agent | 00.03 |
| Disintegrating agent | 01.00 |
| Stabilizer | 00.50 |
| Filler | 06.04 |
| Total | 100.00 |

Acephate 90% granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 5

Acephate 85% granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 86.30 |
| Dispersing agent | 01.50 |
| Wetting agent | 00.50 |
| Binding agent | 01.00 |
| Antifoamer | 00.05 |
| Disintegrating agent | 02.00 |
| Stabilizer | 00.60 |
| Filler | 08.05 |
| Total | 100.00 |

Acephate 85% granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 6

Acephate 75% Granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 76.15 |
| Dispersing agent | 2.00 |
| Wetting agent | 1.50 |
| Binding agent | 1.50 |
| Antifoaming agent | 0.06 |
| Disintegrating agent | 5.00 |
| Stabilizer | 0.75 |
| Filler | 13.04 |
| Total | 100.00 |

Acephate 75% Granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 7

Acephate 50% Granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredients | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 50.77 |
| Dispersing agent | 3.00 |
| Wetting agent | 2.00 |
| Binding agent | 3.00 |
| Antifoaming agent | 0.08 |
| Disintegrating agent | 10.00 |
| Stabilizer | 1.00 |
| Filler | 30.15 |
| Total | 100.00 |

Acephate 50% Granules with above composition can be prepared by following the process described in EXAMPLE 1.

EXAMPLE 8

Acephate 40% granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredient | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 40.61 |
| Dispersing agent | 4.50 |
| Wetting agent | 3.00 |
| Binding agent | 3.00 |
| Antifoaming agent | 0.08 |
| Disintegrating agent | 12.00 |
| Stabilizer | 1.50 |
| Filler | 35.31 |
| Total | 100.00 |

Acephate 40% Granules of above composition can be prepared by following the process described in EXAMPLE 1.

Tests

The physical properties of Acephate granules were determined before and after aging at 45° C. for 500 hrs and for flowability, wetting time, attrition test, disintegration rate, tap density, suspensibility, sedimentation and persistent foam. No noticeable difference in all the above properties was observed. The dynamic wetting time and solubility test was measured as per MT-167 of CIPAC. The flowability was measured as per MT-172 of CIPAC. The dry sieve analysis was measured as per MT-170 of CIPAC. The sedimentation was measured as per MT-15.1 of CIPAC. Dustiness of granules was measured as per MT-171 of CIPAC. The tap density was measured as per MT-58.4 and MT-33 of CIPAC. The Acephate technical was determined by the GLC method published in AOAC.

Although the present invention has been disclosed in terms of a preferred embodiment, it will be understood that numerous additional modifications and variations can be made without departing from the scope of the invention as defined by the following claims.

We claim:

1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w an insecticidally active compound of the following formula:




wherein R and $R^1$ individually are alkyl, alkynyl or alkenyl group containing up to 6 carbon atoms, $R^2$ is hydrogen, an alkyl group containing 1 to 18 carbon atoms, a cycloalkyl group containing 3 to 8 carbon atoms, an alkenyl group containing 2 to 18 carbon atoms or an alkynyl group containing 3 to 18 carbon atoms, $R^3$ is hydrogen or an alkyl group containing 1 to 6 carbon atoms, and Y is oxygen or sulfur, wherein said insecticidal active compound is Acephate;

(ii) 0.1-5.0% w/w a dispersing agent;

(iii) 0.1-3% w/w a wetting agent;

(iv) 0.01-0.08% w/w an antifoaming agent;



(v) 0.01-1% w/w a stabilizer and

(vi) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

2. The chemically stable phosphoroamidothioate granule of claim 1, wherein said dispersing agent is a derivative of sulphonated fatty alcohol.

3. The chemically stable phosphoroamidothioate granule of claim 1, wherein said wetting agent is selected from the group consisting of calcium and sodium salt of alkylaryl sulphonate.

4. The chemically stable phosphoroamidothioate granule of claim 1, wherein said antifoaming agent is a silicon oil defoamer.

5. The chemically stable phosphoroamidothioate granule of claim 1, wherein said stabilizer is a salt of higher fatty acid.

6. The chemically stable phosphoroamidothioate granule of claim 1, wherein said stabilizer is a salt of higher fatty acid.

7. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w an insecticidally active compound of the following formula:




wherein R and $R^1$ individually are alkyl, alkynyl or alkenyl group containing up to 6 carbon atoms, $R^2$ is hydrogen, an alkyl group containing 1 to 18 carbon atoms, a cycloalkyl group containing 3 to 8 carbon atoms, an alkenyl group containing 2 to 18 carbon atoms or an alkynyl group containing 3 to 18 carbon atoms, $R^3$ is hydrogen or an alkyl group containing 1 to 6 carbon atoms, and Y is oxygen or sulfur, wherein said insecticidal active compound is Acephate;

(ii) 0.1-5.0% w/w a dispersing agent;

(iii) 0.1-3% w/w a wetting agent;

(iv) 0.1-3% w/w a binding agent;

(v) 0.01-0.08% w/w an antifoaming agent;

(vi) 0.01-10% w/w a disintegrating agent;

(vii) 0.01-1% w/w a stabilizer and

(viii) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

8. The chemically stable phosphoroamidothioate granule of claim 7, wherein said dispersing agent is a derivative of sulphonated fatty alcohol.

9. The chemically stable phosphoroamidothioate granule of claim 7, wherein said wetting agent is selected from the group consisting of calcium and sodium salt of alkylaryl sulphonate.

10. The chemically stable phosphoroamidothioate granule of claim 7, wherein said binding agent is selected from the group consisting of sucrose and starch derivatives and a blend thereof.

11. The chemically stable phosphoroamidothioate granule of claim 7, wherein said antifoaming agent is a silicon oil defoamer.

12. The chemically stable phosphoroamidothioate granule of claim 7, wherein said disintegrating agent is swelling type clay selected from the group consisting of bentonite and zeolite.

* * * * *

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1). This brief contains 10,230 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), as it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: July 18, 2022

*<u>/s/ Maximilienne Giannelli</u>*

Maximilienne Giannelli
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Attorney for Appellant UPL NA, Inc.*