**No. 22-1514**

# United States Court of Appeals for the Federal Circuit

**UPL NA INC.,**

***Appellant,***

***v.***

**TIDE INTERNATIONAL (USA), INC.**

***Appellee.***

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN INTER PARTES REVIEW NO. IPR2020-01113

## APPELLEE TIDE INTERNATIONAL (USA), INC.'S RESPONSE BRIEF

Bailey K. Benedict
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
Tel: (713) 654-5331
benedict@fr.com

Thad Kodish
FISH & RICHARDSON P.C.
1180 Peachtree St. NE, 21st Floor
Atlanta, GA 30309
Tel: (404) 724-2792
tkodish@fr.com

Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
powell@fr.com

August 29, 2022

*Attorneys for Appellee*

**Independent Claims 1 and 7 of U.S. Patent 7,473,685 (Appx52)**

**1.** A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w an insecticidally active compound of the following formula . . . wherein said insecticidal active compound is Acephate;
(ii) 0.1-5.0% w/w a dispersing agent;
(iii) 0.1-3% w/w a wetting agent;
(iv) 0.01-0.08% w/w an antifoaming agent;
(v) 0.01-1% w/w a stabilizer and
(vi) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

**7.** A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of

(i) 85-98% w/w [acephate];
(ii) 0.1-5.0% w/w a dispersing agent;
(iii) 0.1-3% w/w a wetting agent;
(iv) 0.1-3% w/w a binding agent;
(v) 0.01-0.08% w/w an antifoaming agent;
(vi) 0.01-10% w/w a disintegrating agent;
(vii) 0.01-1% w/w a stabilizer and
(viii) fillers to make 100%,

wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

# CERTIFICATE OF INTEREST

Counsel for Appellee Tide International (USA), Inc. ("Tide") certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **Tide International (USA), Inc.**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Zhejiang Tide Cropscience Co. Ltd.**
   **Ningbo Tide Imp. & Exp. Co., Ltd.**
   **Tide International Company Limited**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **Tide International Company Limited**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: Dorothy Whelan, Jacqueline Tio**

5. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

   ***UPL NA, Inc. v. Tide International (USA), Inc. et al.,***
   **No. 8:19-cv-1201 (C.D. Cal.)**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not applicable**

Dated: August 29, 2022

*/s/ Bailey K. Benedict*
Bailey K. Benedict

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ..... i

STATEMENT OF RELATED CASES ..... 1

STATEMENT OF THE ISSUES ..... 2

INTRODUCTION ..... 2

STATEMENT OF THE FACTS ..... 4

I. THE ’685 PATENT: A RECIPE FOR A WELL-KNOWN TYPE OF PESTICIDE USING WELL-KNOWN INGREDIENTS ..... 4

A. Background ..... 4

B. The ’685 Patent Prosecution History and Issued Claims ..... 6

II. THE ASSERTED ART ..... 8

A. Misselbrook Discloses a High Concentration Acephate Granule of the Claimed Size with Every Ingredient of Claim 1 ..... 8

B. CN ’588 Teaches Fillers that are Not Known Binding Agents ..... 11

C. JP ’902 Teaches Fillers that are not Known Binding Agents ..... 12

III. THE PROCEEDINGS BELOW: THE BOARD AGREES THAT MISSELBROOK DISCLOSES FILLERS ..... 13

SUMMARY OF THE ARGUMENT ..... 16

STANDARD OF REVIEW ..... 19

ARGUMENT ..... 20

I. THE BOARD CORRECTLY DETERMINED THAT A POSITA WOULD BE MOTIVATED TO COMBINE THE PRIOR ART TO MAKE A FORMULATION WITH NO BINDING AGENT .....20

A. Misselbrook Discloses a Granule with No Binding Agent .....20

B. UPL Conceded that a POSITA Would Be Motivated to Use a Filler .....23

C. UPL's Own Patent Contradicts Its Position That a POSITA Would Not Be Motivated To Create a Granule with No Binding Agent .....24

1. The '685 Patent Never Describes a Granule Without a Binding Agent ..... 26

2. Both the '685 Patent and the Prior Art Teach the Desirability of a Dust Free Granule ..... 28

II. UPL'S UNTIMELY CLAIM CONSTRUCTION OF "FILLERS" DOES NOT RENDER THE BOARD'S DECISION INCORRECT .....31

A. UPL's New Proposed Claim Construction of "Fillers" Is Improperly Raised for the First Time on Appeal .....31

B. The Board Did Not Construe "Fillers" in Its Final Written Decision.....32

C. UPL's New Claim Construction Fails on Its Merits .....35

1. UPL Is Wrong About the Meaning of Its New Proposed Construction of "Fillers" as "Inert" ..... 35

2. The Patent Does Not Teach That the Claimed Filler Must Be "Non-Functional" ..... 38

CONCLUSION ..... 42

CERTIFICATE OF SERVICE AND FILING ..... 44

CERTIFICATE OF COMPLIANCE ..... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281, 297 (Fed. Cir. 1985) ....................25

*Consol. Edison Co. of New York v. N.L.R.B.*,
305 U.S. 197 (1938)....................19

*Google LLC v. Ji-Soo Lee*,
759 F. App'x 998 (Fed. Cir. 2019) ....................19

*In re Google Technology Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) ....................31

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................19

*Jazz Pharm., Inc. v. Amneal Pharm., LLC*,
895 F.3d 1347 (Fed. Cir. 2018) ....................19

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ....................19

*Lemoine v. Mossberg Corp.*,
No. 2020-2140, 2021 WL 4199934 (Fed. Cir. Sept. 15, 2021)....................20

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ....................19

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................21

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................19

*Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*,
24 F.4th 1406 (Fed. Cir. 2022) ....................19

*Raytheon Technologies Corporation v. General Electric Co.*,
993 F.3d 1374 (Fed. Cir. 2021) ....................25

*Supercell Oy v. GREE, Inc.*,
No. 2020-2005, 2021 WL 4452082 (Fed. Cir. Sept. 29, 2021) .......................... 24

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
522 F.3d 1279 (Fed. Cir. 2008) .......................................................................... 29

*Tris Pharma, Inc. v. Actavis Labs FL, Inc.*,
No. 2021-1495, 2022 WL 2525318 (Fed. Cir. July 7, 2022) ............................. 25

*United States v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988) ............................................................................ 25

*Verify Smart Corp. v. Askeladden, L.L.C.*,
824 F. App'x 1015 (Fed. Cir. 2020) .................................................................. 31

**Statutes**

5 U.S.C. § 706(2)(E) ........................................................................................ 19

35 U.S.C. § 102(b) ......................................................................................... 11, 12

35 U.S.C. § 102(e) ............................................................................................... 8

**Other Authorities**

*Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal* Board,
83 Fed. Reg. 51,358 (Oct. 11, 2018) ................................................................. 20

*Manual of Patent Examining Procedure* ........................................................ 21, 23

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below from the Patent Trial and Appeal Board's decision in IPR2020-01113.

The patent at issue below is being asserted in *UPL NA, Inc. v. Tide International (USA), Inc, et al.*, Case No. 8:19-cv-01201 (C.D. Cal.), which may be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether substantial evidence supports the Board's finding that there would be a motivation to combine the prior art to arrive at granules that do not include a binding agent, particularly where the '685 patent claims themselves are only supported by a specification describing granules including a binding agent.

2. Whether UPL can now raise a new claim construction argument for the word "fillers," which it failed to raise before the Board or in any other prior proceeding, and which creates an unsupported and incorrect distinction between "fillers" and the remainder of the claimed ingredients.

## INTRODUCTION

The case that UPL presents on appeal ignores the Board's well-grounded factual findings and raises new claim construction arguments UPL forfeited by failing to make below. Neither are grounds for finding error, and the Court should affirm.

This appeal arises from an IPR proceeding reviewing U.S. Patent No. 7,473,685 ("the '685 patent").[1] Challenged claims 1-4 cover a well-known pesticide (acephate) in a well-known form (water dispersible granule), combined with five other well-known and broad categories of ingredients (wetting agent, dispersing

---

[1] On page 2 of its Opening Brief, the first time UPL states the number of the patent in suit, it lists an incorrect patent number: **6,74**3,685, which is a Japanese patent related to Chemical Heat Storage, assigned to Toyota Central R&D Labs, Inc. The correct patent number is actually **7,47**3,685.

agent, antifoaming agent, stabilizer, and fillers) in ranges of concentrations. After examining the prior art, including particularly Tide's primary reference, the Board determined that claims 1-4 were invalid as obvious. At base, in this appeal, UPL argues only one point: that a POSITA would not be motivated to make a granule without a binding agent. UPL's argument rests on the legally flawed premise that though Tide's primary reference discloses fillers, the disclosure does not count because the preferred fillers are actually also known binding agents. In order to make this argument, UPL must walk through two separate analyses which both contradict the '685 patent and the record.

First, in an attempt to force a *de novo* review, UPL proposes a new claim construction, never advanced below, for the term "fillers." As justification for its late proposal, UPL characterizes the Board as having made a "new" construction in its Final Written Decision. The Board did no such thing. In reality, it is UPL that is proposing a new construction of "fillers" to exclude the preferred fillers of the prior art, which are also known binding agents. UPL argues those fillers should not count because fillers must be "inert," which it proposes is distinct from the other four listed ingredients. But aside from finding no support in the '685 patent or, indeed, the record below, for drawing this distinction, UPL also misunderstands the definition of "inert" in this context. And the Court need not even reach these merits, because UPL has forfeited this new claim construction position by failing to raise it below.

In reality, UPL's new claim construction argument is of no consequence because even if the Court adopts UPL's incorrect, forfeited construction of fillers, the Board found that the prior art ***still renders the '685 patent obvious***. UPL asks this Court to ignore that Misselbrook discloses ***any*** filler, which includes at least one example that is not also a known binding agent. This fact alone is justification to uphold the Board's decision, particularly when coupled with the fact that the disclosures in Misselbrook of granules without binding agents are more robust than the disclosures in the '685 patent of granules without binding agents. Substantial evidence supports the Board's findings here, regardless of the construction of the term "fillers."

This Court should affirm the Board's decision.

## STATEMENT OF THE FACTS

### I. THE '685 PATENT: A RECIPE FOR A WELL-KNOWN TYPE OF PESTICIDE USING WELL-KNOWN INGREDIENTS

#### A. Background

Pesticides refer to any chemicals that are used to control pests. Pesticides typically contain at least one "active ingredient" and other "inert ingredients" for maintaining product performance and usability. Appx730-731, ¶¶ 20-21. These "inert ingredients" are also sometimes called "excipients." Pesticides can take many forms, including dusts, wettable powders, soluble powders, emulsifiable concentrates, soluble liquid concentrates, suspension concentrates, and granules, including water dispersible and water soluble granules. Appx49 (1:25-30). Both

water dispersible and soluble granules are more convenient for packaging and use, less dusty, and contain free-flowing granules intended to disperse quickly when added to water in a spray tank. Appx736 ¶ 31. The first soluble granules existed in the 1960s, but grew more popular in the 1990s, with safety and environmental concerns as a driving force. Appx732-733 ¶ 24. During that time, the pesticide industry focused on converting powders and liquids into water dispersible or soluble granule formulations, which were less dusty, easier to handle, and safer to use. Appx733-734 ¶ 25.

By 2001, a person having ordinary skill in the art ("POSITA") had many in-house and published test methods at its disposal for optimizing soluble granule formulations, and numerous well-known considerations existed for making soluble granules. Appx735-736 ¶¶ 29-31. For example, because the cost of making soluble granules was higher than that of making powders, most pesticide formulations sought to increase the active ingredient concentration—thereby decreasing manufacturing costs. Appx733-735 ¶¶ 25-28; Appx49 (1:45-50). Acephate is a well-known organophosphate active ingredient used in pesticides since the early 1970s. Appx731-732 ¶ 22. Acephate is an effective insecticide against a variety of insects and environments. Appx732 ¶ 23. By 2001, there were hundreds of U.S. Environmental Protection Agency ("EPA") registrations for pesticides containing acephate, including many high concentration acephate formulations. Appx731-732 ¶¶ 22-23. In fact, as the Board noted in its Final Written Decision, by 2001 there

was already at least one granular formulation containing 85-98% acephate registered with the EPA. Appx27.

### B. The ’685 Patent Prosecution History and Issued Claims

Independent claim 1 reads, with emphasis added to show the disputed claim language:

> 1. A chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule consisting of (i) 85-98% w/w an insecticidally active compound of the following formula:
>
> 
> 
>
> wherein R and $R^1$ individually are alkyl, alkynyl or alkenyl group containing up to 6 carbon atoms, $R^2$ is hydrogen, an alkyl group containing 1 to 18 carbon atoms, a cycloalkyl group containing 3 to 8 carbon atoms, an alkenyl group containing 2 to 18 carbon atoms or an alkynyl group containing 3 to 18 carbon atoms, $R^3$ is hydrogen or an alkyl group containing 1 to 6 carbon atoms, and Y is oxygen or sulfur, wherein said insecticidal active compound is Acephate:
>
> (ii) 0.1-5.0% w/w a dispersing agent;
>
> (iii) 0.1-3% w/w a wetting agent;
>
> (iv) 0.01-0.08% w/w an antifoaming agent;
>
> (v) 0.01-1% w/w a stabilizer and
>
> (vi) ***fillers to make 100%,***
>
> wherein said granule has a length of 1.5-3.0 mm and a diameter of 0.5-1.5 mm.

Appx52 (7:44-8:4). Independent claim 7 is identical to claim 1, with the addition of two more ingredients: 0.1-3% w/w a binding agent, and 0.1-10% w/w a disintegrating agent. Appx52 (8:19-47). The categories of excipients claimed by the patent—dispersing agents, wetting agents, antifoaming agents, stabilizers, fillers, binding agents, and disintegrating agents—were all undisputedly well-known in the art at the time. The Board's decision regarding Claim 7 (and dependent claims 8-12) is not challenged in this appeal.

The application leading to the '685 patent originally claimed a pesticide granule ***comprising:***

- using ***any phosphoroamidothioate*** as an active ingredient at a concentration anywhere from ***40-98%***;
- 0.1-5.0% w/w a dispersing agent;
- 0.1-3% w/w a wetting agent;
- 0.01-0.08% w/w an antifoaming agent;
- 0.01-1% w/w a stabilizer and
- fillers to make 100%.

Appx555.

Through a series of rejections over various pieces of prior art, the independent claims were eventually limited to acephate only, at a concentration of 85-98%, with a limitation on the granule size. Appx634-640. These claims were converted from the usual "comprising" claims to the much narrower "consisting of" claims. Appx628-633. There were no changes to the specific listed ingredients of each

claim, or to the concentrations of those ingredients. Appx555; Appx52 (7:44-8:4). The patent lists examples of preferred embodiments for each of the ingredients, but never describes or defines the functions of these well-known excipients. Appx50-52 (3:11-7:42); *see* Appx50 (3:42-54).

## II. THE ASSERTED ART

The Board invalidated claims 1-4 of the ’685 patent based on Ground 1 of the Petition, which relies on U.S. Patent 6,387,388 (“Misselbrook”) Appx814-823 as a primary reference, with CN 1127588A (“CN ’588), Appx824-842, and JP H09-315902 A (“JP ’902”), Appx843-842.[2]

### A. Misselbrook Discloses a High Concentration Acephate Granule of the Claimed Size with Every Ingredient of Claim 1

Misselbrook is a patent issued on May 14, 2002, from a series of applications dating back to November 6, 1996. Appx12. It undisputedly qualifies as prior art under 35 U.S.C. § 102(e). *Id.* Misselbrook describes “soluble granule (SG) pesticidal formulation[s] comprising a water-soluble pesticide and a water-soluble filler.” *Id.* Much like the ’685 patent, Misselbrook explains that these granule formulations provide “improved handler safety, such as lower eye irritation.” Appx814 (Abstract). Misselbrook explains that this improved safety is largely due to the fact that the granules are non-dusty, “thereby even further diminishing the risk of exposure to dust from the composition.” Appx815 (2:30-33). Misselbrook also

---

[2] Petitioner’s other grounds also used Misselbrook as a primary reference, but added U.S. Patent No. 6,030,924 (“Mayer”), Appx863-871, to CN ’588 (ground 2), and Mayer to JP ’902 (ground 3). The Board did not reach those grounds for claims 1-4. Appx39.

points out that the granules it discloses are advantageous because "formulations of higher concentration (hence lower cost per kg of active ingredient formulated) can be achieved without any loss in biological activity with respect to a liquid formulation." *Id.* (2:14-18)

Misselbrook discloses a high concentration granule of the claimed size using acephate as the active ingredient. "The pesticidal compositions of the present invention comprise 0.1 to 90% by weight of a water-soluble pesticide." Appx816 (3:34-35); *see also id.* at 3:58-60 ("In one embodiment of the present invention the formulation contains about 0.1 to 90% by weight of the water-soluble pesticide."). "Exemplary water-soluble pesticides which may be employed in the present invention include: … acephate." Appx817 (5:35-41). Misselbrook also discloses a detailed explanation of the processes for creating its granules, including using an "0.8 mm screen" during extrusion, and later transferring the granules to "vibrating sieve equipment where particles outside the specified range of 4 to 50 mesh [a]re segregated." Appx814-823 (3:22-24). It is undisputed that this disclosure teaches a granule size with a diameter of 0.8 mm and a length of 1.6 mm, which fits squarely within the claimed ranges of the '685 patent. Appx766-767 ¶ 96.

Misselbrook standing alone discloses each and every excipient of claim 1 of the '685 patent. One of its "more preferred embodiments" discloses four of the five excipients.

> 0.1 to 60% by weight of a water-soluble pesticide . . . 40 to 99.9% by weight of a water-soluble ***filler***; 0 to 50% by weight of a ***wetting surfactant***; 0 to 50% by weight of a

> ***dispersing surfactant***; 0 to 5% by weight of a ***defoaming agent*** (not to the exclusion of other ingredients).

Appx12-13 (emphasis added). The specification teaches the definition of wetting surfactants, dispersing surfactants, defoaming agents, and fillers, and discloses specific, acceptable examples of each. Appx817 (6:31-41 (wetting surfactant), 6:42-47 (dispersing surfactant), 6:48-52 (defoaming agent), 6:1-13 (water-soluble filler)). Misselbrook further teaches that "[i]n addition to the pesticide, the water soluble filler, the wetting surfactant, the dispersing surfactant and the defoaming agent, the instant pesticidal compositions may also appropriately contain ***stabilizers***, synergists, coloring agents, etc." Appx13.

Crucial to this appeal is Misselbrook's more detailed disclosure of what it means by fillers.

> The term "water-soluble filler" as used herein includes any water soluble or water dispersible agent which may be employed to dilute the pesticide. Preferred water-soluble agents include those which are biologically derived. Appropriate water-soluble fillers include lactose, glucose, fructose, mannose, mannitol, sucrose, such as confectioner's sugar, black sugar, brown sugar, soft brown sugar, other sugars or saccharides, microcrystalline cellulose, powdered cellulose, calcium phosphate(s), inorganic water-soluble salts, and the like, and mixtures thereof. Examples of lactose which can be used in the present invention include hydrated α-lactose, anhydrous α-lactose, hydrated β-lactose, anhydrous β-lactose, and the like, and mixtures thereof.

Appx817 (6:1-13). In no uncertain terms, Misselbrook explains that ***any water soluble or water dispersible agent which may be employed to dilute the pesticide*** is acceptable, without reference to the agent's binding abilities. *Id.* Misselbrook also

discloses at least one specific example filler, inorganic water-soluble salts, which is undisputedly ***not*** a known binding agent. *Id.*

Given the robustness of Misselbrook's disclosure, it is no surprise that the Board found claims 1-4 invalid with this primary reference. Secondary references JP '902 and CN '588 further complement the disclosures of Misselbrook, including disclosing the claimed concentrations of the excipients where Misselbrook's disclosure of the concentrations was unclear or did not precisely overlap. The disclosure of the concentrations of the excipients is not at issue in this appeal.

### B. CN '588 Teaches Fillers that are Not Known Binding Agents

CN '588 is a Chinese patent publication published on July 31, 1996. Appx13, Appx824-842. It is undisputed that CN '588 is prior art under 35 U.S.C. § 102(b). CN '588 functioned as a secondary reference primarily to supplement Misselbrook's disclosure of using a stabilizer. CN '588 teaches that acephate "is less stable in pesticide preparations" than other "organophosphorous compounds" and "may be decomposed violently with the change of storage conditions, thereby unable to effectively show activity all the time." Appx13-14. CN '588 discloses two preferred stabilizers for high concentration acephate formulations (up to 99 %), in concentrations overlapping with the '685 patent's claimed range of stabilizer, and teaches that the dry pesticide preparation may be in the form of a "water soluble granule." Appx14; Appx839-840.

Of particular relevance to this appeal, CN '588 teaches using "solid carriers," at concentrations of 1 to 90 (wt) %, which include fillers such as kaolin (a preferred

filler of the ’685 patent, *see* Appx50 (3:53-54)) and “inorganic salts” Appx765-766 ¶ 95; Appx839. This disclosure of inorganic salts as a filler is particularly compatible with Misselbrook’s disclosure of the same type of filler, “inorganic water-soluble salts.” Appx817 (6:9).

### C. JP ’902 Teaches Fillers that are not Known Binding Agents

JP ’902 is a Japanese patent publication published on December 9, 1997. Appx14, Appx843-862. It is undisputed that JP ’902 is prior art under 35 U.S.C. § 102(b). *Id.* JP ’902 describes “pesticide granules” that are “easy to use” because, among other things, they “cause very little dusting during use.” *Id.* JP ’902 teaches that such granules are preferably made using acephate at concentrations preferably from 50 to 95% by weight. *Id.* Indeed, JP ’902 includes examples of two different granular formulations containing 95% acephate. *Id.* JP ’902 further teaches that the granule ***optionally*** includes other common additives like binders, wetting and dispersing agents,[3] stabilizers, and others, and disclosing concentration ranges for some of those ingredients which overlap with the claimed ranges in the ’685 patent. Appx855-856, [0009]-[0012].

Of particular relevance to this appeal, JP ’902 teaches granules that contain anhydrous silica, which is a filler that is not also a known binding agent, in an amount from about 0.1 to 3% by weight. Appx853 [0002], [0004], [0005].

---

[3] A POSITA would understand the “surfactants” disclosed in CN ’588 to encompass wetting agents and dispersing agents. Appx753-754 ¶¶ 74-77.

## III. THE PROCEEDINGS BELOW: THE BOARD AGREES THAT MISSELBROOK DISCLOSES FILLERS

Tide filed a petition for *inter partes* review of both independent claims of the patent, as well as dependent claims 2-4 and 7-12. Appx56-139. Tide asserted three different grounds in its petition, each of which relied on Misselbrook as a primary reference. Appx64. Tide proposed that the preamble, which describes "a chemically stable dry flow, low compact, dust free soluble phosphoramidothioate granule" be non-limiting except for the word granule, consistent with the District Court's ruling in the related litigation. Tide also proposed that the term "consisting of" be construed to have its ordinary meaning, which is that the claim can include the listed ingredients ***and no others*** (in contrast to a typical "comprising" claim, in which additional elements are fine as long as the claimed elements are also present). Appx11. Finally, Tide proposed constructions for dispersing agent, antifoaming agent, stabilizer, wetting agent, binding agent, and disintegrating agent. UPL did not contest any of these constructions, or propose any new constructions, and the Board ultimately adopted these constructions and no others. Appx9.

| Claim Term | The Board's Adopted Constructions |
|---|---|
| "dispersing agent" | an agent that assists with dispersion |
| "antifoaming agent" | an agent that reduces or prevents the formation of foam |
| "stabilizer" | an agent that promotes physical and chemical stability |
| "wetting agent" | an agent that when added to a liquid, reduces the interfacial tension between the liquid and the surface on which it is spreading |
| "binding agent" | an agent that assists in the binding of particles together in a formulation |
| "disintegrating agent" | an agent that enables a liquid to penetrate the pores of a granule to allow for the dissolution of that particle |

In its Petition, as well as in the accompanying declaration of industry and technical expert, William Geigle, Tide explained in detail how each element of the claims were met. Appx56-139. Relevant to this appeal, Tide explained how each asserted ground disclosed the limitation "fillers to make 100%." *See* Appx91-92, Appx109, Appx120, Appx765 ¶95, Appx787 ¶139, Appx803 ¶174. For example, Tide explained that Misselbrook teaches using a "water-soluble filler," which "includes any water soluble or water dispersible agent which may be employed to dilute the pesticide," CN '588 teaches solid carriers including fillers such as sucrose and inorganic salts, and JP '902 teaches using the fillers anhydrous silica, lactose, and sucrose. Appx91-92. Tide further explained a "POSITA would know fillers normalize the concentration of the active ingredient in a formulation, would reasonably expect success in doing so, and would not view this as unexpected results." Appx92. Persuaded by Tide's arguments, the PTAB instituted the IPR.

In its Patent Owner's Response, UPL argued against the conclusion that certain, but not all, of the limitations in its independent claims were disclosed by the prior art. Appx250-324. In particular, UPL argued: (1) that a POSITA would not have been motivated to make a granule ***without*** a binder, as required by claim 1;[4] (2) that it was not obvious to make a granule containing a stabilizer, as required by claims 1 and 7; (3) that it was not obvious to make a granule containing 0.1-3%

---

[4] This is the only argument UPL made in its Response that it has also advanced in this appeal. UPL's other argument in this appeal related to claim construction is untimely and was not advanced below. *See infra* § II.A.

binding agent, as required by claim 7; (4) that it was not obvious to make a granule including a disintegrating agent, as required by claim 7; and (5) that Tide relied on improper hindsight. *See, e.g.*, Appx251-253.[5] UPL included the expert declaration of Dr. David Rockstraw to support its opinions, but declined to depose Tide's expert. Notably, UPL and its expert never argued that it was not obvious to use fillers to make 100%, as required by both independent claims.

Tide deposed Dr. Rockstraw before preparing its reply brief and obtained testimony that (1) Dr. Rockstraw did not dispute the concept, in general, that certain ingredients can serve more than one function, Appx1441 (31:9-14); and (2) if a granule has acceptable properties without a binder, it means there is no need to use a binder, Appx1467 (57:2-5). This testimony contradicts the arguments UPL makes in this appeal: first, that an excipient with known binding properties cannot also function as a filler, Blue Br. pg. 38; and second that a POSITA would not be

[5] UPL's "improper hindsight" position was largely supported with arguments that there were difficulties with creating high concentration acephate granules. While UPL is not pursuing improper hindsight as grounds for this appeal, it has nonetheless revisited those arguments, citing two prior art references. Blue Br., pg. 9. In particular, UPL relies on Chan's suggestion that high levels of binder were required, which limited the concentration of acephate, and Yamada suggests that acephate is unstable. *Id.* This may be true, but a POSITA in 2001 would understand those difficulties and have the tools to overcome them, a fact supported by the evidence in the record showing that the EPA had already registered at least one high concentration granular acephate formulation. Appx731-732 ¶¶ 22-23. The Board relied on this registration to corroborate Mr. Geigle's testimony that "the general conditions of formulating acephate compositions were already known in the art," and stated that it "undermines Patent Owner's argument that there were intractable difficulties to the formulation of acephate granules containing 85-98% acephate." Appx27.

motivated to exclude a binding agent, *id.* at 40-43. In its Reply, Tide focused on the weakness of UPL's arguments that it would be nonobvious to use disclosures that were all found in the same reference, Misselbrook, which discloses a granule, acephate, and every single one of the excipients in claim 1. *See* Appx346-363.

During Oral Argument, the Board also focused on Misselbrook's disclosure of each of claim 1's excipients. It was here that UPL first tried to recant its acquiescence that fillers to make 100% was obvious. Appx2071 (arguing that "Tide cannot identify any reason why a POSITA would prepare a granule with non-binding agent fillers"). But this last minute, back-door attempt at complicating fillers was unsuccessful. Ultimately, in its Final Written Decision, the Board upheld the validity of claims 7-12 of the '685 patent, but agreed with Tide that claims 1-4 were invalid over Misselbrook, CN '588, and JP '902, Appx43.

## SUMMARY OF THE ARGUMENT

The Board thoroughly evaluated UPL's arguments and properly found against UPL on the highly factual issue of whether or not a POSITA would be motivated to combine the prior art to arrive at a granule without a binding agent. Substantial evidence supports the Board's findings, so this Court should affirm.

On obviousness, the Board weighed the evidence and properly concluded that Misselbrook disclosed "***any*** water soluble filler," including providing at least one specific example of a filler that is not also a known binding agent (inorganic water soluble salts). Because Misselbrook discloses this verbatim, and it is the only point

challenged in this appeal, the Court need not consider any of UPL's remaining arguments.

However, those remaining arguments fail, regardless. UPL already conceded that a POSITA would know to use "fillers to make 100%." It has forfeited the argument it now brings on appeal that a POSITA would not have been motivated to use those fillers, and would instead have used a binding agent. Rather, the only argument that UPL preserved is that a POSITA would have included a binding agent in its granule (without regard to whether or not it contained a filler). UPL bases this argument on: (1) Misselbrook's preferred embodiments and examples all include binding agents, and (2) that Misselbrook and the other prior art tout the importance of dust free granules. But these arguments fail as well because they are inconsistent with the disclosures in UPL's own patent. The '685 patent does not mention or describe a single granule without a binding agent until claim 1, the '685 patent touts the desirability of dust free granules, and UPL has never once argued that its dust free granule with no binding agent was an unexpected result. Given this, UPL cannot argue that Misselbrook's disclosure of granules without binding agents is insufficient; it is actually more robust than the disclosure in the '685 patent. Once again, the Court can stop here. It need not even reach UPL's new claim construction arguments.

UPL's new claim construction argument that fillers must be non-functional (inert) was forfeited since UPL did not bring the argument below, though it had every opportunity to do so. In an attempt to get around this (and to obtain *de novo* review), UPL characterizes ***the Board*** as proposing a new construction in its Final Written Decision. This is untrue; the Board merely correctly applied the plain and ordinary meaning of the term "fillers." The Board's finding was supported by substantial evidence. But if the Court decides to consider UPL's proposed claim construction on its merits, *de novo*, it still fails. UPL's construction is based on an incorrect understanding of what the word "inert" means. There is ample evidence in the '685 patent and the rest of the record, that an "inert ingredient" is simply a "non-active ingredient" (i.e., anything but acephate) rather than "non-functional," as UPL tries to paint it. Even if the Court bypassed all the exits up to this point, and considers UPL's proposal that a filler must be entirely "non-functional" as distinct from the other claimed non-active ingredients, that proposal finds no basis in the disclosures of the '685 patent, which treats fillers the same as all the other listed excipients.

UPL's appeal is a house of cards. The Court must agree with UPL on every one of its flawed arguments in order to justify overturning the Board's decision. Meanwhile, only one of Tide's arguments needs to carry the day in order to justify affirming the Board (though every one of Tide's positions has merit).

## STANDARD OF REVIEW

For questions of obviousness, the Court reviews underlying factual findings for substantial evidence and the ultimate legal conclusions *de novo*. *See* 5 U.S.C. § 706(2)(E); *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015); *see, e.g., Jazz Pharm., Inc. v. Amneal Pharm., LLC,* 895 F.3d 1347, 1360 (Fed. Cir. 2018) (claim construction); *id.* at 1362 (obviousness). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley,* 308 F.3d 1317, 1329 (Fed. Cir. 2002). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd*., 821 F.3d 1359, 1366-67 (Fed. Cir. 2016) (quoting *Par Pharm., Inc. v. TWI Pharm., Inc*., 773 F.3d 1186, 1196 (Fed. Cir. 2014)). This Court also reviews "the Board's factual analysis of the prior art . . . for substantial evidence." *Google LLC v. Ji-Soo Lee*, 759 F. App'x 998, 1001 (Fed. Cir. 2019). Accordingly, the substantial evidence standard of review applies to the issues on appeal here.

In *inter partes* review proceedings filed after November 13, 2018, the Board applies the claim construction standard articulated in *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*); *Quanergy Sys., Inc. v. Velodyne Lidar USA,*

*Inc.*, 24 F.4th 1406, 1414 n.5 (Fed. Cir. 2022).[6] In the event the court reaches the merits of UPL's claim construction arguments, claim construction is an issue of law that this Court reviews *de novo*. *Lemoine v. Mossberg Corp.*, No. 2020-2140, 2021 WL 4199934, at *1 (Fed. Cir. Sept. 15, 2021) (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–26 (2015)).

# ARGUMENT

## I. THE BOARD CORRECTLY DETERMINED THAT A POSITA WOULD BE MOTIVATED TO COMBINE THE PRIOR ART TO MAKE A FORMULATION WITH NO BINDING AGENT

### A. Misselbrook Discloses a Granule with No Binding Agent

In its Opening Brief, UPL largely ignores that Misselbrook discloses a high concentration acephate granule with no binding agent. UPL's refrain is that the fillers disclosed in Misselbrook are actually binding agents, and not fillers. This, however, flatly disregards the explicit disclosure of Misselbrook that "the term 'water soluble filler' as used herein includes ***any water soluble or water dispersible agent*** which may be used to dilute the pesticide . . . includ[ing] ***inorganic water-soluble salts*[.]**" Appx817 (6:1-9) (Misselbrook). This fact, on which the Board

---

[6] The Patent Office recently modified § 42.100(b) to harmonize the *inter partes* review claim construction standard with the one district courts apply (the *Phillips* standard). *See Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal* Board, 83 Fed. Reg. 51,358 (Oct. 11, 2018). This change was made effective November 13, 2018, and is not retroactive. *Id.* at 51,340.

heavily relied, is fatal to UPL's argument that the prior art does not disclose a granule without a binder. The Board noted:

> We agree with Petitioner that Misselbrook's teachings are not limited to the types of water-soluble fillers that Patent Owner says are binding agents. In addition to lactose and other sugars, Misselbrook teaches that "microcrystalline cellulose, powdered cellulose, calcium phosphate(s), [and] inorganic water-soluble salts" are also "[a]ppropriate water-soluble fillers" for its granules. Nothing in the record suggests that such fillers are binding agents. Moreover, Misselbrook's express teaching that "***any*** water soluble or water dispersible" diluent can be used as fillers rebuts Patent Owner's argument that a POSITA would understand fillers with binding properties like lactose, sucrose, and glucose to be a "key feature" of those granules. Thus, the combination of references in Petitioner's ground would not, as Patent Owner contends, have led a POSITA to include a binding agent.

Appx29 (emphasis in original and internal citation marks omitted).

UPL tries to minimize this disclosure by pointing out that the non-binding fillers, are not included in any of Misselbrook's preferred embodiments. Indeed, UPL argues that "the Board applied the wrong legal standard, searching the art for disclosures of what a POSITA *could have* prepared, instead of analyzing what a POSITA *would have* been motivated to prepare." (Blue Br., pg. 7 (emphasis in original)). But it is UPL who applies the wrong legal standard, refusing to acknowledge that a POSITA ***would have*** been motivated to prepare all Misselbrook teaches, ***including granules made with fillers that are not known binding agents***. *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012); *see also MPEP 2123* ("A reference may be relied upon for all that it would have reasonably suggested to one

having ordinary skill in the art, including nonpreferred embodiments.”).[7] Standing alone, Misselbrook discloses (1) granules, Appx814-823; (2) the use of acephate as the active ingredient, Appx817 (5:35-41); (3) active ingredients up to a concentration of 90%, Appx816 (3:34-36); (4) the use of additional ingredients such as wetting surfactants, dispersing surfactants, defoaming agents, and stabilizers, Appx815 (2:63-65), Appx817 (6:31-52); and (5) ***any water soluble filler***, including some fillers that are known to have binding properties and other fillers like inorganic water-soluble salts, which are undisputedly not also known binding agents, Appx817 (6:1-13); Appx29.

The construction of the word “fillers” doesn’t matter here because, at minimum, the inorganic water soluble salts described in Misselbrook are fillers even under UPL’s new construction of the term. Blue Br., pg. 42 (acknowledging that the Board relied on “the prior art’s disclosures of ingredients satisfying the meaning of ‘fillers’ in the ’685 patent (ingredients without binding properties)”). This single fact renders moot the entirety of UPL’s remaining arguments, and standing alone

[7] UPL’s refusal to acknowledge that a prior art reference is available for all it teaches pervades their brief and is not limited to Misselbrook’s disclosure of fillers. For example, UPL argues that Misselbrook does not disclose any specific granular formulation comprising 85-98% acephate (Blue Br., pg. 19), when in reality Misselbrook discloses a wide range of acephate concentrations up to 90%. Appx816. What UPL means is that Misselbrook contains no preferred embodiment with acephate concentrations of 85-98%. In yet another example, UPL argues that CN ’588 is “similarly devoid of any working example of a granule containing 84-98% acephate without a binding agent.” Blue Br., pg. 22. Once again, UPL is myopically focused on the working examples and preferred embodiments, and refuses to embrace the references for all they teach, when in fact CN ’588 discloses formulations with acephate concentrations up to 99 (wt) %. Appx839.

provides a basis for upholding the Board's decision. Appx30 ("That said, because Misselbrook's teachings are not limited to lactose, and Petitioner has sufficiently shown that it would have been obvious to use both non-binding and binding fillers in the asserted combination, ***Patent Owner's argument would remain unavailing even if claim 1 were construed as patent Owner suggests***." (emphases added)).

### B. UPL Conceded that a POSITA Would Be Motivated to Use a Filler

The flaws in UPL's arguments go beyond its lack of attention to Misselbrook's disclosures of fillers that are not also known binding agents. In the briefing below, UPL did not contest the point that a POSITA would be motivated to make a granule including "fillers to make 100%." *See, e.g.*, Appx250-324 (failing to argue that a filler would be non-obvious). UPL, thus, implicitly recognized that fillers are ubiquitous and well-known in the art. *See* Appx765-766 ¶ 95 (Mr. Geigle's statement "A POSITA would have known to use fillers to normalize the concentration of the active ingredient in the formulation" was not challenged by UPL or its expert Dr. Rockstraw, and UPL never deposed Mr. Geigle). Now, however, UPL introduces a narrative that a POSITA must be motivated to "***replace*** the well-known binding agents of the prior art ***with fillers***." Blue Br., pg. 7 (emphases added); *see also id.* at 41 ("The first flaw in the Board's analysis is that it failed to provide any rationale for ***substituting*** Misselbrook's preferred so-called 'fillers,' sucrose, glucose, and lactose—which are well-known binding agents—***with the fillers as claimed in the '685 patent*** (which are not binding agents).") (emphases added). This is in stark contrast to UPL's positions in the briefing below, in which UPL merely

argued that there was no motivation to "*remove* Misselbrook's water-soluble binding agent," with no mention of "replacing it" with a non-functional filler. *See, e.g.*, Appx273 (emphasis in original).

Because it failed to raise these points below, UPL cannot now argue that the inclusion of fillers to make 100% is non-obvious, and therefore it need not be considered on appeal. *Supercell Oy v. GREE, Inc.*, No. 2020-2005, 2021 WL 4452082, at *3 (Fed. Cir. Sept. 29, 2021) (explaining that this Court "routinely decline[s] to consider arguments raised for the first time on appeal because the failure to raise an argument before the Board constitutes a forfeiture of that issue.").

Thus, even if Misselbrook's explicit disclosure of non-binding fillers did not provide the necessary motivation for a POSITA to make a granule with a non-binding filler—which it does—a POSITA need not be motivated to ***replace*** binding agents with fillers. *Id.* UPL has already conceded that "fillers to make 100%" is obvious. Instead, for the purposes of this appeal, the only real issue is whether a POSITA would be motivated to make a granule that does not include a binding agent.

### C. UPL's Own Patent Contradicts Its Position That a POSITA Would Not Be Motivated To Create a Granule with No Binding Agent

UPL's complaint about Misselbrook is glaringly contradicted by its own patent's lack of disclosure. In its Opening Brief, UPL argues that "the invention of claim 1—reciting a granule with 85-98% acephate with no binding agent—represents a significant departure from all prior art formulations of acephate." Blue Br., pg.16. But if it was a "significant departure" from the prior art, it was also a

"significant departure" from the specification of the '685 patent itself, which never describes a formulation without a binding agent. In other words, given that the '685 patent specification, which lacks ***any mention of a granule without a binding agent***, somehow (according to UPL) enabled its claim 1, how can UPL now complain that Misselbrook is insufficient to disclose a granule without a binding agent? The answer: it can't.

The standard for obviousness is closely related to the standard for proving enablement. Whether there is a motivation to combine with a reasonable expectation of success is a factual issue. *Tris Pharma, Inc. v. Actavis Labs FL, Inc.*, No. 2021-1495, 2022 WL 2525318, *4 (Fed. Cir. July 7, 2022). "To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention." *Raytheon Technologies Corporation v. General Electric Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021); *see also Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 297 (Fed. Cir. 1985) ("The test of whether a particular compound described in the prior art may have been relied upon to show that the claimed subject matter at issue would have been obvious is whether the prior art provided an enabling disclosure with respect to the disclosed prior art compound."). "The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation." *United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988)).

### 1. The ’685 Patent Never Describes a Granule Without a Binding Agent

The first sentence of UPL’s “Preliminary Statement” erroneously asserts that the ’685 patent describes formulations both with and without a binding agent. Blue Br., pg. 2. While it is true that the ’685 patent ***claims*** two distinct formulations (one that includes a binder and disintegrating agent, and one that does not), the ’685 patent never once ***describes*** a formulation that does not include a binding agent.

The very first description of the invention includes a binding agent:

> Briefly, and in accordance with a preferred embodiment of the invention, dry flow, low compact, dust free, soluble granules of insecticially [sic] active phosphoroamidothioate are prepared by forming a pre-mix containing the required quantity of phosphoroamidothioate, a dispersing agent, a wetting agent, a ***binding agent***, an antifoaming agent, a disintegrating agent, a stabilizer and filler.

Appx49 (2:44-50). The patent states: “[t]he process of the present invention is best described by referring to the flow chart in FIG. 1,” which is the only figure in the whole patent. Appx50 (3:14-15). But Figure 1 includes a binding agent.



Appx48, Fig. 1. Each and every description of the ingredients of the formulation thereafter includes a binding agent: *See, e.g.*, Appx50 (3:16-23):

> "An essentially dry premix comprising about 95% to 99% of solids and 1% to 5% moisture and/or solvent is formed from the following ingredients: 40% to 98% of the insecticidally active compound 2, 0.1% to 5.0% dispersing agent 4, 0.1% to 3.0% wetting agent 6, 0.1% to 3.0% ***binding agent*** 8, 0.01% to 0.08% antifoaming agent 10, 0.01% to 10.0% disintegrating agent 12, 0.01% to 1.0% stabilizer 14, and fillers 16 to make 100% (w/w).

Each and every one of the patent's eight example formulations includes a binding agent.

EXAMPLE 1

Acephate 97% Granules can be prepared as follows:

| Composition | |
|---|---|
| Ingredients | Quantity (% w/w) |
| Acephate Technical 98.5% purity | 98.48 |
| Dispersing agent | 0.50 |
| Wetting agent | 0.10 |
| Binding agent | 0.10 |
| Antifoaming agent | 0.03 |
| Disintegrating agent | 0.50 |
| Stabilizer | 0.05 |
| Filler | 0.24 |
| Total | 100.00 |

Appx50-52 (4:29-7:21).

There is, quite literally, not one single solitary description in the ’685 patent of a formulation that does not include a binding agent, until claim 1. Assuming that claim 1 is enabled by the disclosures in the patent—and there is no argument at issue in this appeal that it is not enabled—then the disclosures of the prior art of a granule with no binding agent must also be sufficient for a finding that a POSITA would have had a reasonable expectation of success.

**2. Both the ’685 Patent and the Prior Art Teach the Desirability of a Dust Free Granule**

UPL has argued that emphasis on a “dust free” particle suggests that a binding agent must be included. In fact, UPL has gone so far as to argue that Misselbrook ***teaches away*** from granules without a binder because Misselbrook underscores the desirability of a dust free particle. Appx380 (arguing, by UPL, that “Misselbrook teaches away from granules that do not contain binding agents”); Appx27-28 (recognizing, but ultimately finding unpersuasive, that UPL “argues that the cited references ‘teach[] away from preparing a granule without a binder’ because ‘Misselbrook discloses granules containing water-soluble binders’”). In its Opening Brief, UPL makes much the same argument: “The Board’s determination cannot be squared with the alleged motivation of a skilled artisan to prepare non-dusty acephate granules—a benefit that the prior art associated specifically with binding agents.” (Blue Br., pg. 4).

But once again, UPL is talking out of both sides of its mouth. UPL’s own patent underscores the importance of a “dust free” granule. *See, e.g.*, Appx49 (1:39-40) (“[D]usts are undesirable because of airborne contamination and handling

difficulties . . . "); Appx49 (2:21-29) ("Because of the problems associated with producing granular forms of phosphoroamidothioates, such as the preferred acephate, there is a need in the art for a process for preparing chemically stable, dry flow, low compact, ***dust free***, insecticidally active soluble granules . . . "); Appx50 (4:6-10) ("After sizing, the sized granules 44 are subjected to sieving 46 to separate fines 50 generated during the sizing process from ***desired dust free*** soluble granules 51"); *see also* Appx50 (4:11-16), (4:17), (4:19), (4:21). Moreover, the '685 patent consistently describes the inventive granules as dust free. *See, e.g.* Abstract ("Dry flow, low compact, ***dust free*** soluble granules of phosphoroamidothioates, preferably acephate, are produced by . . . "); *see also* Appx49 (2:33-37), (2:45-50), (2:58-60), (2:62-65). How can UPL assert that Misselbrook teaches away from granules without binders by discussing the importance of dust free granules, when the '685 does the exact same thing and then proceeds to claim a granule without a binder?

UPL even argued in claim construction proceedings in the District Court that the preamble—the only portion of the claim requiring dust-free granules—was not limiting. Appx9. The Board applied that construction. Appx11. Because the preamble is not limiting, then nothing in the claims ***requires*** that the claimed granules be dust free. *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) ("Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble 'generally is not limiting.'" (citation

omitted)). Therefore, while a POSITA would certainly understand the advantages of a dust-free granule, a POSITA would not be required to create a dust-free granule to meet the elements of claim 1. Viewing claim 1 through this lens, and given UPL has not suggested the ’685 patent disclosure does not adequately enable claim 1, all of UPL’s arguments that a POSITA would not be motivated to make a binder-free granule go out the window. No such motivation is even required for claim 1.

Finally, as the Board noted, UPL has never argued that the lack of a binding agent in claim 1 produced the “unexpected result” of a granule that is still dust free. Appx24. Despite this, UPL argues that a POSITA would expect from Misselbrook and other references to ***need*** a binder—the clear implication being that a POSITA would not expect to successfully formulate a dust-free granule sans binder. But in drafting the ’685 patent, UPL apparently thought that leaving out the binder was so obvious to a POSITA that it need not include a single description of a binder-less granule in the specification of the ’685 patent. With that backdrop, once again it is clear that UPL is talking out of both sides of its mouth. If the granule of claim 1—without a binding agent—did not produce unexpected results, then what is the basis for stating that a POSITA would not have expected the same success with a binder-less granule as disclosed in Misselbrook?

UPL’s arguments that emphasis on dust free granules teaches away from granules without binders is thus exposed as contradictory to UPL’s own patent.

## II. UPL'S UNTIMELY CLAIM CONSTRUCTION OF "FILLERS" DOES NOT RENDER THE BOARD'S DECISION INCORRECT

UPL incorrectly states that the Board applied an "erroneous construction," but the Board did no such thing. Blue Br., pg. 5. Rather, it is UPL who, for the first time on appeal, attempts to construe the term "fillers" to exclude binders and other so-called "functional excipients" or "functionally active excipients." *Id.* UPL's last-ditch claim construction must fail for at least two reasons; (1) it is long past the deadline for proposing a brand new term for construction; and (2) its newfound construction is still wrong.

### A. UPL's New Proposed Claim Construction of "Fillers" Is Improperly Raised for the First Time on Appeal

Where a party "fail[s] to present its claim construction argument before the Board, [the party] is not entitled to present that argument for the first time on appeal" where the party "failed to request or propose a construction for any claim terms in its patent owner's response." *Verify Smart Corp. v. Askeladden, L.L.C.*, 824 F. App'x 1015, 1020 (Fed. Cir. 2020). Because UPL failed to raise this argument before the Board, this Court should deem it forfeited and reject the argument on that basis alone. *In re Google Technology Holdings LLC,* 980 F.3d 858, 863–64 (Fed. Cir. 2020) (explaining that the patentee had forfeited the claim construction arguments by not adequately having first made them to the Board). Nor has UPL met the high burden of avoiding forfeiture's natural result, since UPL's counsel certainly knew about Misselbrook's disclosure of fillers that are also common binding agents, and knew that there was no proposed construction for "fillers," and

nothing prevented UPL from making its current claim construction argument before now.

That said, as the Board correctly pointed out, and as UPL largely ignores, "because Misselbrook's teachings are not limited to lactose, and Petitioner has shown that it would have been obvious to use both non-binding and binding fillers in the asserted combination, ***Patent Owner's argument would remain unavailing even if claim 1 were construed as Patent Owners suggests.***" Appx30 (emphasis added). In other words, the Court need not even address Patent Owner's new proposed construction of "fillers" as "non-functionally active excipients" because the result does not change—Misselbrook discloses both.

### B. The Board Did Not Construe "Fillers" in Its Final Written Decision

UPL states, without support, that the Board construed the term "fillers." Blue Br., pg. 5, 36-40. This is a distortion of the Board's Final Written Decision; the Board did no such thing. *See* Appx8-11 (determining that there were "no other terms that need to be construed to resolve the issues presented in this proceeding" beyond the terms and constructions proposed by Tide in its petition, and which UPL ***never disputed***). The Board's analysis was just that: an ***analysis*** of the prior art, concluding (correctly) that the prior art disclosed fillers. Appx21 ("As an initial matter, we agree that the combined references teach or suggest an acephate granule containing only the ingredients in claim 1."). Misselbrook discloses a granule containing acephate and all five claimed excipients (i.e., a dispersing agent, a wetting agent, an antifoaming agent, a stabilizer, and fillers). And such a determination is hardly a

stretch, as Misselbrook uses the exact same term—“fillers”—that appears in the ’685 patent to describe its fillers (including specifically disclosing fillers that are not also known binding agents, a fact UPL largely ignores). Appx817 (6:1-13).

The Board relied on the “persuasive[]” testimony of Tide’s expert Mr. Geigle to explain that “the fillers taught in Misselbrook, including lactose, are used to normalize the concentration of the active ingredient by adding an amount . . . to make 100%.” Appx29 (internal citations omitted). Crucially, the Board went on to say “***[t]his would seem to meet the plain meaning of fillers to make 100% as recited in claim 1.***” *Id.* (internal quotation marks omitted and emphases added). Thus, the Board did not construe the term “fillers,” but applied its plain and ordinary meaning. UPL’s position that the Board’s analysis here constitutes a construction of the term fillers is untenable—if that were the case, any analysis by the Board of any unconstrued term in a patent would effectively be a new construction, subject to *de novo* review. Moreover, the Board relied on the testimony of Mr. Geigle to reach this conclusion, ***but UPL never bothered to depose Mr. Geigle***. UPL thus should not be able to second guess the Board’s reliance on Mr. Geigle’s testimony.

The Board further concluded “we do not understand ‘consisting of’ to exclude such fillers from the granule of claim 1 simply because a POSITA would understand that the same ingredient may also serve a different purpose.” Appx29-30. This conclusion that ingredients sometimes wear more than one hat is supported by other evidence in the record in addition to Misselbrook’s disclosure of using known binding agents as fillers to make 100%. For example, Knowles indicates that binders

and dispersants can be the same compound, and can contribute to stability of the granule. *See, e.g.*, Appx1281 ("A minimum quantity of binder/dispersant, however, is required to prevent ageing, and to allow for complete dispersion, and there is therefore a balance between this and the need to reduce the level in order to obtain fast dispersion."). Knowles also indicates that a wetting agent may also function as a dispersing agent. Appx1292 ("It is well known within the agrochemical industry that the addition of wetting agents can produce faster-dispersing granules.").

This is consistent with the deposition testimony of UPL's expert, Dr. Rockstraw:

> Q: So you do not agree that one excipient could perform two of those functions?
>
> A: ***I'm not saying that I don't agree that that's not possible.*** I'm saying that in the context of the '685 patent, it's expected that a separate excipient will perform each of those functions.

Appx1441 (31: 9-14) (emphases added).

UPL's reliance on argument by Tide's counsel regarding multi-functional ingredients is a mere distraction. Blue Br., pg. 28 (citing Appx436-437). UPL misleadingly attempts to characterize Tide's counsel's statements as conceding that an ingredient cannot have more than one function, but this is untrue.[8] Tide's counsel

[8] UPL points to Tide's counsel's use of the term "inert" to describe a filler as distinct from other "functional excipients." However, as described below, the term "inert" does not mean non-functional, and a POSITA uses the term to describe all non-active ingredients in the formulation. Tide's counsel's statements are consistent with the evidence in the record, Tide's prior arguments, and the Board's opinion.

made statements consistent with the evidence in the record that a single ingredient may have more than one function in general, but that ingredient's function in a given formulation "depends on the function for which they were included in the composition." Appx436-437. So, sugars, starches, and starch blends are commonly used as binding agents, but "[t]hat does not necessarily mean that every time they are used[,] they are used as binding agents. It depends on the formulation at issue." *Id*.

It becomes clear, then, that it was not the Board who construed "fillers" for the first time. Rather, it is UPL who is proposing a new construction of the term fillers—one which departs from the plain and ordinary meaning of the term, and which fails to find a basis in the '685 patent.

### C. UPL's New Claim Construction Fails on Its Merits

#### 1. UPL Is Wrong About the Meaning of Its New Proposed Construction of "Fillers" as "Inert"

In its Opening Brief UPL disregards the evidence and uses the term "inert" as a synonym for "entirely non-functional." This is not how a POSITA would understand the term "inert." Instead, the term "inert" is commonly used to refer to any ingredient other than the active ingredient (here, acephate). *See, e.g.*, Appx731, ¶ 21. In fact, in order to pull off the argument that fillers must be "non-functional," UPL's Opening Brief for the first time introduces the terms "functional excipients" and "functionally active excipients" in an attempt to distinguish the other non-active ingredients from fillers. These terms appear nowhere in the patent, file history, briefing, or expert declarations below, and should not be credited. Blue Br. pgs. 2-

3, 5, 14, 39 (stating "functional excipients), 13, 15, 38 (stating "functionally active excipients").

Meanwhile, the evidence that "inert ingredient" simply means "not the active ingredient" is legion. As Mr. Geigle clearly explained:

> A pesticide contains an "active ingredient" that is responsible for controlling a particular type of pest. ***All other ingredients are typically referred to as "inert ingredients"*** and are important for maintaining product performance and usability. Inert ingredients play key roles in pesticide effectiveness and performance, such as improving the ease of application or safety of the applicator.

Appx731 (emphases added and internal citations omitted). UPL never rebutted this statement by Mr. Geigle until this appeal. UPL's expert, Dr. Rockstraw, never indicated that he disagreed with this statement, either in his declaration or during his deposition.[9] And, since UPL also declined to depose Mr. Geigle, this statement remains completely unchallenged.

The EPA itself defines "inert ingredients" as everything other than the active ingredient, consistent with Mr. Geigle, Misselbrook, and Tide. Appx872.

> Inert ingredients play key roles in pesticide effectiveness and product performance. Examples of functions inerts can serve include . . . Improve the ease of application by preventing caking or foaming, extend the product's shelf

[9] During his deposition, Dr. Rockstraw testified when asked whether Misselbrook was wrong in referring to binding agents as fillers that he has "always referred to a filler as an inert material ***that has no function in the performance of your chemical system***." Appx1437 (27:15-19) (emphases added). This testimony seems to indicate that Dr. Rockstraw, at least, may have believed that some inert ingredients ***do have a function***, but that fillers (in his opinion) do not.

> life, protect the pesticide from degradation due to exposure to sunlight.

Appx873. In other words, the EPA explicitly identifies antifoaming agents and stabilizers as "inert ingredients."

In order to make its new claim construction argument that fillers must be inert, and that inert means non-functional UPL even ignores its own patent. In describing a preferred embodiment, the '685 patent states:

> ***All of the inert ingredients are preferably solids and in a powder form***. In one preferred embodiment, the binding agent **8** is selected from sucrose and starch derivatives or a blend thereof, the wetting agent **6** is selected from calcium or sodium salt of alkyl aryl sulphonate, the dispersing agent **4** is selected from the derivative of sulfonated fatty alcohols, the disintegrating agent **12** is selected from swelling type cays such as Bentonite and zeolite, the antifoaming agent **10** is selected from silicon oil derivatives, the stabiliser **14** is selected from salts of higher fatty acids, and the filler **16** is selected from precipitated silica and kaoline and the like.

Appx50 (3:42-43) (emphases added). In other words, the ***'685 patent itself refers to all of the non-active ingredients*** (everything but acephate) ***as "inert ingredients."***

But the finishing blow is that Misselbrook itself clearly defines all non-actives, including specifically lactose, as "inert ingredients." Appx1204 ("Nevertheless***, the use of lactose*** or other water-soluble fillers ***as agricultural inert ingredients*** is not common in formulating pesticides for crop protection." (emphases added)). That Misselbrook defines lactose—which (according to UPL) is a known binding agent—as an "inert ingredient" is fatal to UPL's new claim construction

argument. Every single piece of evidence UPL has to support its argument that fillers must be "non-functional" is based on the word inert being synonymous with "non-functional."[10] *See* Blue Br., pg. 38-40. Indeed, UPL's Statement of the Issues in its Opening Brief makes this clear:

> 1. Did the Board err in construing "fillers" to include well-known binding agents, where the specification repeatedly identifies and claims "fillers" separate from "binding agent[s]" and distinguishes functional excipients such as "binding agent[s]" from non-functional (***inert***) "fillers"?

Blue Br. pg. 2 (emphases added). Now that it is clear that inert does ***not*** mean non-functional, and that binding agents like lactose are in fact "inert ingredients," UPL's Statement of Issue No. 1 in fact reveals that there is no issue.

#### 2. The Patent Does Not Teach That the Claimed Filler Must Be "Non-Functional"

Even setting aside that "inert ingredients" may still have a function, UPL's argument that the claimed fillers must be non-functional in contrast to the so-called

[10] When asked by the Board whether lactose was a filler, counsel for UPL responded that "neither party proposed to construe the term filler but I think both parties had in mind a general concept of an inert diluent when applying the term to the prior art and Ms. Benedict can correct me if I'm wrong." Appx454. It is correct that fillers are "inert diluents." What this appeal has exposed for the first time is that UPL's counsel apparently did not understand that "inert" in this context just means "not the active ingredient," and thus does not exclude a binding agent if the binding agent is used in a granule as a diluent (to reach 100%). This misunderstanding is puzzling given the clear evidence in the record, and particularly given that Tide's Petition for *Inter Partes* Review states that non-active ingredients are called "inert ingredients" in the first paragraph of its Background section: "Pesticides typically contain at least one 'active ingredient' and other 'inert ingredients' for maintaining product performance and usability." Appx67.

"functionally active excipients" still runs contrary to the disclosures in the '685 patent. First, the patent does not distinguish at all between the different kinds of non-active ingredients, as directly evidenced by the citations in UPL's Opening Brief. Second, UPL's arguments that the terms "specified adjuvants" and "other inert ingredients" in the abstract imply a difference between the fillers and the other so-called "functionally active" excipients fall flat when examined in context.

UPL argues that the written description "repeatedly identifies 'fillers' separately from the functionally active excipients, including the claimed 'binding agent.'" Blue Br., pg. 38. In support, though, UPL cites to a litany of disclosures in the patent that clearly reveal the untruth of this argument. The written description lists the active ingredient and all adjuvants, including fillers, in a totally consistent manner, with no description distinguishing them beyond their names.

> An essentially dry pre-mix comprising about 95% to 99% of solids and 1% to 5% moisture and/or solvent is formed from the following ingredients: 40% to 98% of the insecticidally active compound **2**, 0.1% to 5.0% dispersing agent **4**, 0.1% to 3.0% wetting agent **6**, 0.1% to 3.0% binding agent **8**, 0.01% to 0.08% antifoaming agent **10**, 0.01% to 10.0% disintegrating agent **12**, 0.01% to 1.0% stabilizer 14, and fillers 16 to make 100% (w/w).

Appx50 (3:15-22) (cited at Blue Br., pg. 38).

UPL's next two string citations, 3:43-44 and 3:52-53, list the preferred binding agents (sucrose and starch derivatives) and the preferred filler (precipitated silica and kaoline), respectively. Blue Br., pg. 38. There is complete consistency in how the binding agents and fillers are described, as well as all the other non-active

ingredients. Tellingly, these cites immediately follow the ’685 patent’s characterizing all non-active ingredients as “inert ingredients,” although UPL conveniently left that part out of its string cite. *See*, *supra* § II.C.1.

The remaining string citations simply cite to all the examples in the patent, which list out the active ingredient and each of the non-active ingredients in an entirely consistent manner:

EXAMPLE 1

Acephate 97% Granules can be prepared as follows:

Composition

| Ingredients | Quantity (% w/w) |
|---|---|
| Acephate Technical 98.5% purity | 98.48 |
| Dispersing agent | 0.50 |
| Wetting agent | 0.10 |
| Binding agent | 0.10 |
| Antifoaming agent | 0.03 |
| Disintegrating agent | 0.50 |
| Stabilizer | 0.05 |
| Filler | 0.24 |
| Total | 100.00 |

Appx50 (4:29-67).

UPL also attempts to infer that fillers must be “non-functional” by applying contorted readings to disclosures in the ’685 patent. First, UPL applies selective emphasis to a statement in the Abstract: “describing a process involving pre-mixing ‘technical grade phosphoramidothioate [e.g. acephate] with ***specified adjuvants*** and other ***inert ingredients***.’” Blue Br., pg. 39 (emphasis in original). The inference

UPL draws is that the "specified adjuvants" are the "functionally active excipients" and the "inert ingredients" are the fillers.

The far more commonsense inference from this language is that the "specified adjuvants" are all the listed non-actives (including fillers), and the "other inert ingredients" is a vestigial catch-all for additional ingredients. When this description was written, the patent claims were not "consisting of" claims, but instead were "comprising" claims. *See* Appx555-558; *see generally*, Appx535-720. In other words, at the time, the draft claims allowed for the inclusion of additional, unclaimed elements, as this catch-all type sentence suggests. But before issuance, the patentee amended the claims from "comprising," to "consisting essentially of," and finally to the closed claim language "consisting of," mooting the catch-all phrase. Appx555; Appx628; Appx679. Further, as already discussed, the term "inert ingredients" simply meant "non-active" ingredients. Finally, it is grammatically consistent: the word "other" is unnecessary unless meant to distinguish the "specified adjuvants" (which are all inert) from the "***other*** inert ingredients."

UPL tries to bolster its conclusion by pointing to the written description's disclosure that the "specified adjuvants have a maximum of 1% water insoluble matter, while the preferred fillers precipitated silica and kaolin are essentially insoluble in water," and drawing the conclusion that the specified adjuvants must be distinct from the inert ingredients (fillers). Blue Br., pg. 39-40 (internal citations omitted). UPL's inference here still does not hold water. The cited description of 1% water insoluble material is in a ***preferred embodiment*** of the invention. Appx49

(2:44-51) ("Briefly, and in accordance with a preferred embodiment of the invention . . . [t]he specified adjuvants have a maximum of 1% water insoluble matter."). Three of the examples in the patent include less than 1% water insoluble filler. Appx50-51(4:30-5:45) (Example 1 (0.24% filler); Example 2 (0.05% filler), Example 3 (0.13% filler). These three examples are consistent with a preferred embodiment in which ***all the specified adjuvants, including fillers*** have a maximum 1% water insoluble material. This language does not necessitate a departure from a POSITA's understanding of the plain and ordinary meaning of the word "inert" as "non-active."

Thus, UPL's own citations directly contradict its position that fillers are special "non-functional excipients" which are treated differently in the patent than the other "functionally active excipients." All the ingredients are treated exactly the same throughout the written description, and UPL's new proposed construction of fillers as "non-functional" is baseless and waived.

## CONCLUSION

For the foregoing reasons, this Court should affirm the Board's decision that the challenged claims of the '685 patent are unpatentable as obvious.

Dated: August 29, 2022

Respectfully submitted,

*/s/ Bailey K. Benedict*

Bailey K. Benedict
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
Telephone: (713) 654-5331

Thad Kodish
FISH & RICHARDSON P.C.
1180 Peachtree St. NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 724-2792

Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

## CERTIFICATE OF SERVICE AND FILING

I certify that on August 29, 2022, I electronically filed the foregoing **RESPONSE BRIEF** of Appellee using the Court's CM/ECF filing system. Counsel for Appellant were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

Dated: August 29, 2022

*/s/ Bailey K. Benedict*
Bailey K. Benedict

## CERTIFICATE OF COMPLIANCE

The **RESPONSE BRIEF** of Appellee is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The brief contains 10,292 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This **RESPONSE BRIEF** has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.

Dated: August 29, 2022

*/s/ Bailey K. Benedict*
Bailey K. Benedict